**McGuireWoods LLP**
Gateway Plaza
800 East Canal Street
Richmond, VA 23219-3916
Phone: 804.775.1000
Fax: 804.775.1061
www.mcguirewoods.com

**Nicholas J. Giles**
Direct: 804.775.4760

## McGuireWoods

ngiles@mcguirewoods.com

April 28, 2023

**_VIA ECF_**

Patricia S. Connor, Clerk of Court
U.S. Court of Appeals for the Fourth Circuit
Lewis F. Powell, Jr. United States Courthouse Annex
1100 East Main Street, Suite 501
Richmond, Virginia 23219

Re:    Rule 28(j) Letter, *United States v. Lee*, No. 21-4299

Dear Ms. Connor:

By Federal Rule of Appellate Practice 28(j), I write this letter on behalf of Appellant Austin Kyle Lee.  Three pertinent and significant authorities have come to Mr. Lee's attention since filing his briefs:

- *United States v. Fields*, 53 F.4th 1027 (6th Cir. 2022) ("*Fields II*");

- *United States v. Griffin*, No. 17-20639, 2022 WL 2071054 (E.D. Mich. June 8, 2022) (reconsideration denied); and

- *United States v. Legins*, 34 F.4th 304 (4th Cir. 2022).

In *Fields II*, Mr. Fields argued that 21 U.S.C. § 851(c) violates the Sixth Amendment because it requires the judge, not the jury, to decide facts triggering the enhancement for a prior "serious drug felony" conviction under § 841(b)(1)(A).  *Id.* at 1036.  The court considered two opposing district court decisions to resolve this issue: the decision by the district court there ("*Fields I*") and the one here ("*Lee*").  Though it resolved the issue on other grounds, the Sixth Circuit found *Fields I* "more persuasive" than *Lee*.  *Id.* at 1037.

*Griffin* also supports the requirement that a "serious drug felony" be decided by a jury.  There, the court favorably cited *Fields I* (and relegated *Lee* to a footnote) in finding a bifurcated jury trial the proper method to determine whether § 841(b)(1)(A) applied.  2022 WL 2071054, at *9–10.

*Legins* concerns the standard of review.  After finding a Sixth Amendment violation, this Court clarified the remedial analysis, underscoring two takeaways.  First, the omission of an

April 28, 2023
Page 2

element is only harmless "if evidence of the element is overwhelming and uncontroverted." *Legins*, 34 F.4th at 324. And second, that "rule applies to all elements, including sentencing factors." *Id.*

Both *Fields II* and *Griffin* support the merits of Mr. Lee's appeal. Here, the district court committed constitutional error by denying the jury its factfinding role regarding whether the serious-drug-felony enhancement applied. Moreover, because evidence on the enhancement is neither "overwhelming" nor "uncontroverted," the error is not harmless, and so Mr. Lee's sentence should be set aside.

Sincerely,


*/s/ Nicholas J. Giles*
Nicholas J. Giles

*Counsel for Appellant*
*Austin Kyle Lee*

KeyCite Yellow Flag - Negative Treatment

Declined to Extend by  Bergman v. Howard,  6th Cir.(Mich.),   December 12, 2022

53 F.4th 1027
United States Court of Appeals, Sixth Circuit.

UNITED STATES of America, Plaintiff-Appellee,

v.

Timmy L. FIELDS, Defendant-Appellant.

No. 20-5521
|
Argued: June 23, 2021
|
Decided and Filed: November 23, 2022

**Synopsis**

**Background:** After jury convicted defendant of possessing methamphetamine with intent to distribute, the United States District Court for the Eastern District of Kentucky, Robert E. Wier, J., 435 F.Supp.3d 761, imposed statutory sentence enhancement, and defendant appealed.

**Holdings:** The Court of Appeals, White, Circuit Judge, held that:

statute requiring that court ask defendant to "affirm or deny" prior convictions did not violate defendant's Fifth Amendment right against self-incrimination;

imposition of statutory sentence enhancement did not violate Sixth Amendment;

statute requiring judge to determine length and recency of incarceration for prior offenses did not on its face violate Sixth Amendment;

statute requiring district court to hold evidentiary hearing without jury to determine any issues raised by defendant at sentencing that would except him from increased punishment did not prohibit court from sending incarceration-related facts to jury at trial;

district court did not commit plain error in imposing enhancement without first requiring jury to find that each of defendant's state convictions was "final";

defendant's Kentucky conviction for unlawful possession of methamphetamine precursor was not "serious drug felony" for purposes of statutory sentence enhancement; and

defendant's Kentucky conviction for first degree trafficking in controlled substance was "serious drug offense" under Armed Career Criminal Act (ACCA).

Affirmed in part, vacated in part, and remanded.

Murphy, Circuit Judge, concurred and filed opinion in which White, Circuit Judge, joined in part.

Rogers, Senior Circuit Judge, concurred in part, dissented in part, and filed opinion.

Opinion, 🚩 44 F.4th 490, superseded.

**Procedural Posture(s):** Appellate Review; Sentencing or Penalty Phase Motion or Objection.

 **\*1030**  Appeal from the United States District Court for the Eastern District of Kentucky at London. No. 6:19-cr-00029-1—Robert E. Wier, District Judge.

**Attorneys and Law Firms**

ARGUED: Michael J. Stengel, MICHAEL J. STENGEL, PC, Memphis, Tennessee, for Appellant. Andrew C. Noll, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. ON BRIEF: Michael J. Stengel, MICHAEL J. STENGEL, PC, Memphis, Tennessee, for Appellant. Andrew C. Noll, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., Charles P. Wisdom, Jr., Jenna E. Reed, R. Nicholas Rabold, UNITED STATES ATTORNEY'S OFFICE, Lexington, Kentucky, for Appellee.

Before: ROGERS, WHITE, and MURPHY, Circuit Judges.

WHITE, J., delivered the opinion of the court in which MURPHY, J., joined, and ROGERS, J., joined in part. MURPHY, J. (pp. 1054-61), delivered a separate concurring opinion in which WHITE, J., joined except as to Part II.A. ROGERS, J. (pp. 1061-63), delivered a separate opinion concurring in part and dissenting in part.

## AMENDED OPINION

HELENE N. WHITE, Circuit Judge.

 **\*1031**  Defendant Timmy Fields appeals his twenty-five-year mandatory-minimum sentence enhancement imposed for his having committed two prior "serious drug felon[ies]." Fields challenges the procedure used to impose his enhancement and argues as well that neither prior conviction was for a "serious drug felony." Most of Field's challenges lack merit, but we agree that one of the predicate prior convictions was not for a "serious drug felony." Accordingly, we AFFIRM in part, REVERSE in part, and REMAND for resentencing.

## I. BACKGROUND

In January 2020, a jury convicted Defendant Timmy Fields of possessing 500 grams or more of methamphetamine with intent to distribute, in violation of 🚩 21 U.S.C. § 841(a)(1). The district court imposed a statutory sentence enhancement under 🚩 21 U.S.C. § 841(b)(1)(A)(viii), finding that Fields had convictions for two previous "serious drug felon[ies]" in Kentucky—one for possessing a methamphetamine "precursor" with intent to manufacture, the other for trafficking in methamphetamine. Fields raises several challenges to the procedure used to impose the enhancement and the characterization of his prior offenses as "serious drug felonies."

### A. Relevant Statutory and Legal Background

Section 841(b)(1)(A) provides for a twenty-five-year-minimum sentence enhancement if a defendant commits certain violations of 21 U.S.C. § 841(a) "after 2 or more prior convictions for a serious drug felony ... have become final[.]" Prior to the First Step Act, this enhancement provided for a mandatory life sentence after two prior final convictions for a "felony drug offense," which included certain drug-related state or federal offenses punishable by more than a year of imprisonment.

21 U.S.C. § 802(44); First Step Act of 2018, Pub. L. No. 115-391, § 401(a)(2)(A)(ii), 132 Stat. 5194, 5220. The First Step Act lowered this mandatory minimum to twenty-five years and replaced "felony drug offense" with a new term, "serious drug felony." First Step Act § 401(a)(1), (a)(2)(A)(ii). Relevant here, a "serious drug felony" is (1) a "serious drug offense" under 18 U.S.C. § 924(e)(2)(A), for which the defendant (2) served over a year in prison and (3) was released within fifteen years of the commencement of the instant offense. 21 U.S.C. § 802(57). [1]

**\*1032**  A "serious drug offense," as relevant here, means a state-law offense "involving manufacturing, distributing, or possessing with intent to manufacture or distribute, a controlled substance (as defined in [21 U.S.C. § 802]), for which a maximum term of imprisonment of ten years or more is prescribed by law." 18 U.S.C. § 924(e)(2)(A)(ii). So, in this case, prosecutors had to show two prior final convictions for "serious drug offenses" and prove that for each, Fields served over a year in prison and was released within 15 years of the commencement of the instant offense.

Another statutory provision, 21 U.S.C. § 851, governs the procedure for imposing conviction-based statutory sentence enhancements under § 841. Section 851(a) requires the government to file an "information" (often referred to as the "§ 851 notice") informing the defendant of its intent to seek an enhancement based on prior convictions, "stating in writing the previous convictions to be relied upon." 21 U.S.C. § 851(a)(1). Section 851(b) provides that the court—after conviction but before pronouncing a sentence—must ask the defendant if he affirms or denies that he was previously convicted as alleged in the § 851 notice. Id. § 851(b). The court must also "inform [the defendant] that any challenge to a prior conviction which is not made before sentence is imposed may not thereafter be raised to attack the sentence." Id.

Section 851(c) provides that if the defendant "denies any allegation" in the § 851 notice or claims that any conviction is invalid, the defendant "shall file a written response[.]" Id. § 851(c)(1). Then, "[t]he court shall hold a hearing to determine any issues raised by the response which would except the person from increased punishment." Id. This "hearing shall be before the court without a jury[.]" Id. "[E]ither party may introduce evidence," and aside from an exception for claims that a prior conviction was obtained in violation of the Constitution, the government "shall have the burden of proof beyond a reasonable doubt on any issue of fact. At the request of either party, the court shall enter findings of fact and conclusions of law." Id. § 851(c)(1)-(2).

The Sixth Amendment requires that juries determine any facts (except the fact of a conviction) that increase a statutory maximum or mandatory-minimum punishment. Alleyne v. United States, 570 U.S. 99, 103, 111 n.1, 133 S.Ct. 2151, 186 L.Ed.2d 314 (2013); Apprendi v. New Jersey, 530 U.S. 466, 490, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000). Fields argues Alleyne requires that the First Step Act's incarceration facts—"the offender served a term of imprisonment of more than 12 months [for the prior offense]" and "the offender's release from any term of imprisonment was within 15 years of the commencement of the instant offense," § 802(57)—must go to a jury under Alleyne but that § 851 requires a judge to decide them, creating an unsolvable problem.

### B. Factual Background

In April 2019, Kentucky police pulled Fields over and discovered 985 grams of methamphetamine in his vehicle. A few months later, a federal grand jury indicted Fields with one count of possession of 500 grams or more of methamphetamine with intent

to distribute, in violation of 21 U.S.C § 841(a)(1). The indictment also alleged that Fields had two prior "final conviction[s] for ... serious drug felon[ies]" for which he served over a year in prison and was released within fifteen years of the instant offense. R. 1 PID 1-2. The first was for "Trafficking in a Controlled Substance in the First Degree," in violation of Ky. Rev. Stat. § 218A.1412 (the Trafficking Offense). *Id.* PID 1. The second was for "Unlawful Possession of a Methamphetamine Precursor and Persistent Felony **\*1033** Offender," in violation of Ky. Rev. Stat. §§ 218A.1437 & 532.080 (the Meth-Precursor Offense). *Id.* PID 1-2.

Before trial, the government filed a § 851 notice, stating its intent to seek a sentence enhancement based on these two prior convictions. The government also filed a pretrial motion—which Fields did not oppose at the time—to bifurcate the trial into two phases. In the first phase, the government would seek to prove the substantive § 841 drug offense. If Fields were found guilty, the trial would move to a second phase, where the government would seek to prove that Fields had previously been convicted of two serious drug felonies. The court granted the unopposed motion.

### 1. The Trial

The final pretrial conference took place on January 14, 2020, the day before trial. It largely focused on what prior-conviction facts, if any, should go to the jury if the second phase was reached. The district court and government took the position that the Sixth Amendment required the incarceration-related facts (length of incarceration and recency of release) to be decided by the jury. But counsel for Fields argued that "none of it is a jury question," raising the same argument noted above: that under Supreme Court precedent, the additional incarceration-related facts had to be found by a jury, but that § 851 required the court to find them. R. 111 PID 794. Thus, counsel argued, if Fields were convicted, he should "[j]ust be subject to the penalty without any enhancement for prior convictions." *Id.* PID 797.

Trial began the next day. The government put on all its guilt-phase proofs on day one. At the end of the first day, the parties conferred with the court to discuss the § 851 issue further. The court said that if a second phase was necessary, it would likely ask the jury to find whether Fields was convicted of each prior offense and determine, for each, whether he served over a year in prison and was released within fifteen years of his current offense. Counsel for Fields repeated his objection, to which the court responded that the Sixth Amendment, not § 851, determines what questions go to the jury. [2] The court added that its approach may leave Fields with a statutory argument but would likely prevent him from raising a subsequent Sixth Amendment challenge on appeal:

> The Court: ... Well, you know, I understand strategically your argument. I do want to make it clear that I'm extending to the defendant kind of the option of having what I think is the most robust Sixth Amendment protection he can have, and that is for the jury to decide all of it. Down the road, if he's convicted and the jury finds what it finds, if he's got an argument to make, it is going to be that the statutory authority, or clash, as you pointed out, somehow deprives **\*1034** the Court of the power to honor the Sixth Amendment in the way that I'm proposing. It is not going to be there was a violation of the Sixth Amendment by the Court making a finding that the jury could make, because I'm giving him the chance to have it all decided by the jury. Just to make that clear.

> Mr. Hoskins: We recognize that, Your Honor.

R. 107 PID 557-58.

On the second day of trial, the jury deliberated and returned a guilty verdict on the substantive § 841 offense. During deliberations, the court again recognized that Fields "ha[s] an overall objection" to the second-phase jury instructions. R. 108 PID 564. Fields's counsel noted that other than the general objection regarding the appropriate factfinder, "Fields is not going to contest that those two Laurel Circuit Court convictions are him." *Id.* PID 564. Fields, his lawyer, and government counsel

then submitted a stipulation that Fields was convicted of the Meth-Precursor Offense on December 27, 2006 and was convicted of the Trafficking Offense on January 24, 2013. The district court then engaged in the mandated § 851(b) colloquy with Fields, asking him whether he affirmed or denied that he was convicted of these two previous offenses. Fields affirmed that he was.

A brief second phase then began, with the government presenting proof that for both prior convictions, Fields served more than a year in prison and was released within fifteen years from the date of his current offense. Before the jury deliberated, at the close of evidence, Fields's lawyer made an oral motion for judgment of acquittal, arguing that neither prior offense met the legal definition of "serious drug offense." The court denied the motion but noted that Fields had preserved the issue and could develop his arguments prior to sentencing. In a special verdict form, the jury found both factual predicates were satisfied for each prior conviction.

### 2. Sentencing

After trial had concluded and before sentencing, Fields filed an "Objection to § 851 Notice" and an objection to his pre-sentence report, both focusing exclusively on whether his prior offenses were "serious drug offenses," and neither raising any factual disputes regarding the length or recency of his incarceration for the two prior convictions. Regarding the Meth-Precursor Offense, he argued that 🔖 *Shular v. United States*, —— U.S. ——, 140 S. Ct. 779, 206 L.Ed.2d 81 (2020), required the court to ask whether the offense "necessarily entail[ed]" any of the conduct described in 🚩 § 924(e)(2)(A)(ii) and contended that it did not. He also argued that the Trafficking Offense was overly broad because it could encompass trafficking in certain substances that were excluded from federal controlled-substance schedules, including inhalers with levmetamfetamine.

During argument, Fields's counsel emphasized that it was possible to violate the meth-precursor statute before ever beginning the manufacturing process and that the offense did not necessarily entail the predicate conduct. The government responded that the statute's requirement that the defendant possess a methamphetamine ingredient with *intent* to manufacture means that it necessarily entails manufacturing. The district court expressed some skepticism, *see* R. 109 PID 653 ("[C]an you call something that involves intent to use a chemical as a precursor to manufacturing part of manufacturing? Is that logical?"), and posed a hypothetical to test the theory:

> The Court: So if somebody is in a drugstore and shoplifts a pack of Sudafed with the intent to take it to a cook, the **\*1035** second that shoplifting occurs, you would consider that manufacturing?

> [AUSA] Mr. Rabold: Not necessarily. I mean, that's possession of a precursor, but it requires that there is the intent to use it as a precursor of methamphetamine. And that's just - -

> The Court: That's what I said.

> Mr. Rabold: Yes.

> The Court: So in that context, that person is guilty of an offense involving manufacturing?

> Mr. Rabold: I would say so, just based on the plain reading of KRS 218A.1437. That if they possessed that precursor with the intent of using it as a precursor to manufacturing methamphetamine, then that person would then be guilty of that offense.

R. 109 PID 653-54. The court ultimately sided with the government, reasoning that our decision in 🚩 *United States v. Eason*, 919 F.3d 385 (6th Cir. 2019), which found a similar Tennessee conviction to be a serious drug offense, "decides the issue." R. 109 PID 665. The court noted that 🔖 *Shular* may arguably "shrink[ ]" 🚩 *Eason*'s analysis, as the latter relied on a "[p]retty broad

reading" of ⚑ § 924(e)(2)(A)(ii) asking only if the prior crime "related to and connected with manufacturing," but concluded that "⚑ *Eason* is a published Sixth Circuit case that I feel bound by." *Id.* PID 665-66.

Applying the statutory enhancement, the district court sentenced Fields to 300 months in prison (the bottom of the mandatory range), noting that "[w]ithout that mandatory minimum," it would have imposed a lower sentence. *Id.* PID 710. The district court also issued two written orders explaining its reasoning on the § 851 issue and "serious drug offense" issues, respectively. Fields timely appealed.

## II. STANDARD OF REVIEW

Fields raises several legal challenges to his sentencing enhancement, some for the first time on appeal. We review the ones raised below de novo. *See United States v. Mateen,* 764 F.3d 627, 630 (6th Cir. 2014) (en banc) (per curiam); ⚑ *United States v. Green,* 654 F.3d 637, 649 (6th Cir. 2011); ⚑ *Eason,* 919 F.3d at 388. But we apply plain-error review to arguments first raised on appeal, ⚑ *United States v. Cavazos,* 950 F.3d 329, 334 (6th Cir. 2020), requiring (1) an error; that (2) was "plain" (i.e., obvious or clear); (3) affected the defendant's substantial rights; and (4) affected the fairness, integrity, or public reputation of the judicial proceedings. ⚑ *Id.* We first address Fields's challenges to the district court's § 851 procedure. We then address whether his prior convictions were "serious drug offenses."

## III. CHALLENGES TO § 851 PROCEDURE

Fields raises four challenges to the procedure used to impose his enhancement. He first argues that § 851(b) facially violates the Fifth Amendment by compelling defendants to testify regarding previous convictions; second, that § 851(c) facially violates the Sixth Amendment by requiring judges to determine facts—the length and recency of incarceration—that the Constitution requires to be decided by a jury; third, that the court violated § 851 by sending those facts to the jury here; and finally, that the court violated the Sixth Amendment by not requiring the jury to decide whether his prior convictions were "final." We take these arguments in order.

### A. The Fifth Amendment Challenge

Fields first argues that § 851(b) violates a defendant's Fifth Amendment right against self-incrimination by requiring that courts ask defendants to "affirm or deny" prior convictions and warn defendants that they may forfeit challenges they do not raise prior to imposition of sentence. Fields Br. at 17-18. He did not raise this **\*1036** argument below, so plain-error review applies.

The Fifth Amendment provides that no person "shall be compelled in any criminal case to be a witness against himself[.]" U.S. CONST. amend. V. But this privilege "is not a self-executing mechanism; it can be affirmatively waived, or lost by not asserting it in a timely fashion." ⚑ *Maness v. Meyers,* 419 U.S. 449, 466, 95 S.Ct. 584, 42 L.Ed.2d 574 (1975). Generally, answers "are not compelled within the meaning of the Fifth Amendment unless the witness is required to answer over his valid claim of the privilege." ⚑ *Minnesota v. Murphy,* 465 U.S. 420, 427, 104 S.Ct. 1136, 79 L.Ed.2d 409 (1984). The Fifth Amendment "speaks of compulsion. It does not preclude a witness from testifying voluntarily in matters which may incriminate him. If, therefore, he desires the protection of the privilege, he must claim it or he will not be considered to have been 'compelled' within the meaning of the Amendment." ⚑ *Id.* (quoting ⚑ *United States v. Monia,* 317 U.S. 424, 427, 63 S.Ct. 409, 87 L.Ed. 376 (1943)).

Fields never asserted the privilege. Despite being informed of the right not to testify, Fields did not invoke that right when asked if he affirmed or denied his prior convictions. Indeed, prior to being asked that question, he voluntarily stipulated that he had been convicted of those offenses. Fields thus did not suffer a Fifth Amendment violation, and his challenge fails. *See Garner v. United States*, 424 U.S. 648, 653, 96 S.Ct. 1178, 47 L.Ed.2d 370 (1976) ("[A] witness who reveal[s] information instead of claiming the privilege los[es] the benefit of the privilege."); *see also United States v. Jones*, 447 F. App'x 319, 326 (3d Cir. 2011) (rejecting "Jones's facial challenge to 21 U.S.C. § 851(b) under the Fifth Amendment" because "as applied," there was no constitutional violation).

### B. The Sixth Amendment Challenge

Fields next argues that § 851(c) is facially unconstitutional under the Sixth Amendment because it requires the judge to decide facts—the length and recency of incarceration—that should be decided by the jury.

In general, the Sixth Amendment requires the jury to decide any fact that increases the statutory maximum or mandatory-minimum sentence available for a crime. *Alleyne*, 570 U.S. at 103, 133 S.Ct. 2151; *Apprendi*, 530 U.S. at 490, 120 S.Ct. 2348. But there is an exception to this rule for the "fact of conviction." This exception stems from *Almendarez-Torres v. United States*, 523 U.S. 224, 226-27, 118 S.Ct. 1219, 140 L.Ed.2d 350 (1998). The Court has described *Almendarez-Torres* as an "exceptional departure from" and "narrow exception to the general rule." *Apprendi*, 530 U.S. at 487, 490, 120 S.Ct. 2348; *see also Alleyne*, 570 U.S. at 111 n.1, 133 S.Ct. 2151 ("In *Almendarez-Torres*[ ], we recognized a narrow exception to this general rule for the fact of a prior conviction."); *United States v. Haymond*, ––– U.S. ––––, 139 S. Ct. 2369, 2377 n.3, 204 L.Ed.2d 897 (2019) (plurality) (stating that *Almendarez-Torres* provides a "narrow exception[ ] to *Apprendi*'s general rule").

Here, the district court held—and the parties seem to assume—that the Sixth Amendment would require the jury to decide whether, for each prior conviction, Fields was incarcerated for over a year and released within fifteen years of the instant offense. The basis for the district court's view is intuitive. *Alleyne* and *Apprendi* described the *Almendarez-Torres* exception as "narrow" and applying only to the fact of conviction, and the First Step Act's incarceration facts extend beyond the fact of conviction. Further, in justifying the *Almendarez-Torres* exception, the Court has explained that prior convictions **\*1037** are "constitutional[ly] distinct[ ]" because "unlike virtually any other consideration used to enlarge the possible penalty for an offense, ... a prior conviction must itself have been established through procedures satisfying the fair notice, reasonable doubt, and jury trial guarantees." *Jones v. United States*, 526 U.S. 227, 249, 119 S.Ct. 1215, 143 L.Ed.2d 311 (1999). That rationale does not apply to post-conviction facts regarding time served or recency of release. These are *new* facts never previously found in a proceeding with built-in constitutional protections.

But the Court has also sometimes used a broader justification for the *Almendarez-Torres* exception that cuts the other way. The Court has justified the exception on the basis that, traditionally, facts involving recidivism have been within the province of judicial fact-finding and that these facts are usually unconnected with the substantive offense at issue. *See Almendarez-Torres*, 523 U.S. at 243, 118 S.Ct. 1219 (noting that "the sentencing factor at issue here—recidivism—is a traditional, if not the most traditional, basis for a sentencing court's increasing an offender's sentence"); *Jones*, 526 U.S. at 235, 248-49, 119 S.Ct. 1215 (making similar point); *Apprendi*, 530 U.S. at 488, 120 S.Ct. 2348 (pointing out that *Almendarez-Torres* emphasized "the fact that recidivism 'does not relate to the commission of the offense' " (quoting *Almendarez-Torres*,

523 U.S. at 244, 118 S.Ct. 1219)). If *Almendarez-Torres* creates an exception more broadly for "recidivism," there is a case for saying that the incarceration-related facts are a good fit for the exception. They arguably relate only to recidivism, and they are completely unconnected to the current offense.

Two district court decisions directly addressing the Sixth Amendment implications of the new "serious drug felony" incarceration facts have reached opposite conclusions. The difference in their reasoning tracks the separate rationales described above. The district court in our case held that the jury must decide these facts, emphasizing the Court's clear statements that the *Almendarez-Torres* exception is "narrow" and limited solely to the "fact of conviction." *See United States v. Fields, 435 F. Supp. 3d 761, 764 (E.D. Ky. 2020)* (stating that these facts amount to "empirical issues, which rise or fall based on events occurring only after the conviction," and thus "by definition are beyond the 'fact' of conviction (the narrow *Almendarez-Torres* harbor)"); *see also United States v. Beal*, No. 18-00070, 2021 WL 4524159, at *3 n.6 (D. Haw. Oct. 4, 2021) (stating "that the more 'conservative approach' would be to put the question of the serious drug felony determination to the jury before its dismissal"). But a North Carolina district court recently held the opposite, relying more heavily on the "recidivism" justification. *See United States v. Lee*, 2021 WL 640028, at *3-7 (E.D.N.C. Feb. 18, 2021) ("The exception for the fact of a prior conviction is based in the recognition that recidivism does not relate to the commission of the offense." (internal quotation marks omitted)); *see also United States v. Fitch*, No. 19-CR-30, 2022 WL 1165000, at *2 (N.D. Ind. Apr. 19, 2022) (concluding that, although the First Step Act added new facts to consider, those facts are still facts of a prior conviction).

Though both *Fields* and *Lee* give the issue thoughtful consideration, the district court's view in our case appears more persuasive. Although one can find strands of reasoning supporting a broader reading of *Almendarez-Torres*, the Court's repeated descriptions of *Almendarez-Torres* as "narrow" and limited to the "fact of conviction" cut against this approach. But ultimately, we need not (and do not) definitively decide this constitutional issue because even assuming that the incarceration-related facts must be decided by a **\*1038** jury, there was no constitutional violation here.

The basis of Fields's constitutional argument is that § 851(c) requires the judge to decide factual questions (length and recency of incarceration) that must go to the jury under *Alleyne*. But those facts were actually submitted to the jury here. Fields therefore suffered no personal constitutional violation. Instead, his argument is based on a counterfactual hypothetical: he argues that under the correct reading of § 851, the judge *should have* decided these facts himself, and that *had he done so*, he would have violated the Sixth Amendment. That, however, did not happen here. Although Fields has a potential *statutory* argument—that the court did not follow § 851—the district court's application of § 851 did not produce a Sixth Amendment violation.

Fields's facial challenge also fails. Facial challenges only succeed if the challenger can show "that no set of circumstances exists under which the [challenged statutory provision] would be valid." *United States v. Salerno*, 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987). Fields cannot do so. Section 851 applies to all conviction-related enhancements imposed on those convicted of an offense under 21 U.S.C. §§ 841-65, *see id.* § 851(a)(1), and several of those enhancements do not turn on the type of incarceration-related facts that, according to Fields, implicate the Sixth Amendment. *See, e.g., id.* § 841(b)(1)(C) (enhancement for "felony drug offense," which 21 U.S.C. § 802(44) defines without reference to incarceration-related facts); *see also id.* § 842(c)(2)(B); *id.* § 843(d)(1). Fields has not shown that § 851 would be unconstitutional as applied to these types of enhancements.[3] In short, Fields's facial challenge lacks merit. So does any personal "as-applied" challenge (to the extent he brings one), because the jury decided the facts Fields said it needed to decide.

### C. The § 851 Statutory Challenge

The closer question is whether the district court failed to follow § 851. "The requirements delineated in § 851 are mandatory, and a district court cannot enhance a defendant's sentence based on a prior conviction unless" they are satisfied. 🔖 *United States v. King*, 127 F.3d 483, 487 (6th Cir. 1997); *see also* 🔖 *Carachuri-Rosendo v. Holder*, 560 U.S. 563, 569 n.6, 130 S.Ct. 2577, 177 L.Ed.2d 68 (2010) ("Although § 851's procedural safeguards are not constitutionally compelled, they are nevertheless a mandatory feature of the Controlled Substances Act." (citation omitted)); 🔖 *United States v. LaBonte*, 520 U.S. 751, 754 n.1, 117 S.Ct. 1673, 137 L.Ed.2d 1001 (1997) ("[I]mposition of an enhanced penalty is not automatic. ... If the Government does not file [a] notice [under § 851(a)(1)] ... the lower sentencing range will be applied even though the defendant may otherwise be eligible for the increased penalty.").

The question is whether § 851 *required* the district court to decide the incarceration-related facts here—i.e., whether it *precluded* the district court from sending those factual questions to the jury in the post-guilt phase of the bifurcated trial proceeding. Before addressing the parties' arguments on that question, we briefly review § 851's statutory scheme.

### *1039  1.

As relevant here, § 851(a)(1) provides that "[n]o person who stands convicted of an offense under this part [ 🔖 21 U.S.C. §§ 841-65] shall be sentenced to increased punishment by reason of one or more prior convictions, unless before trial, or before entry of a plea of guilty," the government "files an information with the court" and serves a copy on the defendant "stating in writing the previous convictions to be relied upon." 21 U.S.C. § 851(a)(1). Section 851(b) provides that when such an information is filed, "the court shall after conviction but before pronouncement of sentence" ask the defendant "whether he affirms or denies that he has been previously convicted as alleged in the information, and shall inform him that any challenge to a prior conviction which is not made before sentence is imposed may not thereafter be raised to attack the sentence." *Id.* § 851(b).

Section 851(c) provides that if the defendant "denies any allegation of the information of prior conviction, or claims that any conviction alleged is invalid, he shall file a written response to the information" and serve the government with a copy. *Id.* § 851(c)(1). Then, "[t]he court shall hold a hearing to determine any issues raised by the response which would except the person from increased punishment." *Id.* "The hearing shall be before the court without a jury and either party may introduce evidence." *Id.* Aside from one exception (when the defendant asserts that the prior conviction was obtained in violation of the Constitution), the government "shall have the burden of proof beyond a reasonable doubt on any issue of fact." *Id.* § 851(c)(1)-(2). The "failure of the [government] to include in the information ... any facts in addition to the convictions to be relied upon shall not constitute grounds for invalidating the notice[.]" *Id.* § 851(c)(1). "At the request of either party, the court shall enter findings of fact and conclusions of law." *Id.*

Section 851(d)(1) provides that the court "shall proceed to impose sentence" upon the defendant if the defendant fails to respond to the § 851 notice "or if the court determines, after hearing, that the person is subject to increased punishment by reason of prior convictions[.]" *Id.* § 851(d)(1). Section 851(d)(2) provides that the court must—if requested by the government—stay imposition of the sentence to allow for appeal if the court "determines that the person has not been convicted as alleged in the information, that a conviction alleged in the information is invalid, or that the person is otherwise not subject to an increased sentence as a matter of law[.]" *Id.* § 851(d)(2). Finally, § 851(e) prevents defendants from "challeng[ing] the validity of any prior conviction alleged under this section which occurred more than five years before the date of the information alleging such prior conviction." *Id.* § 851(e).

### 2.

The parties first dispute whether § 851 applies to the incarceration-related facts at all. The government argues that § 851's text is limited to questions involving the validity of previous convictions and "does not encompass the resolution of any term-of-imprisonment-related questions at all." Gov't Br. at 18. In support of this argument, it cites portions of § 851(a)(1), (b), and (d)(2) that refer to challenges implicating the validity of convictions, as well as § 851's title ("[p]roceedings to establish prior convictions."). [4] We are not persuaded. **\*1040**

The government picks out portions of § 851 that mention the validity of convictions but omits parts of the statute using broader language, in particular § 851(c)(1), the main sub-section Fields relies on. Section 851(c)(1) provides that "[i]f the person denies *any allegation* of the information of prior conviction," he must file a written response. 21 U.S.C. § 851(c)(1) (emphasis added). "Any allegation" is broad. The subsection adds that the court "shall hold a hearing to determine *any issues raised by the response* which would except the person from increased punishment." *Id.* (emphasis added). Had Congress sought to limit § 851 to challenges involving the validity or existence of convictions, it could have said so here. "[A]ny issues" is far broader. *See, e.g., id.* (stating that the government will have the burden of proof on "*any issue* of fact" in the § 851(c) hearing (emphasis added)). Section 851(c)(1) also expressly contemplates that the hearing may encompass facts beyond the mere fact of conviction. It states that the government's "failure" to "include ... *any facts in addition to the convictions to be relied upon*" will not invalidate the § 851 notice. *Id.* (emphasis added). If the § 851 hearing is focused only on the existence of a conviction, why reference "facts in addition to the conviction"? *See, e.g., Lee,* 2021 WL 640028 at *5 (citing these portions of § 851 and concluding that its scope "encompasses a variety of subsidiary findings necessary to define or qualify [a] prior conviction").

Section 851(c)(1) refers to a "hearing to determine any issues raised by the [defendant's] response which would except the [defendant] from increased punishment." If a defendant has not served over a year in prison or was released more than fifteen years before the present offense, those facts "except [him] from increased punishment." If raised, they fit within § 851's scope.

### 3.

The parties next dispute whether § 851 prevents a court from doing what the court did here: i.e., sending the incarceration-related facts to the jury via a bifurcated proceeding at trial. While we do not agree with the government's precise framing, we ultimately agree that the answer to this close question is "no."

The government argues that nothing in § 851 "mandates that the [district] court *independently* make factual findings, nor prevents the district court from adopting a jury's determinations." Gov't Br. at 20. We have trouble with both assertions. To start, § 851(c)(1) *does* require the court, not a jury, to make certain findings. It requires the court to hold a hearing to determine "any issues" raised by a defendant's written § 851 response, contemplates that this hearing may involve "facts in addition to the convictions to be relied upon," and provides that the "hearing shall be before the court without a jury and either party may introduce evidence." 21 U.S.C. § 851(c)(1). It also states that the government "shall have the burden of proof beyond a reasonable doubt on any issues of fact" in the hearing, and that when requested, "the court *shall enter findings of* **\*1041** *fact* and conclusions of law." *Id.* (emphasis added). These sentences (in part) describe an evidentiary hearing. Clearly, if the jury is not present to evaluate evidence in that hearing, only the court can decide the "issues of fact" raised in it. It follows that when there are issues left to be resolved in a § 851(c) hearing (i.e., unresolved factual issues raised by the defendant's written § 851 notice), the court is the entity that decides those issues.

There are two problems with the government's argument that nothing in § 851 bars the court from *adopting* the jury's factual findings, as if they were optional recommendations. First, the court did not purport to "adopt" the jury's findings here. *See* R. 72 PID 293 ("These post-conviction factual criteria ... are for the jury alone to evaluate."). Second, if the Sixth Amendment requires a jury to decide the incarceration-related facts at issue here—as the government argued below and seems to assume on appeal—there could well be a constitutional problem with concluding that a court could treat a jury's findings as "recommendations" it could choose to adopt or reject. Under that view, the judge, not jury, would make the final factual determination. That would

"reduce[ ] the jury's role 'to the relative importance of low-level gatekeeping.' " *United States v. Booker,* 543 U.S. 220, 230, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005) (quoting *Jones,* 526 U.S. at 244, 119 S.Ct. 1215).

Yet a slightly different framing makes the argument more plausible. Nothing in § 851 expressly forbids a court from sending factual questions to a jury during a bifurcated trial merely because they may come up later in a § 851(c) hearing. The statute is silent on what a court can and cannot do during the trial phase of a criminal proceeding. Fields notes that § 851(c)(1) refers to a hearing "before the court without a jury," and argues that this language expressly precludes the jury's involvement, adding that in *Booker,* the Court read 18 U.S.C. § 3553(a)(1)'s use of the phrase "the court" to "mean 'the judge without the jury,' not 'the judge working together with the jury.' " *Booker,* 543 U.S. at 249, 125 S.Ct. 738. We agree, of course, that the phrase "before the court without a jury" means what it says and precludes a jury's involvement. But the question is how far this language extends—i.e., *at what point* the jury's involvement is precluded. Section 851 clearly requires a court, not a jury, to decide disputed issues *when the § 851 hearing happens.* But a § 851 hearing necessarily cannot occur until a defendant files a written § 851 response. *See* 21 U.S.C. § 851(c)(1). Fields had not filed a § 851 response when phase two of the trial proceeding occurred; therefore, phase two of the trial could not have been a § 851(c)(1) hearing. [5] And Fields never explains how the statute extends to prohibit **\*1042** the court from sending questions to the jury before the § 851 hearing, during a bifurcated trial.

Because the text does not clearly prohibit what the district court did here, the most Fields can hope to show is that § 851 is capable of competing plausible constructions, including his. But when a "statute is susceptible of 'two plausible ... constructions,' one of which 'would raise a multitude of constitutional problems, the other should prevail.' " *United States v. Erpenbeck,* 682 F.3d 472, 476 (6th Cir. 2012) (quoting *Clark v. Martinez,* 543 U.S. 371, 380-81, 125 S.Ct. 716, 160 L.Ed.2d 734 (2005)). To the extent that is the case here, this canon cuts against Fields's reading, which would create constitutional problems that a contrary reading would avoid. [6]

**\*1043**

\*\*\*\*

In sum, we conclude that the district court's bifurcated procedure in this case did not violate § 851. Nothing in the statute explicitly forbids the district court from submitting to the jury the factual questions it submitted at the point it did so.

### D. The "Finality of Conviction" Argument

Fields makes one last challenge to the district court's procedure. He argues that the district court violated the Sixth Amendment by failing to require the jury to find the "fact" that each of his previous state-law convictions was "final." Fields Br. at 22. Fields never requested that the jury make such a finding and never raised this argument below. We thus review for plain error.

Fields has not shown that any error was "plain." He cites no cases adopting his position, and "[a] lack of binding case law that answers the question presented will ... preclude our finding of plain error." *United States v. Al-Maliki,* 787 F.3d 784, 794 (6th Cir. 2015); *see also United States v. Gonzalez,* 584 F. App'x 188, 190 (5th Cir. 2014) ("Gonzalez is unable to show a clear or obvious error on the question whether the finality of the prior conviction is an issue beyond the fact of a prior conviction.") (citing *Alleyne,* 570 U.S. at 116, 133 S.Ct. 2151; *Almendarez-Torres,* 523 U.S. at 239-47, 118 S.Ct. 1219)). The government also points out that Fields has not shown that the error affected his substantial rights, as the plain-error standard requires. *Cavazos,* 950 F.3d at 334; *see* Gov't Br. at 28-29 ("Fields served his years-long sentence for each conviction and was initially released on parole for those convictions in 2010 and 2014, respectively. There is no doubt that his prior convictions

long ago became final." (citation omitted)). Fields fails to contest that point in his reply brief. In short, Fields fails to show that plain error warrants reversal on this argument.

## IV. THE "SERIOUS DRUG OFFENSE" CHALLENGES

In his second category of challenges, Fields argues that neither of his prior convictions—both for criminal offenses in Kentucky —qualifies as a "serious drug offense." His first conviction is the Meth-Precursor Offense: a 2006 conviction for violating Kentucky's statute prohibiting possession of a methamphetamine precursor with intent to manufacture. The second is the Trafficking Offense: a 2013 conviction for violating Kentucky's drug-trafficking statute. As relevant here, a "serious drug offense" is "an offense under State law, involving manufacturing, distributing, or possessing with intent to manufacture or distribute, a controlled substance (as defined in [ 21 U.S.C. § 802]), for which a maximum term of imprisonment of ten years or more is prescribed by law[.]" 18 U.S.C. § 924(e)(2)(A)(ii).

To assess Fields's challenges, we use the "categorical approach." That approach looks only to the statutory definitions of the prior offenses, not the facts underlying each conviction. *Eason*, 919 F.3d at 388. It asks if the underlying state conviction, "by definition, ... falls within [the] category" of offenses described by the federal statute. *Mellouli v. Lynch*, 575 U.S. 798, 805, 135 S.Ct. 1980, 192 L.Ed.2d 60 (2015). We "must presume that the [previous] conviction rested upon nothing **\*1044** more than the least of the acts criminalized under the state statute." *Id.* (internal quotation marks omitted). The inquiry is "hypothetical" and asks if "someone [could] commit [the] crime of conviction without" meeting the federal enhancement's criteria. *Pereida v. Wilkinson*, ––– U.S. ––––, 141 S. Ct. 754, 762, 209 L.Ed.2d 47 (2021). But sometimes we must first ask a factual question: "what was [the] crime of conviction?" *Id.* This arises when a state law is "divisible," i.e., has "multiple, stand-alone offenses, some of which" meet the federal criteria and "others of which do not." *Id.* at 762-63. In those cases we use a "modified categorical approach," "consult[ing] a limited class of documents[ ] to determine which alternative formed the basis of the ... prior conviction[.]" *Eason*, 919 F.3d at 388 (internal quotation marks omitted). [7]

### A. The Meth-Precursor Offense

In 2006, Fields was convicted of a first-time violation of Ky. Rev. Stat. § 218A.1437, the meth-precursor statute, for "Unlawful Possession of a Methamphetamine Precursor" and received an enhancement under Ky. Rev. Stat. § 532.080 for being a "persistent felony offender in the first degree." The meth-precursor statute proscribes "knowingly and unlawfully" possessing certain chemicals with intent to use them as a precursor to manufacturing methamphetamine. *Id.* § 218A.1437(1). A first-time violation is a "Class D" felony, *id.* § 218A.1437(3), which carries a five-year maximum sentence "[u]nless otherwise provided by law," *id.* § 532.060(2)(c)-(d). But a "persistent felony offender in the first degree" who commits a Class D felony is subject to at least a ten-year maximum sentence. *Id.* § 532.080(6).

Fields argues that his Meth-Precursor Offense is not a "serious drug offense" because it (1) does not carry a ten-year maximum sentence and (2) does not "necessarily entail" the conduct described in 18 U.S.C. § 924(e)(2)(A)(ii). The first argument is foreclosed by *United States v. Rodriquez*, 553 U.S. 377, 128 S.Ct. 1783, 170 L.Ed.2d 719 (2008), [8] so we focus on the second one. It relies heavily on *Shular v. United States*, ––– U.S. ––––, 140 S. Ct. 779, 206 L.Ed.2d 81 (2020). Fields argues that *Shular* requires us to ask whether the Meth-Precursor Offense necessarily entails any of the conduct described in § 924(e)(2)(A)(ii), and that because the Meth-Precursor Offense does not necessarily entail "manufacturing," the only relevant

prong of § 924(e)(2)(A)(ii), his enhancement cannot stand. He acknowledges, however, that in 2019 we held that a similar Tennessee statute—barring possession of methamphetamine **\*1045** ingredients with recklessness as to their potential use in manufacturing—*was* a "serious drug offense." *Eason, 919 F.3d at 390-92.* But *Eason* was a pre-*Shular* decision, and Fields argues that because *Eason*'s test—requiring only that the prior offense be related to or connected with the conduct listed in § 924(e)(2)(A)(ii)—is far broader than *Shular*'s, *Eason* should not control our decision here.

Because the Meth-Precursor Offense would constitute a "serious drug offense" under *Eason*'s broader "relates to or connects with" test, but may not under *Shular*'s "necessarily entails" test, our threshold question is which standard applies.

### 1.

Prior to *Shular*, most circuits, including ours in *Eason*, interpreted the word "involving" in § 924(e)(2)(A)(ii) to require only that a prior state offense "relate to or connect with" the offenses listed in § 924(e)(2)(A)(ii). *See Eason, 919 F.3d at 390-91* (collecting cases). But a few circuits read "involving" more narrowly. *See United States v. Franklin, 904 F.3d 793, 800-02 & n.9 (9th Cir. 2018)* (rejecting the "relates to or connects with" test as overly broad), *abrogated on other grounds by Shular, 140 S. Ct. at 784*; *United States v. Brandon, 247 F.3d 186, 191 (4th Cir. 2001)* (asking, more narrowly, whether the prior offense "intrinsically involves the proscribed conduct" in § 924(e)(2)(A)(ii), or whether that "conduct is an inherent part or result of the generic [state] crime of conviction"). There are dictionary definitions supporting both views. [9]

At the same time the "relates to or connects with" line of cases developed, courts considering similar provisions outside the § 924(e)(2)(A)(ii) context often interpreted "involving" more narrowly. The most significant example is the Supreme Court's decision in *Kawashima v. Holder, 565 U.S. 478, 481, 484-85, 132 S.Ct. 1166, 182 L.Ed.2d 1 (2012).* Applying the categorical approach, *Kawashima* held that an immigration statute providing for removal upon commission of an offense that "involves fraud or deceit" applies to "offenses with elements that *necessarily entail* fraudulent or deceitful conduct." *Id.* (emphasis added). Several decisions in other contexts have taken similar approaches. [10]

**\*1046** *Shular* appeared to adopt the *Kawashima* interpretation of "involves" in the § 924(e)(2)(A)(ii) context. The parties in *Shular* disagreed on the type of categorical analysis § 924(e)(2)(A)(ii) calls for. The defendant argued for a "generic-offense matching exercise," under which state-law convictions only constitute "serious drug offenses" if their elements match the *elements* of the "generic" versions of the offenses listed in § 924(e)(2)(A)(ii). *140 S. Ct. at 783-84.* The government argued that the *Kawashima* test should apply instead, which requires courts to ask if the elements of the prior offense necessarily entail *conduct* described in § 924(e)(2)(A)(ii), without the need to define a generic offense. The Court concluded that the government's reading was the correct one. *See id. at 784-85* ("In the Government's view, a court should apply 'the *Kawashima* categorical approach': It should ask whether the state offense's elements 'necessarily entail one of the types of *conduct*' identified in § 924(e)(2)(A)(ii) .... The Government's reading, we are convinced, correctly interprets the statutory text and context.").

Post-🚩 *Shular*, several circuits that previously applied (or favorably cited cases applying) the "relates to or connects with" test have recognized that 📍 *Kawashima*'s "necessarily entails" test now governs in 🚩 § 924(e)(2)(A)(ii) contexts. *See United States v. Godinez*, 955 F.3d 651, 656-57 (7th Cir. 2020); *United States v. Coleman*, 977 F.3d 666, 669-70 (8th Cir. 2020); *United States v. Smith*, 983 F.3d 1213, 1223 (11th Cir. 2020). [11]  The Ninth Circuit—which rejected this broader test pre-🚩 *Shular*, *see* 🚩 *Franklin*, 904 F.3d at 800-02 & n.9—has recognized the same in a post-📍 *Shular* decision. *United States v. Davis*, 806 F. App'x 572, 574 (9th Cir. 2020).

One panel is usually bound by the ruling of a previous one, but there is an exception to that rule when the Supreme  **\*1047**  Court issues an intervening decision that is directly on point. *Ne. Ohio Coal. for the Homeless v. Husted*, 831 F.3d 686, 720-21 (6th Cir. 2016). That exception applies even when the intervening Supreme Court decision is *not* "precisely on point" but provides "directly applicable" legal reasoning, *id.*, or when it provides on-point dictum, *see In re Baker*, 791 F.3d 677, 682-83 (6th Cir. 2015) (stating that on-point Supreme Court dictum in bankruptcy case governed rather than prior panel holding, to extent the two conflicted). Here, 📍 *Shular* is directly on point. It held that the government "correctly" read 🚩 § 924(e)(2)(A)(ii), and the government had asserted that the statute calls for courts to "ask whether the state offense's elements 'necessarily entail one of the types of *conduct*' identified in 🚩 § 924(e)(2)(A)(ii)." 📍 *Shular*, 140 S. Ct. at 784-85. To the extent that this "necessarily entails" test was part of the Court's underlying rationale for adopting the government's conduct-based interpretation, we are bound to follow it. *See Ne. Ohio Coal. for the Homeless*, 831 F.3d at 721.

We are aware of no circuit decisions declining to follow 📍 *Shular*'s discussion of the "necessarily entails" test on the basis that it was dictum. And some decisions have expressly stated that this discussion was part of 📍 *Shular*'s holding. *See Smith*, 983 F.3d at 1223 ("The Supreme Court held that a court determining whether an offense qualifies as a serious drug offense need only consider whether the offense's elements 'necessarily entail' the types of conduct identified in the ACCA's definition rather than engage in a 'generic-offense matching exercise.' " (quoting 📍 *Shular*, 140 S. Ct. at 783-84)); *United States v. Curry*, 833 F. App'x 328, 329 (11th Cir. 2020) (same). But we note that *after Shular* stated that the government "correctly" read 🚩 § 924(e)(2)(A)(ii) as requiring courts to apply the " 📍 *Kawashima* categorical approach," it noted—in a single sentence three paragraphs later—that the parties agreed on the dictionary definition of "involve" as meaning "necessarily require." 📍 *Shular*, 140 S. Ct. at 783-85. [12]  The same is the case here.

Though no party raises it, we can imagine an argument that 📍 *Shular*'s recognition of party agreement on that definition somehow deprived its discussion of the "necessarily entails" test of any precedential value. A close reading of 📍 *Shular*, however, cuts the other way. It is true that the parties agreed on the definition of "involving," but they did not agree on the test to apply in 🚩 § 924(e)(2)(A)(ii) cases. That was the dispute the Court aimed to resolve. *See* 📍 *id.* at 782 ("This case concerns the methodology courts use to apply that definition."); 📍 *id.* at 783-84 (describing the generic element-matching test and then the 📍 *Kawashima* "necessarily entails" test, then stating, "[t]his case invites us to decide which of the two categorical methodologies just described applies").

The Court set up and resolved that dispute by describing both parties' proposed approaches and affirmatively choosing the government's test. *See* 📍 *id.* at 784-85 ("In  **\*1048**  the Government's view, a court should apply 'the 📍 *Kawashima* categorical approach' [and] ask whether the state offense's elements 'necessarily entail one of the types of *conduct* identified in 🚩 § 924(e)(2)(A)(ii).... The Government's reading, we are convinced, correctly interprets the statutory text and context."). The Court's recognition—in a single sentence, three paragraphs later—that the parties agreed on the dictionary definition of "involve" does

not erase its previous articulation of its *own* position: that the government's interpretation (that the 🚩 *Kawashima* test applies) was the "correct[ ]" one. 🚩 *Id.* at 785.

The view that 🚩 *Shular*'s holding focused *solely* on whether 🚩 § 924(e)(2)(A)(ii) referred to *conduct* or *generic elements*, and that any comment on the applicable test (i.e., 🚩 *Kawashima*'s test or something else) was extraneous carves out the Court's explicit recognition that the government "correctly interpreted" 🚩 § 924(e)(2)(A)(ii) as requiring inquiry into whether a state offense's elements "necessarily entailed" the conduct listed in the provision. This view also supposes that the Court—despite setting out to identify the correct "methodology courts use to apply" the serious-drug-offense definition, 🚩 *id.* 782—chose to *avoid* articulating the proper test, and that it did so without noting that it did not intend its articulation of the "correct[ ]" test to be binding.

Further, 🚩 *Shular* resolved a dispute over whether the generic-offense test or some other test applied. One side said the generic-offense test applied while the other said the 🚩 *Kawashima* test applied. The Court said the latter represented a correct reading of the statute. That statement—that 🚩 *Kawashima*'s test is the "correct[ ]" one—was part of its answer to the central issue raised in the case. That statement was not dictum, *see* 🚩 *Wright v. Spaulding*, 939 F.3d 695, 701 (6th Cir. 2019) ("The decision of the issue must contribute to the judgment[.]"), and, at minimum, is certainly an intervening on-point statement of the Court. [13] Further, as Judge Murphy thoughtfully explains in his separate opinion, it is the better understanding of the word "involve."

We thus conclude that we should follow 🚩 *Shular* and now ask whether the elements of Fields's state offenses "necessarily entail" conduct described in 🚩 § 924(e)(2)(A)(ii). All agree that "manufacturing" is the only conduct implicated. So, we ask if the Meth-Precursor Offense "necessarily entails" manufacturing.

### *1049 2.

🚩 Section 924(e)(2)(A)(ii) does not define "manufacture" but the Controlled Substances Act does. It defines manufacture to "mean[ ] the production, preparation, propagation, compounding, or processing of a drug or other substance, either directly or indirectly or by extraction from substances of natural origin, or independently by means of chemical synthesis or by a combination of extraction and chemical synthesis[.]" 🚩 21 U.S.C. § 802(15). When used in connection with a word like "substance" or "drug," the words in this definition connote (1) the creation of a final product from component ingredients and (2) the initiation of a *process* for doing so. [14]

Statutory context indicates that 🚩 § 802(15)'s definition of "manufacture" does not encompass mere possession of a precursor with intent to manufacture. Congress chose to create separate substantive offenses for "manufacturing" (*see* 🚩 21 U.S.C. § 841(a)(1)), on the one hand, and possession of ingredients with intent to manufacture, on the other, *see, e.g.*, 🚩 *id.* §§ 841(c)(1), 🚩 843(a)(6). Reading 🚩 § 802(15)'s definition of "manufacture" to include possession with intent to manufacture would collapse the distinction between these crimes; and if Congress meant the word "manufacture" to include possession with intent, it would have been pointless to treat that conduct as a crime separate from the substantive offense of manufacturing.

### 3.

The Kentucky meth-precursor statute prohibits the "unlawful possession" of a "drug product or combination of drug products containing ephedrine, pseudoephedrine, or phenylpropanolamine, or their salts, isomers, or salts of isomers, with the intent to use the drug product or combination of drug products as a precursor to manufacturing methamphetamine or other controlled substance." Ky. Rev. Stat. § 218A.1437(1). [15]

In Kentucky's methamphetamine-focused statutory framework, the meth-precursor **\*1050** statute sits near the bottom of the ladder. It applies when someone possesses *one* of the chemicals listed in § 218A.1437(1) with intent to manufacture methamphetamine. Possession of two or more of those chemicals—or any others used for manufacturing methamphetamine— is a more serious Class B felony under Kentucky's methamphetamine-manufacturing statute. Ky. Rev. Stat. § 218A.1432(1)(b). That statute proscribes "knowingly and unlawfully" (a) manufacturing methamphetamine or (b) "[w]ith intent to manufacture methamphetamine possess[ing] two (2) or more chemicals or two (2) or more items of equipment for the manufacture of methamphetamine." *Id.* § 218A.1432(1)(a)-(b).

The "only difference" between the meth-precursor statute and the chemical-possession subsection of the methamphetamine-manufacturing statute is that "the manufacturing-methamphetamine statute requires possession of additional contraband beyond that necessary for a possession-of-a-methamphetamine-precursor conviction." *Sevier v. Commonwealth*, 434 S.W.3d 443, 451-52 (Ky. 2014) (noting that the methamphetamine-manufacturing statute's chemical-possession prong has, for practical purposes, the same "intent" element as the meth-precursor statute and "simply requires proof of an *additional* fact"—"possession of an additional chemical").

The Kentucky Supreme Court has stated that both the meth-precursor statute and "chemical-possession" prong of the methamphetamine-manufacturing statute can be violated before it is even possible to begin the manufacturing process. *See Kotila v. Commonwealth*, 114 S.W.3d 226, 240 (Ky. 2003) ("KRS § 218A.1437(1) ... [was] intended to fill the gap where there is proof of possession of a methamphetamine precursor ... but not proof of possession of ... other chemicals necessary to manufacture methamphetamine.") [16]; *Sizemore v. Commonwealth*, 2011 WL 317474 at \*3 (Ky. Jan. 27, 2011) (noting that § 218A.1432(1)(b) does "not actually require that [the defendant] had been actively 'involved' in manufacturing methamphetamine" or the " 'manufacturing process' "); *id.* (adding that statute requires no "immediate intent to manufacture" and "impl[ies]" that an intent to manufacture at some point in the future would suffice").

### 4.

With that understanding, we turn to the parties' arguments. The government argues that the meth-precursor statute requires intent to manufacture and therefore necessarily entails manufacturing. Fields **\*1051** replies that intent to take an action does not necessarily mean the action will occur and argues that the statute plainly does not require that someone manufacture a controlled substance. Fields is correct.

To start, Kentucky's Supreme Court has specifically recognized that the meth-precursor statute was meant to apply when a defendant was not yet even *capable* of manufacturing methamphetamine because he did not yet possess the materials necessary to do so. *Kotila*, 114 S.W.3d at 240. It is hard to say that a statute tailored to situations where manufacture is not yet possible "necessarily entails" manufacturing conduct. Indeed, when a defendant possesses more than one methamphetamine ingredient, the harsher § 218A.1432(1)(b) statute would apply instead. *Sevier*, 434 S.W.3d at 451-52. And the Kentucky Supreme Court has expressly stated that even that statute does not "actually require that [the defendant] had been actively 'involved' in manufacturing methamphetamine" or the " 'manufacturing process.' " *Sizemore*, 2011 WL 317474 at \*3. That observation

necessarily applies to the meth-precursor statute as well, given that the two statutes target the same conduct and intent. *Sevier, 434 S.W.3d at 451-52.*

These statements from the Kentucky Supreme Court show that the answer to our dispositive question—whether a violation of § 218A.1437(1) necessarily entails "manufacturing" methamphetamine—is "no." So does common sense. Consider a variation on the district court's hypothetical: "somebody is in a drugstore and shoplifts a pack of Sudafed with the intent to take it to a [methamphetamine] cook" a month later, but is arrested right after leaving the store. [17] It is hard to see how that person was "manufacturing" methamphetamine. Because the person does not yet have ingredients other than pseudoephedrine (if he did, he would be facing § 218A.1432(1)(b) charges instead), he necessarily cannot yet begin the process of combining ingredients to form a finished product.

The government asserts that because a defendant convicted of the Meth-Precursor Offense must have an intent to manufacture, "the necessary result or consequence of his possession [is] the manufacture of methamphetamine." Gov't Br. at 35. This logic does not hold together. Intent to take an action does not necessarily mean the action will occur. The shoplifter example bears that out. Because the shoplifter was arrested, no manufacturing process ever began. [18]

Believing that *Eason* decides the issue, the district court reached the opposite conclusion. To be sure, *Eason* is analogous; it found a conviction under a similar state statute to be a "serious drug offense." *919 F.3d at 387-92.* But *Eason* asked if that offense "related to or connected with" manufacturing, a far broader (and more elastic) question. *See Mellouli, 575 U.S. at 811-12, 135 S.Ct. 1980* (noting that phrases like "relating to[ ] are broad and indeterminate" and "stop nowhere" when "extended to the furthest stretch of their indeterminacy" (citations, alterations, and internal quotation marks omitted)). [19] Possessing a **\*1052** precursor with intent to manufacture may "relate to and connect with" manufacturing, but the *Shular* question is whether it "necessarily entails" manufacturing. The latter test is narrower, and *Eason* never applied it.

The government makes one last argument: it points out that another provision of the "serious drug offense" definition covers any offense under the Controlled Substances Act (CSA) with a maximum sentence of ten or more years, 18 U.S.C. § 924(e)(2)(A)(i); contends that possessing a precursor with intent to manufacture would amount to a CSA offense for possessing certain kinds of chemicals with intent to manufacture under 21 U.S.C. § 843(a)(6) (which provides a ten-year maximum sentence when applied to methamphetamine, *id.* § 843(d)(2)); and argues that Congress "could [not] have intended to exclude state offenses that necessarily require the intent to use a substance to manufacture methamphetamine, because that same conduct, when charged under [§ 843(a)(6)], qualifies as a 'serious drug offense.' " Gov't Br. at 36.

Again, we are not persuaded. We are interpreting § 924(e)(2)(A)(ii) here, not § 924(e)(2)(A)(i). If Congress wanted, it could have defined "serious drug offense" to include any state-law offense that, had it been prosecuted federally, would have fit the criteria described in § 924(e)(2)(A)(i). Elsewhere, it has done just that. *See, e.g.,* 18 U.S.C. § 3559(c)(2)(H)(i)-(ii) (defining the term "serious drug offense," in a different context, to mean either an offense under certain federal drug-law provisions or a state-law offense "that, had [it] been prosecuted in a [federal] court ... would have been punishable under" those same federal provisions). But it chose not to here. The categorical approach requires us to focus on the words Congress used in the enhancement being applied. The government's final argument strays too far afield from that task. [20]

In short, it is possible to violate the meth-precursor statute without committing manufacturing conduct. Accordingly, the Meth-Precursor Offense does not "necessarily entail" manufacturing under § 924(e)(2)(A)(ii) and does not constitute a "serious drug offense."

### B. The Trafficking Offense

Fields also argues that his second state-court conviction—for first degree **\*1053** trafficking in a controlled substance, in violation of Ky. Rev. Stat. § 218A.1412—does not constitute a "serious drug felony." This provision prohibited "knowingly and unlawfully traffic[king]" in a number of drugs, including "methamphetamine." Ky. Rev. Stat. § 218A.1412(1) (effective June 8, 2011 to March 24, 2015). Fields argues that this offense is overly broad because at the time of his offense (2012/13), an over-the-counter inhaler containing certain levels of levmetamfetamine would have fit within Kentucky's definition of an illegal "methamphetamine," while federal regulations exempted the same kind of over-the-counter inhaler. The problem with this argument, however, is that another Kentucky statute required the state agency responsible for scheduling controlled substances to "exclude any nonnarcotic substance from a schedule if the substance may be lawfully sold over the counter without prescription" under the Federal Food, Drug, and Cosmetic Act (FDCA) or the Federal Comprehensive Drug Abuse Prevention and Control Act of 1970. Ky. Rev. Stat. § 218A.020(4). The FDA exempted the inhaler from federal schedules in 2010, two years before his 2012 Trafficking Offense. *See* 75 Fed. Reg. 13678, 13678 (Mar. 23, 2010) (final rule categorizing this inhaler as a "nonnarcotic drug product[ ] which may be lawfully sold over the counter without a prescription under the [FDCA]").

Though the relevant state agency had not yet exempted the inhaler from state schedules, *see* 902 K.A.R. 55:040 (2012 ed.), [21] a Kentucky statute required the inhaler to be exempted, and the relevant Kentucky statutes therefore do not support Fields's contention that Kentucky law defined "methamphetamine" more broadly than federal law.

Finally, in a barely developed argument, Fields argues that the Kentucky trafficking statute is overly broad because Kentucky's definition of "trafficking" includes "dispensing," which is "excepted from 18 U.S.C. § 924(e)(2)(A)(ii)." Fields Br. at 31. Fields looks to *United States v. Goldston* to support this assertion. 906 F.3d 390 (6th Cir. 2018). In that case, however, we rejected the argument that Tennessee's definition of "deliver" was overly broad for including "dispensing" because Tennessee does not actually criminalize "dispensing" in that by definition dispensing can only occur "by or pursuant to the *lawful* order of a practitioner." *Id.* at 395 (quoting Tennessee law). Under Kentucky's statutory scheme, "[d]ispens[ing]" is also defined as "deliver[ing] a controlled substance ... by or pursuant to the lawful order of a practitioner," Ky. Rev. Stat. § 218A.010(11), which, following *Goldston*'s reasoning and the fact that Fields cites no other case to support his argument, makes it equally unrealistic that Kentucky would apply § 218A.1412 to conduct falling outside § 924(e)(2)(A)(ii)'s coverage. *Cf. Goldston,* 906 F.3d at 395-97; *see also United States v. Fox*, No. 20-6039, 2021 WL 3747190 at *2-4 (6th Cir. Aug. 25, 2021) (concluding that "Kentucky's first-degree drug-trafficking qualifies as a 'serious drug felony' under the First Step Act"). Thus, we reject Field's final argument.

### V. CONCLUSION

In sum, we reject Fields's challenges to the procedure used to impose his enhancement and his argument that the Trafficking Offense was not a "serious drug offense." We agree with Fields that the Meth-Precursor Offense was not a "serious drug offense" and therefore cannot serve **\*1054** as a "serious drug felony" for purposes of Fields's twenty-five-year-mandatory-minimum enhancement. We therefore AFFIRM in part, VACATE Fields's sentence, and REMAND for resentencing consistent with this opinion.

### CONCURRENCE

MURPHY, Circuit Judge, concurring.

I concur in Judge White's excellent opinion for the court. I write to add a few more thoughts on whether we should follow the narrow interpretation of the word "involving" from *Shular v. United States*, ––– U.S. ––––, 140 S. Ct. 779, 206 L.Ed.2d 81 (2020), or stick with the broad interpretation from *United States v. Eason*, 919 F.3d 385 (6th Cir. 2019). I find the issue difficult. We have a duty to follow a published precedent like *Eason*, and its reading comports with the near consensus of courts that considered this issue before *Shular*. Yet *Shular*'s reasoning calls *Eason* into doubt. And the federal government—which appears to have changed positions between *Eason* and *Shular*—does not ask us to follow *Eason*'s broad interpretation as a precedential matter. At day's end, I view *Shular*'s reading as the correct one. And because *Shular* allows us to depart from *Eason* under our precedent on precedent, we should adopt that reading here.

## I

Several federal drug laws increase the length of a defendant's sentence if the defendant has one or more prior convictions for a "serious drug felony," a phrase that incorporates the Armed Career Criminal Act's definition of "serious drug offense." 21 U.S.C. §§ 802(57), 841. The Armed Career Criminal Act, in turn, defines "serious drug offense" to cover "an offense under State law, involving manufacturing, distributing, or possessing with intent to manufacture or distribute, a controlled substance" if the offense has a maximum punishment of ten or more years in prison. 18 U.S.C. § 924(e)(2)(A)(ii). This definition raises a recurring question of great importance for defendants convicted of various drug or firearm offenses. Suppose a defendant has previously committed a state crime like attempting to manufacture drugs, conspiring to distribute drugs, or possessing an ingredient with an intent to manufacture drugs. Do these inchoate crimes "involve" drug "manufacturing" or "distributing" under § 924(e)(2)(A)(ii) even if a person can accomplish them without engaging in anything that resembles manufacturing or distributing?

This case brings us to a fork in the road on this question. Down one path, we could continue to follow *Eason*. That decision treated these types of incomplete crimes as "serious drug offenses" even if a defendant could commit them without manufacturing or distributing drugs (or possessing drugs with the required intent). 919 F.3d at 390–92; *see also United States v. Myers*, 925 F.3d 881, 884–86 (6th Cir. 2019); *Young v. Quintana*, 2019 WL 11863648, at *4 (6th Cir. May 15, 2019). *Eason* considered a Tennessee law that barred a person from buying a methamphetamine ingredient with reckless disregard as to whether the ingredient would be used to make methamphetamine. 919 F.3d at 388–89. There, we interpreted the statutory definition's key word—involving—to mean "related to or connected with[.]" *Id.* at 390 (citation omitted). And while a defendant could commit the crime by merely buying an ingredient (without starting the manufacturing process), we found that this conduct was related to manufacturing because it was "an essential first step to the drug's manufacture." *Id.* at 391. This broad reading adopted the government's position in *Eason*: "The test should be whether the prior conviction was 'related to or connected with' drug manufacture, distribution, or possession with intent to manufacture or distribute, as long as the relationship is **\*1055** not 'too remote or tangential.' " Brief for the United States at 13, *Eason*, 919 F.3d 385 (No. 18-5387), 2018 WL 3218556 (citation omitted).

Down the other path, we could follow language from *Shular*. That language suggests that we should exclude these inchoate crimes from the definition of "serious drug offense" if a defendant could commit them without manufacturing or distributing drugs (or possessing them with the required intent). *See* 140 S. Ct. at 785. *Shular* considered the process that courts should

follow to decide whether a state offense qualifies as a "serious drug offense." 🚩 *Id.* at 782. The defendant argued that courts should identify the elements of a "generic" manufacturing, distributing, or possessing offense and ask whether the defendant's crime contains all elements of this court-identified "generic" crime. 🚩 *Id.* The government responded that courts should ask simply whether the defendant's crime will always "involve" the listed behavior—manufacturing drugs, distributing drugs, or possessing drugs with the required intent. 🚩 *Id.* The Court adopted the government's view because, unlike extortion or burglary, things like "manufacturing" or "distributing" are not "generic" offenses with well-established elements. 🚩 *Id.* at 785. The Court added that the statute's use of the verb "involve" (instead of "is") more naturally called for a conduct-based approach than a generic-offense approach. 🚩 *Id.* When making this latter point, the Court noted that both parties (including the government) agreed that "involve" narrowly means "necessarily requir[e]" (not "relate to"). 🚩 *Id.* (citation omitted). The government thus abandoned in 🚩 *Shular* the broad definition of "involve" it asked our court to adopt in 🚩 *Eason*.

## II

Which path should we choose now? Should we continue to apply 🚩 *Eason*'s broad definition ("relate to")? Or should we switch to 🚩 *Shular*'s narrow definition ("necessarily entail" or "necessarily require")? This question raises tricky procedural and substantive questions.

## A

Two factors suggest that we should stick with 🚩 *Eason*'s broad reading. *First*, precedential concerns point that way. We generally must follow a published precedent like 🚩 *Eason* (whether right or wrong) until the Supreme Court or our en banc court jettisons it. *See* 🚩 *Salmi v. Sec'y of Health & Hum. Servs.*, 774 F.2d 685, 689 (6th Cir. 1985). And it is not obvious to me that 🚩 *Shular* squarely confronted the key issue in this case, let alone rejected the broad definition of "involve" in favor of the narrow one. Nothing in 🚩 *Shular*'s bottom-line holding—that courts should decide whether a state crime is a "serious drug offense" using a conduct-based approach, not a generic-offense approach—seems to have turned on this subtle difference in the meaning of "involve." 🚩 140 S. Ct. at 785. 🚩 *Shular*'s chosen conduct-based approach makes sense whether that word means "relate to" or "require." Its references to the narrower definition thus do not appear critical to the question presented or the ultimate result.

This distinction also might not have mattered to the outcome in 🚩 *Kawashima v. Holder*, 565 U.S. 478, 132 S.Ct. 1166, 182 L.Ed.2d 1 (2012). That case concerned a statute that required a court to determine whether a prior crime "involv[ed] fraud or deceit." *See* 🚩 *id.* at 485, 132 S.Ct. 1166. The Court noted in one sentence that this phrase covered "offenses with elements that necessarily entail fraudulent or deceitful conduct." 🚩 *Id.* at 483–84, 132 S.Ct. 1166. It went on to hold that the specific crimes at issue necessarily entailed deceit even if they did not include deceit as a formal element. 🚩 *Id.* at 484–85, 132 S.Ct. 1166. The **\*1056** Court thus did not need to address whether "involve" could also reach crimes that were merely related to deceit.

Given the ultimate holdings of these cases, I doubt that the Court *itself* would feel bound by 🚩 *Shular*'s references to the "necessarily entails" or "necessarily requires" test if it addresses this case's question about the meaning of "involving." After all,

the Court has repeatedly said that it does not "dissect" every sentence of its opinions as if they were enacted statutes that have passed through both houses of Congress. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993); *see Borden v. United States*, ––– U.S. ––––, 141 S. Ct. 1817, 1833 n.9, 210 L.Ed.2d 63 (2021) (plurality opinion); *Cent. Green Co. v. United States*, 531 U.S. 425, 431, 121 S.Ct. 1005, 148 L.Ed.2d 919 (2001); *Reiter v. Sonotone Corp.*, 442 U.S. 330, 341, 99 S.Ct. 2326, 60 L.Ed.2d 931 (1979). Still, I agree that *Shular*'s statements (even if dicta) cast enough doubt on *Eason*'s reading to allow us to reassess that decision—as the majority opinion explains when discussing our caselaw on the requirement to follow prior precedent. *See Ellmann v. Baker (In re Baker)*, 791 F.3d 677, 682–83 (6th Cir. 2015); *cf. Gearlds v. Entergy Servs., Inc.*, 709 F.3d 448, 452 (5th Cir. 2013); *Carpenters Loc. Union No. 26 v. U.S. Fid. & Guar. Co.*, 215 F.3d 136, 141–42 (1st Cir. 2000).

*Second*, besides the lack of an unambiguous Supreme Court holding giving the word "involve" a narrow construction, a practical concern favors *Eason*'s broader reading. *Eason* was no outlier. If we depart from that decision, we depart from nearly every other court in the country—at least at the present time. Before *Shular*, a near-unanimous judicial consensus interpreted "involve" broadly to mean "related to" or "connected with." *See Eason*, 919 F.3d at 390–91. These courts thus held that many similar inchoate offenses qualified as "serious drug offenses" even though a defendant could commit them without undertaking any manufacturing or distributing. *See, e.g., United States v. McKenney*, 450 F.3d 39, 42–45 (1st Cir. 2006) (drug conspiracy); *United States v. King*, 325 F.3d 110, 112–15 (2d Cir. 2003) (attempted drug crime); *United States v. Daniels*, 915 F.3d 148, 152–67 (3d Cir. 2019) (attempted drug crime); *United States v. Winbush*, 407 F.3d 703, 705–08 (5th Cir. 2005) (attempted drug crime); *United States v. Williams*, 931 F.3d 570, 575–76 (7th Cir. 2019) (financing drug manufacturing or delivery); *United States v. Coleman*, 700 F.3d 329, 339 (8th Cir. 2012) (attempted drug crime); *United States v. Alexander*, 331 F.3d 116, 131 (D.C. Cir. 2003) (attempted drug crime). (The Fourth Circuit reached a similar result for similar statutory language. *See United States v. James*, 834 F.2d 92, 93 (4th Cir. 1987).)

As the majority opinion rightly notes, other courts have begun to cite *Shular*'s "necessarily require" or "necessarily entail" test when discussing the word "involve" in the statutory definition of "serious drug offense" or similar definitions. *See, e.g., United States v. Sandoval*, 6 F.4th 63, 108–09 (1st Cir. 2021); *United States v. Smith*, 983 F.3d 1213, 1223 (11th Cir. 2020); *United States v. Ruth*, 966 F.3d 642, 647 (7th Cir. 2020). As far as I am aware, however, no circuit court has held that a crime that the court previously found covered (under its old "related to" test) no longer counts (under a new "necessarily entails" test). *Cf. United States v. Prentice*, 956 F.3d 295, 299–300 (5th Cir. 2020); *United States v. Miles*, 2021 WL 3077302, at *2 (N.D. Fla. July 21, 2021). We thus would break significant new ground by relying on *Shular* to depart from *Eason*.

**\*1057  B**

In my mind, though, two factors point the other way. *First*, the government has not argued that *Eason*'s "related to" test binds us as a precedential matter. It instead continues to embrace *Shular*'s narrow reading (while suggesting that this reading covers the Kentucky crime at issue in this case). The government's decision to accept the narrow reading may (or may not) be intentional. Recall that, unlike in *Eason*, it advocated for the narrow definition in *Shular*, asserting that "involve" means to "include (something) as a necessary part or result." Brief for the United States at 13, *Shular*, 140 S. Ct. 779 (No.

18-6662), 2019 WL 6324154 (quoting *New Oxford Dictionary of English* 962 (2001)). The government in 🚩*Shular* may well have departed from its prior "related to" test because the defendant claimed that this test was unworkable. *See* Brief for Petitioner at 24–29, 🚩*Shular*, 140 S. Ct. 779 (No. 18-6662), 2019 WL 4689150. According to the government, the "necessarily entails" test avoids these administrative headaches by adopting a "straightforward inquiry" that courts can easily apply. Transcript of Oral Argument at 46, 🚩*Shular*, 140 S. Ct. 779 (No. 18-6662), 2020 WL 354451.

I agree that the narrow definition leads to an easy-to-apply test. But this test is easy to apply precisely because it excludes inchoate crimes like the offenses at issue in this case and 🚩*Eason*. Under the "necessarily entails" or "necessarily requires" framework, a court need only ask whether a crime will always include manufacturing, distributing, or possessing with intent to manufacture or distribute in order for a defendant to commit it. If the crime could be completed without any of those activities occurring, the crime does not "necessarily entail" or "necessarily require" the activities (even if it is related to them). And here, the majority opinion persuasively explains why a defendant could complete the crime of possessing an ingredient with intent to produce methamphetamine without anyone engaging in anything resembling "manufacturing."

I simply do not understand the government's contrary argument that the difference between the two definitions does not matter in this case. Its view that an offense can "necessarily require" certain conduct even if the crime can be accomplished without that conduct conflicts with the ordinary English meaning of those words. It also resurrects the workability concerns that the government seemingly sought to eliminate by abandoning 🚩*Eason*'s "related to" test in 🚩*Shular*. I have no idea what crimes would (or would not) "necessarily entail" manufacturing under the government's view. The pre-🚩*Shular* caselaw that treated inchoate drug offenses as "serious drug offenses" confirms that this distinction matters. These decisions do not suggest that these inchoate offenses would involve manufacturing or distributing under a narrow definition of "involve." Rather, they treated such unfinished crimes as "serious drug offenses" by adopting the broad "related to" test that the government previously espoused. *See, e.g.*, *Daniels*, 915 F.3d at 155; *Winbush*, 407 F.3d at 707; 🚩*King*, 325 F.3d at 113–14. In one of these cases, a defendant even quoted the narrow definition to argue that a state drug conspiracy was not a serious drug offense. *See* 🚩*McKenney*, 450 F.3d at 42–43. The First Circuit did not hold that the "narrow definition" would cover the conspiracy. 🚩*Id.* at 43. It instead adopted the broad definition that did cover it. 🚩*Id.*

In short, the difference between the definitions is critical. Yet the government does not treat 🚩*Shular*'s narrow definition as dicta or 🚩*Eason*'s broad definition as binding. I suppose we could find that 🚩*Eason* continues to bind us on our own initiative because litigants cannot force us to **\*1058** create bad law through their agreements in the lawsuit. *See* 🚩*Swift & Co. v. Hocking Valley Ry. Co.*, 243 U.S. 281, 289, 37 S.Ct. 287, 61 L.Ed. 722 (1917); 🚩*Weston v. Wash. Metro. Area Transit Auth.*, 78 F.3d 682, 685 (D.C. Cir. 1996); *Brown v. United States*, 868 F.2d 859, 864 (6th Cir. 1989); *cf.* 🚩*Terry v. United States*, ––– U.S. ––––, 141 S. Ct. 1858, 1862, 210 L.Ed.2d 108 (2021). Nevertheless, that neither party treats 🚩*Eason*'s broad reading as the binding test undermines any claim that we must continue to follow it after 🚩*Shular*.

*Second,* 🚩*Shular*'s narrow reading strikes me as the better one. The statutory definition of "serious drug offense" dates to the Career Criminals Amendment Act of 1986. Pub. L. No. 99-570, § 1402(b), 100 Stat. 3207, 3207-39 to 3207-40. Then, as now, "involve" had a range of meanings. Every dictionary that I have reviewed lists a definition like the following: "to include as a necessary circumstance, condition, or consequence; imply; entail[.]" *Random House Dictionary of the English Language* 1005 (2d ed. 1987); *see also Oxford Dictionary of English* 912 (2d ed. 2003); 8 *Oxford English Dictionary* 57 (2d ed. 1989); *Webster's Third New International Dictionary* 1191 (1986); *American Heritage Dictionary of the English Language* 690 (1969); *Webster's New International Dictionary of the English Language* 1307 (2d ed. 1944). This definition might have grown out of

the word's original meaning: to "envelop" or "wrap up." *See* 8 *Oxford English Dictionary, supra*, at 57. When "involve" is used in this sense, the subject that precedes the word typically contains or requires the direct object that comes after it. It would apply, for instance, if an employer told a prospective employee that "the job would involve travel." *American Heritage Dictionary of the English Language* 921 (4th ed. 2000). The employee likely would think that the job requires travel (like the position of a traveling salesperson), not that the job relates to travel (like the position of an airport baggage handler).

Other times, "involve" means "implicate." When used to mean "implicate," the word usually conveys that a person has a "close, often entangling, connection with something" that is typically unsavory or criminal. *Webster's New International*, *supra*, at 1307 (2d ed.). If, for example, a politician discussed "evidence that involved the governor in the scandal," the politician would be describing evidence that connected the governor to the scandal. *American Heritage*, *supra*, at 921 (4th ed. 2000). When "involve" is used in this sense, the subject that precedes the word ("evidence") typically connects a direct object ("governor") to an indirect object ("scandal").

Some dictionaries also suggest that "involve" can mean "relate closely." *Webster's Third*, *supra*, at 1191; *Webster's Ninth New Collegiate Dictionary* 637 (1984). *Webster's Third* lists as its lone example for this usage: "the problem is closely *involved* with the management of pastures." *Webster's Third*, *supra*, at 1191. It thus suggests that the phrasal verb "involved with" conveys this meaning (like the phrasal verb "relate to"). *Cf. McGraw-Hill's Dictionary of American Idioms and Phrasal Verbs* 352, 554 (2005). Another dictionary ties this "relate to" meaning to another definition: "to relate to or affect" as in "the matter *involves* his honor." *Webster's New World Dictionary* 711 (3d college ed. 1988); *cf. Random House*, *supra*, at 1005 ("to affect, as something within the scope of operation").

In sum, "involve" can mean anything from "include," to "implicate," to "relate to." We thus must decide which usage an ordinary person would think best fits the statutory definition at issue here. *See* *United States v. Hill*, 963 F.3d 528, 532–33 (6th Cir. 2020). To recap, "serious drug ***1059** offense" covers "an offense under State law, involving manufacturing, distributing, or possessing with intent to manufacture or distribute, a controlled substance" (as long as the offense has at least a 10-year maximum sentence). 18 U.S.C. § 924(e)(2)(A)(ii). This text, it seems to me, signals the first meaning—"to include as a necessary circumstance, condition, or consequence[.]" *Random House*, *supra*, at 1005. That is because "involving" connects an intangible subject ("offense") with active objects ("manufacturing, distributing, or possessing with intent to manufacture or distribute"). This construction is typical when "involve" seeks to convey that one thing contains another. Indeed, one dictionary even lists a directly on-point example for this definition: "a bill proposing harsher penalties for crimes involving firearms and drugs." *Oxford Dictionary of English, supra*, at 912.

Admittedly, the First Circuit—the only pre-*Shular* circuit to grapple with these differing definitions—thought that "connect closely" or "relate closely" was the better reading. *McKenney*, 450 F.3d at 43 (citations omitted). I do not see why. The full definition with "connect closely" provides: "[t]o connect closely and often incriminatingly; implicate." *American Heritage*, *supra*, at 921 (4th ed. 2000). Yet the statute does not seek to convey that a state offense is incriminatingly connected to the "manufacturing" or "distributing" of drugs—as if this inanimate offense (like a person) could have committed the crimes. The statute identifies the conduct that the offense must *contain* (i.e., "include"), not the conduct that the offense must have *participated in* (i.e., "implicate"). As noted, moreover, when "involve" means "implicate" or "connect," an inanimate subject (like "evidence") typically connects one thing (like "governor") with something else (like "scandal"). *See id.* This construction is a poor fit for this statute.

That leaves "relate to." I have found only a few dictionaries, including *Webster's Third* and *Webster's Ninth New Collegiate* (an offshoot), that list this definition for "involve." Yet the Supreme Court has told us to use *Webster's Third* "cautiously" given its "frequent inclusion of doubtful, slipshod meanings[.]" Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 422 & n.21 (2012); *see* *MCI Telecomms. Corp. v. Am. Tel. & Tel. Co.*, 512 U.S. 218, 228 n.3, 114 S.Ct. 2223, 129 L.Ed.2d 182 (1994). In addition, the statute does not use the phrasal-verb construction ("involved with") that *Webster's*

*Third* associates with this usage. *Webster's Third*, *supra*, at 1191. Although another dictionary ties this "relate to" definition with "affect," *Webster's New World*, *supra*, at 711, the statute also does not suggest that a state offense must have an effect on manufacturing or distributing. The statute instead conveys a meaning closer to this dictionary's example for "include" ("a project *involving* years of work") than its example for "relate to or affect" ("the matter *involves* his honor"). *Id.*

Even if some lingering ambiguity existed, though, other contextual clues point to a narrow reading. For starters, the broad definition comes with a superfluity downside. Congress opted to identify three specific types of covered drug activities in the statutory definition: manufacturing, distributing, and possessing with intent to manufacture or distribute. Yet the third activity serves no purpose under a broad "related to" definition of "involving." I, for example, would think that possessing a *drug* (say, cocaine) with an intent to manufacture another drug (say, crack cocaine) "relates to" manufacturing—in the same way that purchasing a drug *ingredient* relates to manufacturing. *See* 🚩 *Eason*, 919 F.3d at 391–92. Similarly, possessing a drug with an intent to distribute it also "relates to" distribution—as the Fourth **\*1060** Circuit essentially held in a related context. *See* 🚩 *James*, 834 F.2d at 93. If "involve" means "relate to," Congress had no reason to include this possession activity in the statute. The narrow definition, by contrast, gives each of the three objects independent work to do. *See* 🚩 *Clark v. Rameker*, 573 U.S. 122, 130–31, 134 S.Ct. 2242, 189 L.Ed.2d 157 (2014); *see also* 🚩 *United States v. Colon*, 268 F.3d 367, 376–77 (6th Cir. 2001).

To be sure, when Congress seeks to ensure wide coverage by using broad language, its statutes will often contain some amount of redundancy. *See* 🚩 *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253–54, 112 S.Ct. 1146, 117 L.Ed.2d 391 (1992); *cf.* 🚩 *TMW Enters., Inc. v. Fed. Ins. Co.*, 619 F.3d 574, 577–78 (6th Cir. 2010). And we must respect Congress's choice if its unambiguous language shows that it opted for this belt-and-suspenders approach. *See* Scalia & Garner, *supra*, at 176–77.

But Congress does not appear to me to have opted for that approach here. If it sought to broadly cover any state drug crime related to manufacturing or distributing, it could have simply said "relating to." Congress has not been shy about using that phrase. In the same section as the definition of "serious drug offense," it prohibited individuals from traveling interstate to buy a gun "with the intent to engage in conduct which" "violates any State law relating to any controlled substance[.]" 🚩 18 U.S.C. § 924(g)(3); *see also* 🚩 *id.* § 924(k)(2). It also defined "felony drug offense" (another phrase used to increase sentences, *see*, *e.g.*, 🚩 21 U.S.C. § 841(b)(1)(C)) to mean "an offense ... under any law of ... a State ... that prohibits or restricts conduct relating to" various drugs. 🚩 21 U.S.C. § 802(44); *see* 🚩 *United States v. Spikes*, 158 F.3d 913, 932 (6th Cir. 1998).

Perhaps most tellingly, the very Act that codified the "serious drug offense" definition evinces a clear distinction between "relating to" and "involving." For one thing, this Act elsewhere imposed stiffer sentences for individuals who had prior felony convictions under a "law of a State ... *relating to* narcotic drugs[.]" Anti-Drug Abuse Act of 1986, 🚩 Pub. L. No. 99-570, § 1002, 100 Stat. 3207, 3207-3 to 3207-4 (emphasis added). (Congress has since amended this provision. *See* 🚩 21 U.S.C. § 841(b)(1) (A), (B).) If Congress did not intend different meanings, why would it use "relating to" in some places yet switch to "involving" for the "serious drug offense" definition? *Cf.* 🚩 *Russello v. United States*, 464 U.S. 16, 23, 104 S.Ct. 296, 78 L.Ed.2d 17 (1983).

For another thing, the Act uses "involve" or "involving" elsewhere to mean "include," not "relate to." The unconstitutional "residual clause" in the nearby "violent felony" definition covers a crime that "otherwise involves conduct that presents a serious potential risk of physical injury to another." § 1402(b), 100 Stat. at 3207-40 (codified at 🚩 18 U.S.C. § 924(e)(2)(B) (ii)), *declared unconstitutional by* 🚩 *Johnson v. United States*, 576 U.S. 591, 606, 135 S.Ct. 2551, 192 L.Ed.2d 569 (2015). Similarly, the Act adopted a staggered sentencing scheme that ties an offense's sentence to the quantity of drugs involved. So, for example, an offense "involving" "1 kilogram or more" of heroin calls for a 10-year minimum sentence. § 1002, 100 Stat. at 3207-2 (codified as amended at 🚩 21 U.S.C. § 841(b)(1)(A)). Just as these other uses of the word "involve" require an offense to

include (not be related to) certain dangerous conduct or drug amounts, so too the definition of "serious drug offense" requires a state offense to include (not be related to) manufacturing, distributing, or possessing with the intent to manufacture or distribute.

**\*1061**  That said, I readily acknowledge that Congress could have used language requiring an even closer connection between a state drug offense and the manufacture or distribution of drugs. The Act, for example, imposed harsher sentences for an offense that "*is* burglary" or that "*has as an element*" the use of force. § 1402(b), 100 Stat. at 3207-40 (codified at 18 U.S.C. § 924(e)(2)(B)(i)–(ii)) (emphases added). As the First Circuit noted, the verb "involve" covers more conduct than these more precise words. *McKenney,* 450 F.3d at 43. For example, the offense of wearing body armor while distributing drugs might not "be" the offense of drug distribution, but it still could qualify as a serious drug offense because it necessarily entails ("involves") that distribution. *Cf. United States v. Gibbs,* 656 F.3d 180, 187–89 (3d Cir. 2011). And even if a crime does not have drug manufacturing as a "formal element[ ]," it could still qualify as a serious drug offense if that conduct must occur whenever anybody commits the crime. *Kawashima,* 565 U.S. at 483–84, 132 S.Ct. 1166; *cf. Borden,* 141 S. Ct. at 1822 (plurality opinion). But I fail to see why these other phrases help answer whether "involve" should mean "relate to" or "necessarily entail." Just because "involve" has a broader reach than "is" does not make it as expansive as "relate to."

Lastly, even if the reader is still not convinced, remember that we are interpreting a criminal statute. The rule of lenity thus applies when choosing between these differing definitions of the word "involve." *See Jones v. United States,* 529 U.S. 848, 858, 120 S.Ct. 1904, 146 L.Ed.2d 902 (2000); *cf. Shular,* 140 S. Ct. at 787–89 (Kavanaugh, J., concurring). I would think that I have said enough to show that the statute at least remains ambiguous after exhausting all of the traditional tools of interpretation. This potential tie breaker thus points in the direction of the narrow definition too.

\* \* \*

To sum up, I am hesitant to depart from a published precedent like *Eason* and from the current approach in many other courts based on Supreme Court reasoning that the Court may later treat as dicta. At the same time, I do think *Shular* allows us to reexamine *Eason*'s definition, especially considering that the federal government has not defended that definition here. And, perhaps most notably, the statutory context and structure lead me to conclude that *Shular*'s narrow reading of "involving" best fits the statutory definition of "serious drug offense." For these reasons, along with those in Judge White's majority opinion, I concur.

## CONCURRING IN PART AND DISSENTING IN PART

ROGERS, Circuit Judge, concurring and dissenting in part.

I concur in all but Part IV.A of the majority opinion. The published holding of this court in *United States v. Eason,* 919 F.3d 385 (6th Cir. 2019), flatly precludes the adoption of a "necessarily requires" standard, and incidental language in a Supreme Court opinion resolving a very different issue is not sufficient to overrule our precedent. While such language might be relevant or even persuasive in the absence of binding published precedent of our court, or in arguments for en banc review or certiorari to the Supreme Court, it is not sufficient to overrule our precedent.

We are required to follow the clear holding in *Eason* notwithstanding *Shular v. United States,* —— U.S. ——, 140 S. Ct. 779, 206 L.Ed.2d 81 (2020). Formally speaking, any language in *Shular* appearing to adopt the "necessarily requires"

standard is, at most, dictum rather than holding. *See* 🚩 *id.* at 784-86. More importantly, though, a careful reading of the 🚩 *Shular* **\*1062** opinion does not reflect that the Court even adopted that standard.

First, the issue in 🚩 *Shular* was whether, as the offender argued, finding a "serious drug offense" required a generic-offense analysis. The 🚩 *Shular* Court ruled in *favor of the government* on this issue, and certainly would have done the same thing if it had assumed a more generous reading of "involves" than the "necessarily entail" standard. Accordingly, the "necessarily entail" standard was simply not necessary to its affirmance of the court of appeals. Formally speaking, in other words, any statement by the Court that "involves" cannot be broader than "necessarily entail," to the detriment of the government, cannot be a holding in a case where the government prevailed.

Second, a careful reading shows that Justice Ginsburg was not deciding the "necessarily entail" issue, regardless of whether such a decision would have been dictum or holding. The Court used the 🚩 *Kawashima* case as an "example" to show that the Court did not always require a generic-offense analysis. *See* 🚩 *id.* at 783 (citing 🚩 *Kawashima v. Holder,* 565 U.S. 478, 132 S.Ct. 1166, 182 L.Ed.2d 1 (2012)). In describing the dispute before it, the Court described the Government's view as that "a court should apply 'the 🚩 *Kawashima* categorical approach,' " which asks "whether the state offense's elements 'necessarily entail one of the types of *conduct*' identified in 🚩 § 924(e)(2)(A)(ii)." 🚩 *Id.* at 784 (emphasis in original).

But the Court went on in the next paragraph to describe the two positions more crisply as follows:

> This methodological dispute is occasioned by an interpretive disagreement over 🚩 § 924(e)(2)(A)(ii)'s reference to "manufacturing, distributing, or possessing with intent to manufacture or distribute, a controlled substance." Those terms, in the Government's view, describe conduct a court can compare directly against the state crime's elements. Shular sees them instead as offenses whose elements a court must first expound.

🚩 *Id.* at 785. This description is the one that immediately precedes the Court's statement that "[t]he Government's reading, we are convinced, correctly interprets the statutory text and context." 🚩 *Id.* In the following sentence, the Court concluded that 🚩 § 924(e)(2)(A)(ii) "refers to conduct." 🚩 *Id.* In other words, the statement that the Government's reading "correctly interprets the statutory text and context" refers to the Court's holding that the statute requires a conduct-focused, rather than a generic-offense, approach. The "correctly interprets" statement thus cannot be read to apply to the "necessarily entail" language without simply disregarding the intervening paragraph that the Court was obviously referring to.

The subsequent paragraphs confirm this. The Court's primary argument was that words like "manufacturing" and "distributing" were unlikely names for generic offenses. This argument says nothing about the meaning of "involves." The Court's second argument was that the word "involving" "suggests that the descriptive terms immediately following the word ... identify conduct." 🚩 *Id.* The Court reasoned that in contrast, the use of the word "is" instead of "involving" would have been used to refer to crimes. In making this argument, the Court did say the "[t]he parties agree that 'involve' means 'necessarily require[d],' " 🚩 *id.,* but this was only to support the idea that the words addressed conduct. It is true that the fact that the parties agreed does not by itself make a statement dictum, but in the context of this case it certainly shows that the language used by the Court was not meant to reject an argument (that "involve" means **\*1063** more than "necessarily requires") when that was not an argument before it.

So what we have is a clear holding in a published opinion of our court that adopts a broad interpretation of "involving" in the statute, and an intervening opinion of the Supreme Court that does not hold, or even decide, or even make an analysis that could

be used to support, the contrary. We are bound to follow our precedent, no matter how thoughtful the arguments for coming to a different conclusion are, in the absence of en banc review or an intervening Supreme Court decision adopting a different rule.

I do not address subparts 2-4 of Part IV.A of the majority's opinion, which proceed to apply the "necessarily entail" test. The majority appears to accept that affirmance would be required on this issue if the 🚩 *Eason* test instead were applied.

**All Citations**

53 F.4th 1027

## Footnotes

1    A "serious drug felony" can also be a "violent felony" as described in 🚩 18 U.S.C. § 924(e)(2)(B), but that definition is not relevant to this case. *See* 🚩 21 U.S.C. § 802(57) (defining "serious drug felony" as "an offense described in 🚩 section 924(e)(2) of Title 18 for which" the defendant served over a year in prison and was released within fifteen years of present offense); 🚩 18 U.S.C. § 924(e)(2) (providing definitions for "serious drug offense" and "violent felony").

2    "Mr. Hoskins: Your Honor, I think that as the law stands now, that the only statutory way to address these points is for the Court to make the determination on the prior convictions. And the arguments that I made earlier, I think there is a problem with a federal contradiction between the First Step Act and 851 as written. ...

The Court: You gave me a thoughtful argument, and I appreciate the argument. But what defines what goes to a jury is the Sixth Amendment, not a statute. And if the enhancing facts are within the ambit of the Sixth Amendment, that tells me it has to go to the jury. I don't need a statute to tell me that. The constitution is the primary authority, not the statute. ... I understand your argument about 851, but I don't think that defines what goes to the jury. I think the Court has to define the elements of the crime. The elements of the crime go to the jury under the Sixth Amendment. ... [T]o the extent there is a Sixth Amendment issue, it is easily cured by letting the jury decide. That's what I intend to do."

R. 107 PID 525-28.

3    Even in the "serious drug felony" context, § 851 would not be unconstitutional in all its applications. Section 851(c)(1) provides that a court "shall hold a hearing to determine any issues *raised by*" a defendant. 21 U.S.C. § 851(c)(1) (emphasis added). If a defendant concedes the length and recency of incarceration but raises the purely legal challenge that his prior convictions were not for "serious drug offenses," there would be no Sixth Amendment issue, even under Fields's view.

4    *See* Gov't Br. at 18-19 ("Section 851's procedure does not encompass the resolution of any term-of-imprisonment-related questions at all. Section 851 sets forth a process for the district court to determine the 'facts regarding prior convictions'—including whether the defendant 'has been previously convicted as alleged in the information,' whether an alleged conviction 'is invalid,' or whether a conviction would not subject a defendant 'to an increased sentence as a matter of law.' 21 U.S.C. § 851(a)(1), (b), (d)(2). As the district court suggested, questions about the characteristics of the *sentence* a defendant served as a result of a prior conviction are not encompassed by Section 851."); *id.* at 19 (adding that "[a]ny doubt about the scope of the statutory section is resolved by [its] heading, which refers to

'[p]roceedings to establish prior convictions'—and not to 'establish' the period of imprisonment the defendant served or other consequences that resulted from the conviction").

5    We also note another problem with Fields's argument, albeit one that the government has not raised. Fields's entire argument hinges on the language in § 851(c)(1) describing the § 851 hearing, emphasizing that § 851(c)(1)'s exclusion of the jury from this hearing necessarily means that the court must decide the Sixth-Amendment-implicating facts that he discusses here. But the scope of the § 851(c)(1) hearing—and, by logical extension, the scope of the purported obligation for the judge (and not the jury) to decide such facts under Fields's argument—is itself defined by what issues a defendant raises in his written response to the § 851 notice. If a defendant does not raise factual objections to the § 851 notice in a written response, there will be no factual issues to resolve in the § 851 hearing, and thus no obligation, even under Fields's argument, for the judge to decide those facts. *See* 21 U.S.C. § 851(c)(1) (describing hearing as applying to resolve "any issues *raised by* the [defendant's] response which would except the [defendant] from increased punishment" (emphasis added)); *see also* United States v. Espinal, 634 F.3d 655, 664 (2d Cir. 2011) ("While § 851(c)(1) requires the government to prove contested facts relating to the prior felony beyond a reasonable doubt, that burden is triggered only where the defendant ... submits a written response raising a factual issue.").

Fields raised no factual issues in his § 851 response. Indeed, he waited until after trial—and after the jury had found the incarceration-related conditions to be met—to file any § 851 response at all, and that response challenged only the legal characterization of his prior convictions as being for "serious drug felonies." *See* R. 75 PID 303-05; *see also* R. 91 PID 353-58 (supplemental brief objecting to PSR, solely raising challenge to this legal characterization). He had time to do so before trial. The indictment alleged that he had served over a year in prison and was released within fifteen years of the present offense for each of his alleged prior convictions for "serious drug felon[ies]." R. 1 PID 1-2. And the government filed a § 851 notice in November 2019, just shy of two months before the January 15, 2020 trial started. Indeed, Fields's counsel told the government that he "ha[d] no objection to bifurcation" when the government moved to bifurcate proceedings on January 3, 2020. R. 44 PID 133.

It is difficult to accept Fields's argument that § 851 required the court to refrain from sending facts to the jury that Fields never challenged in a § 851 written objection—the trigger for a § 851 hearing. *Cf.* United States v. Hill, 142 F.3d 305, 313 (6th Cir. 1998) (holding that district court's failure to engage in § 851(b) colloquy was harmless because the defendant never filed § 851(c)(1) response challenging his prior convictions: "there is no reason for a district court to conduct a hearing on the validity of the prior convictions when a defendant fails to first meet the requirements of 21 U.S.C. [§] 851(c), which requires that a defendant give advance notice concerning the basis of his challenge"); *United States v. Denkins*, 367 F.3d 537, 549 (6th Cir. 2004) (same); *United States v. Walker*, 761 F. App'x 547, 552-53 (6th Cir. 2019) (same). Although we recognize it would be pointless to raise such a factual challenge *after* the incarceration-related facts were found at trial, Fields had two months to do so before trial.

6    There is another problem with Fields's argument. Federal Rule of Criminal Procedure 23(a) states that "[i]f the defendant is entitled to a jury trial, the trial must be by jury unless" the defendant and government waive the jury trial in writing and the court approves. Fed. R. Crim. P. 23(a). The committee notes make clear that this rule aims to codify the requirements of the Sixth Amendment. Fed. R. Crim. P. 23(a) advisory committee's note 1 to 1944 adoption. Rule 23(a) became effective in 1946, while § 851 was enacted in 1970. *See* Fed. R. Crim. P. historical note; Controlled Substances Act, Pub. L. No. 91-513 § 411, 84 Stat. 1242, 1269 (1970). Absent a "clear and manifest" intent, we generally disfavor implied repeals of earlier statutes by later ones, Rodriguez v. United States, 480 U.S. 522, 524, 107 S.Ct. 1391, 94 L.Ed.2d 533 (1987) (internal quotation marks omitted); *Beckert v. Our Lady of Angels Apartments, Inc.*, 192 F.3d 601, 606 (6th Cir. 1999), and that principle applies to implied repeals of Federal Rules as well, *Callihan v. Schneider*, 178 F.3d 800, 802-03 (6th Cir. 1999); Zedner v. United States, 547 U.S. 489, 507, 126 S.Ct. 1976, 164 L.Ed.2d 749 (2006); *United States v. Borden Co.*, 308 U.S. 188, 198, 60 S.Ct. 182, 84 L.Ed. 181 (1939) ("It is a cardinal principle of construction that repeals by implication are not favored. When there are two acts upon the same subject, the rule is to give effect to both if possible. The intention of the legislature to repeal 'must be clear and manifest.' " (citations and internal quotation

marks omitted)). But the practical import of Fields's argument is that § 851 impliedly repeals Rule 23(a)'s requirement to have a jury trial on any issues implicating the Sixth Amendment. So, Fields's argument that § 851 forbids or invalidates the procedure employed here creates a constitutional-avoidance and an "implied-repeal" problem. When statutes are ambiguous, we avoid reading them to create constitutional problems, and in general, we avoid readings that treat a subsequent statute as impliedly repealing a prior statute (or Federal Rule). Fields's reading would do both.

7    These documents include "the statutory definition, charging document, written plea agreement, transcript of plea colloquy, and any explicit factual finding by the trial judge to which the defendant assented." *Shepard v. United States*, 544 U.S. 13, 16, 125 S.Ct. 1254, 161 L.Ed.2d 205 (2005). The laws underlying both of Fields's convictions refer to "methamphetamine" *or* another "controlled substance." Ky. Rev. Stat. §§ 218A.1437, 218A.1412. The district court found both laws were divisible and, applying the modified categorical approach, looked to the indictments for both to determine that they involved methamphetamine, not some other controlled substance. Fields does not challenge that analysis, so we assume the same for purposes of resolving this appeal.

8    Fields's first argument is that the Meth-Precursor Offense is not "punishable by ten years or more imprisonment" because a first-time violation of § 218A.1437 alone—without considering the persistent felony offender enhancement —would only permit five years' imprisonment. But *Rodriguez* held that courts must consider all applicable state recidivism enhancements affecting the defendant's maximum sentence. 553 U.S. at 383-84, 128 S.Ct. 1783. In light of *Rodriguez*, Fields's first argument is unavailing.

9    For example, one entry in Merriam Webster defines "involve" to mean "to have within or as part of itself: Include," or "to require as a necessary accompaniment: Entail," which hews closely to the narrower *Brandon* articulation; but another entry defines the word to mean "to relate closely: Connect," which echoes the "relates to or connects with" formulation. *Involve*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/involve (last accessed Aug. 2, 2022).

10   *See, e.g., Lovano v. Lynch*, 846 F.3d 815, 817 (6th Cir. 2017) (describing BIA interpretation of statutory phrase "crime involving moral turpitude" as asking whether prior crimes "necessarily entail[ ] conduct" reaching certain levels of culpability); *United States v. Reliford*, 471 F.3d 913, 916 (8th Cir. 2006) (applying a "necessarily entails" test to determine, under 18 U.S.C. § 924(e)(2)(B)(ii), whether a prior offense "otherwise involves conduct that presents a serious potential risk of physical injury to another"); *United States v. Montgomery*, 402 F.3d 482, 488 (5th Cir. 2005) (same); *United States v. Scheels*, 846 F.3d 1341, 1342 (11th Cir. 2017) (per curiam) (noting that "[t]he ordinary meaning of 'involve,' "—as used in U.S.S.G. § 2G2.1(b)(4)'s enhancement for offenses that "*involve*[ ] material that portrays sadistic or masochistic conduct"—"is '[t]o have as a necessary feature or consequence; entail,' or 'to have within or as a part of itself' " (emphasis added) (citations omitted)); *United States v. Lachowski*, 405 F.3d 696, 699 (8th Cir. 2005) (applying similar definition to interpret word "involving" in 21 U.S.C. § 853(q), which provides for restitution for crimes "involving the manufacture of amphetamine or methamphetamine").

11   For pertinent pre-*Shular* decisions from these circuits, *see United States v. Williams*, 931 F.3d 570, 575 (7th Cir. 2019); *United States v. Bynum*, 669 F.3d 880, 886-87 (8th Cir. 2012); *see also United States v. Smith*, 775 F.3d 1262, 1267 (11th Cir. 2014) (noting that § 924(e)(2)(A)(ii) "require[s] only that the predicate offense 'involv[es]' ... certain activities *related to* controlled substances" (alteration in original) (emphasis added)); *United States v. White*, 837 F.3d 1225, 1233 (11th Cir. 2016) (stating that several cases in the "relates to or connects with" line of decisions have "likewise adopted an expansive interpretation of the word 'involving' "). The Fifth Circuit—another prior adherent to the broader version of the test, *see United States v. Vickers*, 540 F.3d 356, 365 (5th Cir. 2008)— recently discussed (but declined to rule on) *Shular*'s impact on the "relates to or connects with" test. *United States v. Prentice*, 956 F.3d

295 (5th Cir. 2020). The court assumed without deciding that the defendant was correct when he argued that *Shular* endorsed a narrower understanding of "involving" than *Vickers* did, but held that even under *Shular*, the prior crime at issue was a "serious drug offense." *Id.* at 299. The panel noted, however, that *Shular* "altered" the rationale of its pre-*Shular* caselaw. *See id.* ("*Shular* altered the rationale underlying *Vickers*, but not its result."); *id.* at 300 ("The precise reasoning of *Vickers*, *i.e.*, its interpretation of 'involving,' differs from that of *Shular* and seems at odds with *Shular*'s focus on the underlying *conduct* charged in state offenses."). Similarly, although the First Circuit previously read "involve" to mean "relate closely" or "connect closely" when construing § 924(e)(2)(A)(ii) (but added that "involving" should not be read too broadly), *United States v. McKenney*, 450 F.3d 39, 43, 45 (1st Cir. 2006), it later applied *Shular*'s "necessary" approach when construing "involving" as used in another statutory provision, *United States v. Sandoval*, 6 F.4th 63, 108-10 (1st Cir. 2021). And we recently recognized, albeit when interpreting a Guidelines provision rather than § 924(e)(2)(A)(ii), that *Shular*'s narrower understanding of "involve" may be at odds with *Eason*'s broader understanding of the term. *United States v. Gould*, 30 F.4th 538, 545-46 (6th Cir. 2022); *see also United States v. Winn*, No. 20-1477, 2022 WL 636633, at *4 n.7 (3d Cir. Mar. 4, 2022) (recognizing that *Shular* introduced a new approach).

12   *See id.* at 785 ("[B]y speaking of activities a state-law drug offense 'involv[es],' § 924(e)(2)(A)(ii) suggests that the descriptive terms immediately following the word 'involving' identify conduct. The parties agree that 'involve' means 'necessarily requir[e].' Brief for Petitioner 14 (citing Random House Dictionary of the English Language 1005 (2d ed. 1987) ('to include as a necessary circumstance, condition, or consequence')); Brief for United States 21 (same). It is natural to say that an offense 'involves' or 'requires' certain conduct. ... To refer to offenses as Shular urges, it would have been far more natural for the drafter to follow the enumerated-offense clause in using 'is,' not 'involving.' Yet Congress did not adopt that formulation in § 924(e)(2)(A)(ii), opting instead for language suited to conduct." (citations omitted)).

13   But even if the statement were dictum—a proposition we have not seen any post-*Shular* courts definitively endorse —we would still follow it here. "Honoring intervening Supreme Court authority is a critical duty for any lower court, including ours." *Williams v. Burt*, 949 F.3d 966, 977 (6th Cir. 2020); *see also Ne. Ohio Coal. for the Homeless*, 831 F.3d at 721 ("[L]ower courts are 'bound not only by the holdings of higher courts' decisions but also by their 'mode of analysis' " (quoting *Troy v. Samson Mfg. Corp.*, 758 F.3d 1322, 1326 (Fed. Cir. 2014))). Accordingly, our circuit has repeatedly stated that we must give on-point Supreme Court dictum substantial weight. *See, e.g.*, *Holt v. City of Battle Creek*, 925 F.3d 905, 910 (6th Cir. 2019) ("Even if the Supreme Court's statement in *Encino* was dicta outside of the context of the salesman exemption, '[l]ower courts are obligated to follow Supreme Court dicta, particularly where there is not substantial reason for disregarding it, such as age or subsequent statements undermining its rationale.' " (quoting *In re Baker*, 791 F.3d at 682; *Murray v. U.S. Dep't of Treasury*, 681 F.3d 744, 750 n.5 (6th Cir. 2012); *ACLU of Ky. v. McCreary County*, 607 F.3d 439, 447 (6th Cir. 2010); *United States v. Marlow*, 278 F.3d 581, 588 n.7 (6th Cir. 2002); *United States v. Morgan*, 572 F. App'x 292, 301 (6th Cir. 2014). There is no substantial reason to disregard *Shular*'s indication that the narrow interpretation of "involve" applies under § 924(e)(2)(A)(ii).

14   "Produce," "prepare," and "compound" describe the creation of a final product from several ingredients; "produce" and "prepare" also refer to engaging in a *process* to do so, as do "propagate" and "process." *See id.* § 802(22) (defining "production" to "includ[e] the manufacture, planting, cultivation, growing, or harvesting of a controlled substance");

*Produce*, OXFORD ENGLISH DICTIONARY, https://tinyurl.com/3szjh3dd (last accessed Aug. 2, 2022) (to "bring (a thing) into existence from its raw materials or elements, or as the result of a process"); *Preparation*, OXFORD ENGLISH DICTIONARY, https://tinyurl.com/2bvr7ryz (last accessed Aug. 2, 2022) (the "action or process of specially producing or making up a thing in its proper condition for use or consideration ... the making of a chemical compound, drug, etc., from appropriate starting materials"); *Prepare*, OXFORD ENGLISH DICTIONARY, https://tinyurl.com/5a55f26z (last accessed Aug. 2, 2022) ("To produce, form, or make, esp. by bringing together ingredients or components; to manufacture; to synthesize, concoct, compound. ... To bring (an object, substance, surface, etc.) into a fit condition for use by means of some special or technical process"); *Compound*, OXFORD ENGLISH DICTIONARY, https://tinyurl.com/p7pdjp79 (last accessed Aug. 2, 2022) ("To make up (a composite product) by the mixture of combination of various ingredients or elements"). *Process*, OXFORD ENGLISH DICTIONARY, https://tinyurl.com/3hjcbsbj (last accessed Aug. 2, 2022) ("To subject to or treat by a special process; to operate on mechanically or chemically."); *Propagate*, OXFORD ENGLISH DICTIONARY, https://tinyurl.com/ejs36j4c (last accessed Aug. 2, 2022) ("[T]o cause (a plant, animal, etc.) to reproduce or multiply.").

15　Some of the chemicals listed in this statute are available in over-the-counter products that can be legally purchased at pharmacies. For example, pseudoephedrine is found in the over-the-counter cold medicine, Sudafed. *See* ⚑*Hayes v. Commonwealth*, 175 S.W.3d 574, 580 (Ky. 2005) ("Sudafed is a cold medication containing pseudoephedrine, a precursor used to manufacture methamphetamine.").

16　⚑*Kotila* has been partially abrogated, but not the proposition in the cited passage. ⚑*Kotila* held that a previous version of the meth-manufacturing statute—which only referred to possession of "*the*" chemicals or equipment used in methamphetamine manufacture, as opposed to "two (2) or more" of either—required possession of *all* the chemicals or *all* the equipment necessary to manufacture methamphetamine. ⚑114 S.W.3d at 236-37. ⚑*Kotila* was abrogated by statute in 2005 when the legislature expressly added the "two (2) or more" language. And *Matheney v. Commonwealth*, 191 S.W.3d 599, 602-04 (Ky. 2006) overruled ⚑*Kotila*'s interpretation of the pre-amendment version of the statute, holding that this version also required only possession of two or more (not *all*) chemicals or pieces of equipment. ⚑*Kotila*'s recognition that § 218A.1437 fills a gap remains correct, but the size of the gap has shrunk. ⚑*Kotila* said § 218A.1437 applied where a defendant possesses a methamphetamine precursor but did not possess "*all of the* other chemicals necessary to manufacture methamphetamine." ⚑114 S.W.3d at 240 (emphasis added). But after *Matheney* and the 2005 statutory amendment, it is more accurate to say that the meth-precursor statute occupies a gap where a defendant possesses a precursor but there is no proof of possession of *any other* chemicals used to manufacture methamphetamine. Once a defendant possesses any second chemical, § 218A.1432(1)(b) would apply instead.

17　*Cf. Pittman v. Commonwealth*, 2007 WL 1195442 at *1 (Ky. Ct. App. Apr. 6, 2007) (describing indictment for meth-precursor offense after defendant was caught "stealing sudafed from a Kroger [pharmacy] store").

18　Everyday examples suggest the same. For example, if a baker goes to the store on Monday to buy some ingredients for a cake to be made on Saturday, nobody would say the baker had begun making the cake upon leaving the store on Monday.

19　*Accord* ⚑*Maracich v. Spears*, 570 U.S. 48, 59-60, 133 S.Ct. 2191, 186 L.Ed.2d 275 (2013) ("The phrase 'in connection with' is essentially 'indeterminat[e]' because connections, like relations, 'stop nowhere.' So the phrase 'in connection with' provides little guidance without a limiting principle[.]" (citations omitted); ⚑*id.* at 60, 133 S.Ct. 2191 ("[A]pplying the 'relate to' provision according to its terms was a project doomed to failure, since, as many a curbstone philosopher has observed, everything is related to everything else." (quoting ⚑*Cal. Div. of Lab. Standards Enf't v. Dillingham Constr., N.A., Inc.*, 519 U.S. 316, 335, 117 S.Ct. 832, 136 L.Ed.2d 791 (1997) (Scalia, J., concurring)); ⚑*N.Y. State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 655, 115 S.Ct. 1671, 131

L.Ed.2d 695 (1995) ("If 'relate to' were taken to extend to the furthest stretch of its indeterminacy, then for all practical purposes pre-emption would never run its course, for '[r]eally, universally, relations stop nowhere.' " (citation omitted)).

20    And as noted above, the government's reference to 🚩 21 U.S.C. § 843(a)(6), if anything, hurts its position. Congress chose to make "manufacturing" and possession of chemicals with intent to manufacture separate crimes, under 🚩 21 U.S.C. §§ 841(a)(1) and 🚩 843(a)(6), respectively. If we interpret 🚩 21 U.S.C. § 802(15)'s definition of "manufacture" to include possession of chemicals with intent to manufacture, we would partially collapse the distinction between these two crimes, because anytime someone possessed chemicals with intent to manufacture, they would also (under such a reading) be guilty of manufacturing. If anything, the existence of 🚩 § 843(a)(6) underscores that 🚩 § 802(15)'s definition of "manufacture" does *not* include possession with intent to manufacture, because any other reading would render other substantive portions of the CSA superfluous.

21    Kentucky eventually amended its regulations in 2017 to simply exclude all over-the-counter products excluded from federal schedules, as opposed to enumerating each excluded product. 902 K.A.R. 55:040 (2017 ed.).

---

**End of Document**                                      © 2023 Thomson Reuters. No claim to original U.S. Government Works.

---

2022 WL 2071054
Only the Westlaw citation is currently available.
United States District Court, E.D. Michigan, Southern Division.

UNITED STATES, Plaintiff,

v.

Michael GRIFFIN, et al., Defendants.

2:17-CR-20639-TGB-MKM
|
Signed 06/08/2022

**Attorneys and Law Firms**

Rajesh Prasad, Dawn N. Ison, U.S. Attorneys, U.S. Department of Justice U.S. Attorney's Office, Detroit, MI, for Plaintiff.

Federal Community Defender, Public Defender, Detroit, MI, Harold Z. Gurewitz, Gurewitz & Raben, PLC, Detroit, MI, Michael O. Sheehan, Sheehan and Reeve, New Haven, CT, for Defendant Michael Deangelo Griffin.

Federal Community Defender, Public Defender, Detroit, MI, James Alan Swetz, Wilton Manors, FL, Douglas R. Mullkoff, Kessler & Mullkoff, Ann Arbor, MI, for Defendant Dennis Clifton Epps.

Edward Dale Robertson, Jr., Brownsville, TX, Noe Domingo Garza, Law Office of Noe D. Garza, Jr., Brownsville, TX, for Defendant Mariano Lozoya Garcia.

Federal Community Defender, Public Defender, Detroit, MI, Paul J. Stablein, Paul Stablein, PLLC, Birmingham, MI, for Defendant Ruben Valdez, Jr.

Byron H. Pitts, Cornelius Pitts Assoc., Detroit, MI, for Defendant Troy Dontel Harris.

**ORDER RESOLVING DEFENDANTS' PRETRIAL MOTIONS**

**(ECF NOS. 167, 176, 177, 178 180)**

TERRENCE G. BERG, UNITED STATES DISTRICT JUDGE

**\*1**  This criminal case involves charges of drug trafficking, conspiracy, carrying firearms in furtherance of drug trafficking and violent crimes, and murder. [1]

Before the Court are several motions filed by Defendants. Specifically,

• Defendants Griffin and Epps move to dismiss Counts Two, Three, and Four (ECF Nos. 167, 180);

• Defendant Griffin moves to strike certain sentencing allegations found in Count Five. (ECF No. 167);

• Defendant Garcia asks the Court to dismiss the firearm-related counts—Counts Two, Four, and Six—or, in the alternative, to order the Government to select only one of those counts upon which to proceed. (ECF No. 176);

• Defendant Garcia also asks the Court to order the Government to preserve and turn over certain discovery materials (ECF Nos. 177, 178).

Having reviewed the parties' briefs, the relevant case law, and heard oral argument on the issues, the Court concludes that Defendants Griffin and Epps' Motions to Dismiss Counts Two, Three, and Four (ECF Nos. 167, 180) will be **DENIED**. While Count Three need not be dismissed as Griffin and Epps request (*see* ECF Nos. 167, 180), the Government will be **ORDERED** to file a bill of particulars specifying the crime of violence contemplated by Count Three. The portion of Griffin's Motion (ECF No. 167) regarding the sentencing allegations contained in Count Five will be **DENIED WITHOUT PREJUDICE**. Defendant Garcia's Motion to Dismiss Counts Two, Four, and Six (ECF No. 176) will be **DENIED WITHOUT PREJUDICE**. Finally, Defendant Garcia's Motion to "Reveal the Deal" (ECF No 178) and Motion to Preserve Notes (ECF No. 177) will be **DENIED AS MOOT**.

## I. BACKGROUND

Many of the facts described below are taken from the Government's brief; they do not represent any finding by the Court and should be considered as allegations. The recitation below is offered to provide context to the parties' legal arguments, not to suggest any findings of fact or conclusions concerning the alleged conduct of the accused Defendants.

 **\*2**  According to the Government, Defendants Troy Harris, Mariano Garcia, and Ruben Valdez began trafficking cocaine in Detroit in June, 2016. ECF No. 189, PageID.914. Coincidentally at the same time, Defendant Michael Griffin and his best friend, Robert Eddins IV, came to Detroit from Alabama to visit Harris, with whom Griffin had spent time in prison. *Id.* During that visit, Harris introduced Griffin to Garcia, who was Harris' drug supplier. *Id.* at PageID.914-915. After their initial meeting, Garcia allegedly met with Griffin and Eddins several times in Texas and Alabama, providing Griffin and Eddins with three to six kilograms of cocaine every two weeks "on consignment," with Griffin and Eddins paying Garcia for the drugs after they were sold. *Id.* at PageID.916.

This distribution relationship allegedly broke down in early November 2016, when it became clear that Eddins would be unable to repay Garcia for some of the cocaine Garcia had fronted to the pair. *Id.* at PageID.917. According to the Government, Garcia was pressuring Griffin because of Eddins' failure to produce the money he owed Garcia. *Id.* Tensions mounted between all three men and, at the end of November, Griffin ultimately paid Garcia at least some of the money that Eddins owed Garcia, apparently in an effort to salvage Griffin's own relationship with Garcia. *Id.* at PageID.917-18. After the end of November, 2016, Eddins purchased a new phone, returned to Detroit, and stopped communicating with either Griffin or Garcia. *Id.*

Over the first two weeks of December, Griffin allegedly sought information about Eddins' whereabouts from mutual friends. *Id.* at PageID.918-19. At the same time, Garcia was explaining to Griffin in near-daily text messages that Garcia was now coming under pressure from unspecified others. *Id.* On December 18, Defendants Griffin and Dennis Epps, an associate of Griffin whose role is otherwise unexplained, allegedly left Alabama and travelled to Detroit. *Id.* Throughout the trip to Detroit, Griffin and Garcia were allegedly in constant contact. *Id.* At some point, Griffin and Epps' search for Eddins was successful: on December 19, video of Griffin, Epps, Eddins, and a fourth person was captured on a Walmart surveillance camera in Livonia, Michigan. *Id.* at PageID.920. Griffin and Epps' cellphones were also identified as being near Eddins' residence from around 9:30 p.m. on December 19 to 1:20 a.m. on December 20. *Id.* at PageID.920-22. Phone location records allegedly show that Griffin and Epps left Eddins' residence separately. *Id.* Around 4:00 a.m., on December 20, Griffin picked up Epps and the pair drove back to Birmingham, Alabama. *Id.* Later that day, in the evening, Robert Eddins and another man, Ricardo McFarlin, were found shot to death in the basement of Eddins' home. *Id.* at PageID.923.

Approximately two weeks after Eddins' death, Griffin, Epps, and another person were stopped by Louisiana state troopers while travelling along the highway in a rented car.[2] The state troopers, investigating a potential traffic violation, discovered what was believed to be heroin in the vehicle, and all three were arrested. *Id.* at PageID.931. Although the suspected heroin was later determined not to be heroin or any other controlled substance, police discovered, upon subsequent searches of the

rental car, a firearm and what appeared to be the jackets that Eddins and Griffin were wearing on the Walmart surveillance tape. *Id.* at PageID.931-32.

## II. ANALYSIS

### a. Whether Count Two must be dismissed on the ground that interstate stalking in violation of 18 U.S.C. § 2261A resulting in death does not constitute a crime of violence

Count Two of the Third Superseding Indictment charges Defendants Griffin, Epps, and Garcia with violating 18 U.S.C. § 924(c) by using a firearm during a predicate "crime of violence." To qualify as a "crime of violence," the predicate offense must have as an element "the use, attempted use, or threatened use of physical force against the person or property of another." § 924(c)(3)(A). To determine whether a predicate offense qualifies as a crime of violence under this "categorical approach," courts focus on the elements of the generic offense itself, and not the particular facts of the case at hand. *Knight v. United States*, 936 F.3d 495, 498 (6th Cir. 2019). Courts look to the "minimum criminal conduct necessary for conviction" under the statute to determine whether a statute may be violated without the use or threatened use of force, but do not apply "legal imagination"— that is, "there must be a realistic probability, not a theoretical possibility" that the statute could be applied to conduct that is not a crime of violence. *United States v. Hill*, 890 F.3d 51, 55-56 (2d Cir. 2018)(citation and quotation marks omitted).

**\*3** When a statute contains multiple versions of the same crime that consist of alternate elements or provide for different punishments, it is referred to as a "divisible" statute, and a court must "look beyond the statutory language and examine a limited set of documents" such as the indictment, to determine which portion of the statute a defendant violated, and whether conviction under *that portion* of the statute would require proof that the defendant used, attempted to use, or threatened the use of physical force. *United States v. Gooch*, 850 F.3d 285, 291 (6th Cir. 2017).

Defendants argue that the predicate offense charged in Count One does not qualify as a crime of violence. That offense is 18 U.S.C. § 2261A, which criminalizes interstate stalking. Here, that offense is coupled with § 2261(b), which provides enhanced penalties if the stalking results in death. The version of that statute in effect at the time of the offense provided in relevant part that:

> Whoever (1) travels in interstate or foreign commerce ... with the intent to kill, injure, harass, intimidate, or place under surveillance with intent to kill, injure, harass, or intimidate another person, and in the course of, or as a result of, such travel or presence engages in conduct that
>
> (A) places that person in reasonable fear of the death of, or serious bodily injury to (i) that person ...
>
> shall be punished as provided in section 2261(b) ....

18 U.S.C. § 2261A.

Section 2261(b) provides that a person who violates 2261A faces four increasing maximum penalties depending on the nature of the injury caused by the conduct. A violator of § 2261A shall be imprisoned "for life or any term of years, if death of the victim results," 18 U.S.C. § 2261(b)(1); for not more than 20 years "if permanent disfigurement or life threatening bodily injury to the victim results;" for not more than ten years if serious bodily injury results or if the offender uses a dangerous weapon; or for not more than five years in any other case." § 2261(b)(2-5). Because this "death resulting" requirement increases the

maximum penalty to which a defendant convicted of interstate stalking may be subject, it is an "element" that must be submitted to a jury and found beyond a reasonable doubt. *See* *Burrage v. United States*, 571 U.S. 204, 210 (2014)("Because the 'death results' enhancement [of a drug offense] increased the minimum and maximum sentences to which [the defendant] was exposed, it is an element that must be submitted to the jury and found beyond a reasonable doubt.")(citing *Alleyne v. United States*, 570 U.S. 99, 115-116 (2013)); *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000). Accordingly, because the statute imposes different penalties based on whether or not "death resulted," this is a "divisible" statute. *See Knight v. United States*, 936 F.3d 495, 498-99 (6th Cir. 2019)(assault statute was divisible where it included an aggravated offense with an increased penalty for wounding victim or putting victim's life in danger by use of a dangerous weapon); *United States v. Wheeler*, 483 F. Supp. 3d 505, 510 (N.D. Ohio 2020)(destruction of motor vehicle statute was divisible due to inclusion of "death results" element) (collecting cases).

Therefore, the Court must consider a "limited set of documents," including the Indictment, to determine what part of the statute Defendants allegedly violated. *Gooch*, 850 F.3d at 291. Here, the Indictment specifically charges Defendants with a violation of § 2261A resulting in death, invoking the language of § 2261(b). *See* Third Super. Ind., ECF No. 123, PageID.469-70. Therefore, the portion of § 2261A at issue in this case, and to which the Court must apply the "modified categorical" crime of violence analysis, is that which includes the element of death resulting from engaging in conduct that places that person in reasonable fear of death or bodily injury in the course of or as the result of travel in interstate commerce with intent to kill, injury, harass, or intimidate another person. 18 U.S.C. §§ 2261A, 2261(b).

\*4   Defendants contend that § 2261A can be violated in a manner causing death with either unintentional use of physical force, or with no physical force at all, and thus is categorically not a crime of violence. Defendants argue that the most innocent way the statute may be violated is by a person traveling with intent to harass another. Def's. Mot., ECF No. 167, PageID.696. Defendants argue that the statute's language—that the travel "result in" the victim's death—does not require any additional *mens rea*. Defendants hypothesize that "one may be convicted under § 2261A by traveling across state lines and harassing the victim, who then dies of a heart attack or who has a fatal fall as he runs from the defendant who is verbally harassing him. This can be done without the intentional use of force." *Id.* at PageID.697 (emphasis omitted).

The Government responds that the Court should not look to whether each element involves the use of force, but rather whether the offense "overall include[s] use of violent force." Gov't. Resp., ECF No. 189, PageID.940 (quoting *United States v. Harris*, 853 F.3d 318, 322 (6th Cir. 2017)). The Government points out that to satisfy the statute, the defendant must "engage[ ] in conduct that ... places [the victim] in reasonable fear of the death of, or serious bodily injury and results in death," which necessarily involves the "threat" of violent force. ECF No. 189, PageID.940-41. The government also argues that there is no realistic probability that the statute would be enforced in the manner the Defendants hypothesize, and that to do so would be an exercise in "legal imagination"—the use of which courts have repeatedly discouraged. *Id.* at PageID.941-42.

Two federal district courts have considered whether various versions of § 2261A qualify as crimes of violence, and have reached opposing conclusions. An Oklahoma district court, applying the categorical approach, concluded that a prior version of § 2261A was not a crime of violence:

> There is a travel element, which does not include the use, attempted use, or threatened use of physical force. There is an intent element, which, again, does not include the use, attempted use, or threatened use of physical force. Finally, there is a results element, which could or could not be committed with the use, attempted use, or threatened use of physical force. This is why, under the categorical approach,

generically, interstate stalking could be committed without any use, attempted use, or threatened use of physical force. For example, the defendant may have had a prior relationship with the victim, so by merely telling the victim that the defendant will be in his or her area could cause the victim a reasonable fear of death or serious bodily injury. Or the defendant could merely have stalked the victim in a way that harassed the victim and caused the victim to reasonably fear for his or her life. However, this may or may not have been accomplished with the use, attempted use, or threatened use of physical force. As another example, the defendant could have, prior to the interstate stalking, used physical force against the victim, causing the victim to reasonably believe that physical force could be used against him or her again.

*United States v. Minners*, No. 05-CR-0152-CVE-02, 2020 WL 4275040, at *6 (N.D. Okla. July 24, 2020). More recently, another district court sitting in Delaware reached the opposite conclusion, rejecting the logic of *Minners*:

In this Court's view, the hypothesized [scenarios described by the court in *Minners* do] involve at least the threatened use of physical force, when considering all the circumstances. Moreover, the version of the statute applicable here requires that the defendant intend "to kill, injure, harass, intimidate, or place under surveillance with intent to kill, injure, harass, or intimidate." It does not, therefore, reach unintentional conduct, as potentially contemplated in the *Minners* hypothetical. If the hypothetical defendant intentionally communicates with the victim in a way that causes reasonable fear of death or serious bodily injury, that communication necessarily involves at least the threatened use of physical force.

**\*5** *United States v. Bacon*, No. CR 18-75-LPS, 2021 WL 5051364 at *14 (D. Del. Nov. 1, 2021). After closely reviewing the statutory language in effect when this offense was committed, the Court concludes that § 2261A does have as an essential element the use, attempted use, or threatened use of force.

First, the requirement that one must place a person in reasonable fear of death or serious bodily injury to be convicted under § 2261A is not, as Defendants contend, purely a "results" element. In support of that characterization, Defendants rely on *United States v. Al-Zubaidy*, in which the Sixth Circuit explained that 2261A has three elements: "(a) that interstate travel occurred; (b) that Defendant's intent was to injure or harass another person; and (c) that the person he intended to harass or injure was placed in reasonable fear of death or serious bodily injury to herself or a member of her family as a result of that travel." 283 F.3d 804, 808-809 (6th Cir. 2002). But the *Minners* and *Al-Zubaidy* decisions are both distinguishable from the present case for the same reason: both analyzed a prior version of § 2261A. That prior incarnation of the statute was different in a key respect from the version at issue here. The statute reviewed by those courts allowed conviction where an offender travels in interstate commerce and "in the course of, or as a result of, such travel places that person in reasonable fear" of death or serious injury. § 2261A. By contrast, the language of the statute in effect here makes it an offense only when a defendant, travelling in interstate commerce and acting with the requisite intent, "engages in conduct that" places a victim in such fear of death or injury. This additional language eliminates any doubt that, for conviction under § 2261A, a defendant must not only travel, but also engage in some kind of volitional conduct that places the victim in reasonable fear of death or injury—it is not sufficient that such fear may merely result from the travel itself.

Second, the *Minners* case is distinguishable for another important reason: there, the death resulting element was not implicated. Under Sixth Circuit precedent, crimes requiring proof of serious physical injury necessarily require proof of violent physical force. *United States v. Verwiebe*, 874 F.3d 258, 261 (6th Cir. 2017)(abrogated on other grounds by *Borden v. United States*, 141 S. Ct. 1817 (2021)). The same logic applies to crimes requiring proof that the defendant's actions resulted in death. *See, e.g., Battle v. United States*, No. 3:14-CV-01805, 2021 WL 1611917 at *7 (M.D. Tenn. Apr. 26, 2021)("under *Verwiebe*, a defendant's actions that result in the victim's death necessarily involve physical force even if the force applied is indirect.").

Though not binding precedent, the First Circuit's recent decision in *United States v. Tsarnaev*, 968 F.3d 24, 104 (1st Cir. 2020) (rev'd in part on other grounds, 142 S. Ct. 1024 (2022)), elucidates how a violation of § 2261A resulting in death is categorically a crime of violence. In the Boston Marathon bombing case, the First Circuit considered whether conspiracy to commit a violation of 18 U.S.C. § 2332f, which criminalizes bombing a public place, constituted a crime of violence, and concluded that § 2332f was "divisible into two branches: one in which there is no "death results" element (and the penalty is up to life in prison), and one in which "death results" is an element (and the penalty can be death). *Tsarnaev*, 968 F.3d. at 103-105. The "death results" enhancement was an "element" of § 2332f because that statute "incorporate[d] this penalty scheme," and because the death results enhancement authorized for a different punishment than a violation of § 2332f that did *not* result in death. *Id.* at 104. Therefore, because, under First Circuit precedent, any offense resulting in death is necessarily a crime involving the use of force, a violation of § 2332f resulting in death was a crime of violence. *Id.* at 104-105 (citing *United States v. Baez-Martinez*, 950 F.3d 119, 132 (1st Cir. 2020)).

**\*6** The same logic applies here. The penalty provisions of § 2261(b) are "incorporated into" § 2261A in the same manner as were the penalty provisions of § 2332f at issue in *Tsarnaev*. And here, as in that case, the "death results" element contained in § 2261(b) authorizes a longer term of incarceration than a violation of the statute that does not result in death, *see* § 2261(b)(1-5), making that provision an element of the crime. *Burrage v. United States*, 571 U.S. 204, 210 (2014). Finally, in agreement with the First Circuit, Sixth Circuit precedent holds that any crime requiring proof that a defendant's conduct caused serious physical injury necessarily requires the use of violent force—and the same logic holds true for crimes that require proof that death resulted. *See Verwiebe*, 874 F.3d at 261; *Battle*, 2021 WL 1611917 at \*7; *see also United States v. Davis*, No. 18-CR-20085, 2020 WL 4284315, at \*3 (E.D. Mich. July 27, 2020)(Borman, J.)(concluding murder-for-hire and conspiracy to commit murder-for-hire were crimes of violence where death resulted and accepting the argument that "[t]he added element of a resulting death, coupled with the standard element of intent to kill, qualifies the predicate offenses as crimes of violence").

Third, the Court agrees with the *Bacon* court that the hypothetical scenarios proposed by the *Minners* court *do* indeed involve at the very least, an implicit threat of force. *See Bacon*, 2021 WL 5051364 at \*14. For example, the *Minners* court proposes a hypothetical offender who, prior to interstate stalking, uses physical force against a victim, and the victim is therefore put in reasonable fear of death or injury when he or she learns that the offender will be in the victim's area. *Minners*, 2020 WL 4275040 at \*6. In this Court's view, if an offender stalks a victim against whom he has already used physical force in the past, and then, with the intent to intimidate, harass, or place that victim in fear of death, engages in some kind of conduct dangerous or threatening enough to cause a reasonable fear of death or serious injury, it seems clear that such conduct would be an implicit, if not explicit, threat that physical force will be used again.

Ultimately, except for far-fetched hypotheticals involving the forbidden application of "legal imagination," the Court fails to see how an offender acting with the intent to kill, injure, or harass, can "engage in conduct that places a person in reasonable fear of death or serious injury," and from which conduct death does indeed result, without the use or threatened use of physical violence. For these reasons, the Court concludes that interstate stalking resulting in death is a crime of violence, and Defendants' motion to dismiss Count Two must therefore be denied.

### b. Whether Count Three must be dismissed for failure to state an essential element of the offense

Count Three charges defendants with a violation of 18 U.S.C. § 1952(a). Under that statute, "[w]hoever travels in interstate or foreign commerce ... with intent to (2) commit any crime of violence to further any unlawful activity ... and thereafter performs or attempts to perform ... [a crime of violence to further any unlawful activity]" shall be imprisoned for up to twenty years or,

if death results, for life. § 1952(a)(2)(B). Defendants argue that Count Three fails to give notice of an essential element, as it does not specifically identify the "crime of violence" the Defendants allegedly committed. The Government responds that Count Three tracks the language of the statute, and meets the requirements of Federal Rule of Criminal Procedure 7 and the relevant Supreme Court precedent.

The Constitution imposes two requirements on an indictment: first, that it "contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, [that it] enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." *United States v. Resendiz–Ponce*, 549 U.S. 102, 108 (2007)(quoting *Hamling v. United States*, 418 U.S. 87, 117 (1974)). It is "generally sufficient that an indictment set forth the offense in the words of the statute itself, as long as those words of themselves fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the offence intended to be punished." *United States v. Coss*, 677 F.3d 278, 288 (6th Cir. 2012) (citation and internal marks omitted).

**\*7** Here, tracking the language of 18 U.S.C. § 1952, Count Three of the Third Superseding Indictment alleges that:

> On or about December 18, 2016, in the Eastern District of Michigan, and elsewhere, the defendants MICHAEL DEANGELO GRIFFIN, DENNIS CLIFTON EPPS and MARIANO LOZOYA GARCIA, aiding and abetting each other, did knowingly travel in interstate commerce from the area of Birmingham, Alabama to Detroit, Michigan, with the intent to commit violence to further an unlawful activity, that is, conspiracy to distribute and possess with intent to distribute a controlled substance in violation of Title 21, United States Code, Section 846, and thereafter committed and attempted to commit the crime of violence, to further such activity, and the crime of violence resulted in the deaths of Robert Eddins IV and Ricardo Denard McFarlin, all in violation of Title 18, United States Code, Sections 1952 and 2."

Third Super. Ind., ECF No. 123, PageID.471-72. Defendants cite no authority to explain why Count Three does not meet the Constitutional requirements.

Here, although the indictment does not specify exactly *what* crime of violence the Defendants committed, the indictment places the Defendants on notice of what they are accused of having done, particularly with the addition of the "death resulting" language. Similarly, Defendants do not argue—and it is not clear how they could argue—that the indictment is too vague to protect them from double jeopardy. This case can be analogized to the Sixth Circuit case *United States v. McClellan*, 436 Fed. Appx. 479, (6th Cir. 2011). In that case, several defendants were charged with carrying a firearm during a crime of violence in violation of § 924(c). The predicate offense for the disputed § 924(c) count was a violation of § 1952, which criminalizes travelling in interstate commerce with the intent to commit a crime of violence to further an unlawful activity. In *McClellan*, the indictment was amended at trial, striking from the § 924(c) charge a sentence that specified the crime of violence that the Defendants allegedly committed as part of the § 1952 charge. *Id.* at 487-488. The indictment otherwise tracked the language of the statute. *Id.* at 488. Affirming the district court's decision not to dismiss the indictment for failure to specify a crime of violence, the Sixth Circuit explained that the disputed count had to be read in the context of the entire indictment. *Id.* Considered in context, the previous § 1952 count in the *McClellan* indictment specified a crime of violence ("robbery and/or burglary") and noted that the crime of violence resulted in the death of a victim. *Id.* This, the Sixth Circuit concluded, was enough to inform the Defendant of the charge against him. Although, as Defendant Epps points out, the *McClellan* indictment was amended to *remove* more detailed language, and thus the defense "could not complain that it lacked

notice of the crime of violence" alleged in the original indictment, Epps' Repl., ECF No. 191, PageID.1025, the Sixth Circuit in *McClellan* did not rely on that fact in its analysis.

The same logic applies here. Counts Two and Four of the indictment specify that the Defendants "committed murder ... that is the unlawful killing of Robert James Eddins IV and Ricardo Denard McFarlin, with malice aforethought[.]" Third Super. Ind., ECF No. 123, PageID.570-73. The disputed Count Three, which Defendants seek to dismiss in these motions, states that the "crime of violence [that the Defendants committed to further unlawful activity] resulted in the deaths of Robert James Eddins IV and Ricardo Denard McFarlin." *Id.* at PageID.471-72. Considered in the context of the entire indictment, the language of Count Three informs the Defendants of the charge against them and allows them to plead double jeopardy. Therefore, Count Three need not be dismissed.

**\*8** However, at the January 7, 2022 hearing concerning these motions, the Government indicated that it would file a bill of particulars specifying the crime of violence Defendants allegedly committed in Count Three. Filing such a bill would leave no room for doubt that defendants have been given notice of the precise crime of violence being charged in Count Three. As of the date of this Order, no bill of particulars has yet been filed. And while the Indictment in its present form is not constitutionally deficient, a bill of particulars will clarify the issues for trial, and should be filed. With these considerations in mind, the Government is therefore directed to file a bill of particulars within 14 days of the date that this Order issues.

### c. Whether Count Four must be dismissed

Count Four charges Defendants with using or carrying a firearm in the course of a crime of violence—the offense charged in Count Three. Defendants contend that, if Count Three is dismissed—as they argue it must be—then Count Four must be dismissed as well. But for the reasons discussed above Count Three need not be dismissed, so neither must Count Four.

Moreover, the offense outlined in Count Three, a violation of 18 U.S.C. § 1952, does qualify as a crime of violence for purposes of § 924(c). Because § 1952 sets out multiple, alternative elements, it is a divisible statute, and the Court must look to the indictment to determine which part of the statute Defendants are charged with violating. *See Haynes v. United States*, 936 F.3d 683, 690 (7th Cir. 2019). The indictment charges Defendants with violating § 1952(a)(2), which criminalizes travelling in interstate commerce to commit a crime of violence to further unlawful activity, and § 1952(a)(2)(B), which imposes a greater term of incarceration if death results. To be convicted under § 1952(a)(2)(B) in Count Three, the Government must prove that Defendants committed or attempted to commit a crime of violence. *See United States v. Burns*, 298 F.3d 523, 537-38 (6th Cir. 2002); *United States v. Dvorkin*, 799 F.3d 867, 876 (7th Cir. 2015)(explaining that conviction 1952(a) requires that "a defendant carry out or otherwise attempt to accomplish his criminal intent"). As the Seventh Circuit explained in *Haynes*, the elements of that crime of violence are, therefore, incorporated into the § 1952(a) charge itself, and, so long as underlying crime would itself qualify as a crime of violence under § 924(c)—as the murders alleged here would—the § 1952(a) charge may properly support the § 924(c) charge in Count Four. *See Haynes*, 936 F.3d at 692. For these reasons, Count Four need not be dismissed.

### d. Whether the Government should be required to elect upon which of Counts Two, Four, and Six it will proceed

Defendant Garcia argues that Counts Two, Four, and Six are multiplicitous, because they charge the same conduct in three separate counts. Defendant Garcia relies on a Sixth Circuit case, *United States v. Vichitvongsa*, 819 F.3d 260 (6th Cir. 2016), for the proposition that a single act involving a firearm taken in furtherance of two simultaneous conspiracies may only

support a single conviction under § 924(c). Garcia Mot., ECF No. 176, PageID.843-44. The Government responds that *Vichitvongsa* applies only to situations where the predicate offenses were simultaneous, and argues that the predicates here were not simultaneous.

In a few limited circumstances, the Sixth Circuit has held that a single act of using or carrying a gun may support only a single § 924(c) charge. *See United States v. Johnson*, 25 F.3d 1335, 1336 (6th Cir. 1994) (deciding the "narrow question" of "whether a defendant may be sentenced to two or more consecutive terms for violating [§ 924(c)] by possessing firearms while simultaneously trafficking in two or more controlled substances" and holding that only one § 924(c) charge could stand); *Vichitvongsa*, 819 F.3d at 269-270. In *Vichitvongsa*, the defendant used the same firearm simultaneously to further two conspiracies: conspiracy to commit Hobbs Act robbery and conspiracy to traffic drugs. In order to obtain drugs to sell, the defendant participated in two armed robberies of drug dealers—acts which were in furtherance of both the Hobbs Act robbery conspiracy and the drug trafficking conspiracy. *Id.* at 265. Ultimately, the *Vichitvongsa* defendant was charged with two counts of conspiring to commit Hobbs Act robbery, two counts of conspiring to traffic drugs, and, because he used of a firearm in both robberies, he was also charged with *four* § 924(c) counts—two for each act of robbery. *Id.* The *Vichitvongsa* court explained that, although the predicate conspiracy offenses had different elements, "in order for the government to convict a defendant of more than one § 924(c) charge, the defendant must use, carry, or possess a firearm—even if it is the same one—more than once." *Vichitvongsa*, 819 F.3d at 269. Therefore, only one § 924(c) conviction per robbery could be sustained. *Id.* at 264. However, the *Vichitvongsa* court also emphasized the narrowness of its decision. *Id.* at 269. The key post-*Vichitvongsa* inquiry is whether a defendant made "more than one choice to use, carry, or possess a firearm." *Id.* at 270; *United States v. Jackson*, 918 F.3d 467, 494 (6th Cir. 2019) (only one § 924(c) charge was supported where a defendant "made a single choice to 'use, carry, or possess' a firearm in connection with [two] simultaneous carjackings[.]").

**\*9** At this stage, it would be premature to decide to require the government to elect between Counts Two, Four, and Six based on the holding of *Vichitvongsa*. There may be no *Vichitvongsa* problem, because the predicate offenses charged in Counts Two, Four and Six appear to have taken place over different time periods and involved different objectives. *See United States v. Davis*, No. 18-CR-20085, 2020 WL 4284315 at \*4 (E.D. Mich. July 27, 2020) (*Vichitvongsa* was not controlling and both of two § 924(c) counts where valid where indictment charged "one predicate offense [murder for hire] on one date, and one conspiracy offense [conspiracy to commit murder for hire] over a period of time," and where the government "spell[ed] out the conspiracy count's disparate, multiple activities that occurred on days apart, in addition to the day of the murder."). At this stage, however, it is unknown what the evidence at trial may show regarding the question of whether one or more of the defendants made only one choice—or several separate choices—to use, carry, or possess a firearm.

Whether any of the defendants made a single choice, or more than one choice, to use, carry, or possess a firearm, is a matter to be proved at trial, not resolved on a pretrial motion. *See United States v. Mills*, 378 F. Supp. 3d 563, 585 (E.D. Mich. 2019) (explaining that whether the evidence is sufficient to support only a single 924(c) conviction is a matter to be determined based on the evidence presented at trial); *United States v. Frazier*, No. 3:17-CR-00130, 2019 WL 4242412 at \*15 (M.D. Tenn. Sept. 6, 2019) (denying a similar motion without prejudice and explaining that "the proper remedy for multiplicitous counts may include allowing the jury to consider all counts that are reasonably supported by the evidence and addressing any multiple-punishment issues at sentencing by merging overlapping convictions.") (citation omitted) For that reason, Defendant Garcia's motion will be denied without prejudice, and, if the facts adduced at trial suggest that *Vichitvongsa* may be applicable, Garcia may raise the issue at that time.

#### e. Whether the sentencing allegations in Count Five should be struck

Because Griffin and several other defendants have prior felony drug convictions, the Government seeks to apply the sentencing enhancement set out in 🚩 21 U.S.C. § 841, which provides harsher penalties for defendants who have been convicted of a "serious drug felony." *See* Third Super. Ind., ECF No. 123, PageID.474-75. Therefore, Count Five includes information about Defendant Griffin's prior drug felony conviction—possession with intent to distribute cocaine base. *Id.* Griffin argues that this language is prejudicial and unnecessary. ECF No. 167, PageID.701-702.

Ordinarily, the fact of a prior conviction that establishes an enhancement may be found by the court, even though that fact may increase the penalty to which a defendant may be subject beyond the ordinary statutory maximum. 🚩 *Apprendi v. New Jersey*, 530 U.S. 466, 490. (2000). But any fact "that, by law, increases the penalty for a crime" *other than* the fact that a defendant has a prior conviction "is an 'element' that must be submitted to the jury and found beyond a reasonable doubt." 🚩 *Alleyne v. United States*, 570 U.S. 99, 103 (2013). Prior to December, 2018, 🚩 § 841 required only proof of a prior conviction. However, the First Step Act of 2018 now requires three facts to be found for the 🚩 § 841 enhancement for conviction of a prior "serious drug felony" to apply: (1) that the defendant committed "an offense described in 🚩 § 924(e)(2) of Title 18[;]" (2) for which the defendant served more than a year in prison; and, (3) that the defendant's release from prison was within 15 years of the commencement of the now-charged offense. 🚩 21 U.S.C.A. § 802(57).

The parties seem to agree, as does the court, that (1), the existence of a prior conviction, falls within the prior-conviction exception to *Alleyne*, and need not be found by a jury. *See* ECF No. 167, PageID.702. The Government also seems to agree that none of the sentencing facts need to, or indeed should be, included in the indictment presented to the jury for purposes of determining the Defendants' guilt. *See* Gov't. Supp. Br., ECF No. 231, PageID.1641. The other facts, that a defendant served more than a year in prison as a result of that conviction and that the defendant's release from prison occurred within 15 years of the present offense, however, are different and somewhat problematic. The parties argue, and several other district courts have concluded, that one or both of these temporal proximity facts fall outside of the narrow *Apprendi* exception for the "fact" of a prior conviction, and are "elements" under *Alleyne* that must be found by a jury. *See, e.g., United States v. Swinton*, No. 3:19-CV-65-1 (VLB), 2020 WL 1940744 at *3-4 (D. Conn. Apr. 22, 2020). 🚩 *United States v. Fields*, 435 F. Supp. 3d 761, 764-65 (E.D. Ky. 2020). [3]

**\*10**   At the January 7, 2022 hearing on these motions, the Government indicated that it had proposed a bifurcated trial procedure, consisting of a guilt phase and a sentencing phase. At the Court's request, the government has filed its proposal in writing. *See* ECF No. 231. The Court has reviewed the Government's proposal and, if Defendants and the government agree on this or a similar framework, the Court will entertain a two-phase trial of the sort contemplated by the Government's proposal.

In an effort to allow the parties to resolve this issue in a manner amenable to both sides, the Court will deny Griffin's motion with respect to Count Five without prejudice. If the parties do not agree on a procedure or stipulation for addressing the sentencing allegations prior to the final pretrial conference, Griffin may raise the issue at the pretrial conference and the Court will issue an order to resolve the matter. [4]

#### f. Discovery Motions

Also before the Court are two motions filed by Defendant Garcia pertaining to the discovery or preservation of certain evidence. The first motion asks the Court to order government investigators to preserve any "rough notes" generated during this

investigation. *See generally*, Mot. Regarding Notes, ECF No. 177. The other motion seeks an order requiring the government to disclose "the existence and substance" of any agreements between the government and any co-conspirator in this case. *See generally*, Mot. to Reveal the Deal, ECF No. 178. At the hearing on these motions, the government indicated that it had already directed its agents to preserve their rough notes, and would comply with its obligations to disclose impeachment evidence, including information pertaining to any agreements struck with co-conspirators in this case. Defendant Garcia's counsel indicated at that hearing that this was a satisfactory resolution to the issues presented by these two motions, and therefore the motions will be denied as moot.

## III. CONCLUSION

For the foregoing reasons, Defendants Griffin and Epps' Motions to Dismiss Counts Two, Three, and Four (ECF Nos. 167, 180) are **DENIED**. The portion of Griffin's Motion regarding the sentencing allegations contained in Count Five is **DENIED WITHOUT PREJUDICE**.

It is **FURTHER ORDERED** that the Government shall file a bill of particulars specifying the crime of violence contemplated by Count Three within 14 days of the date of this Order.

It is **FURTHER ORDERED** that Defendant Garcia's Motion to Dismiss Counts Two, Four, and Six (ECF No. 176) is **DENIED WITHOUT PREJUDICE**.

It is **FURTHER ORDERED** that Defendant Garcia's Motion to Reveal the Deal (ECF No 178) and Motion to Preserve Notes (ECF No. 177) are **DENIED AS MOOT**.

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2022 WL 2071054

## Footnotes

1        The Third Superseding Indictment charges Defendants Michael Griffin, Dennis Epps, and Mariano Garcia with: (1) Interstate Travel with the Intent to Kill, Injure or Harass in violation of 18 U.S.C. §§ 2261A(1) and 2261(b)(1) as well as aiding and abetting the same in violation of 18 U.S.C. § 2; (2) Use and Carry of a Firearm During and in Relation to, a Crime of Violence Causing Death, specifically the offense charged in Count One, in violation of 18 U.S.C. §§ 924(c) and 924(j) and aiding and abetting; (3) Interstate Travel in Aid of Unlawful Activity in violation of 18 U.S.C. § 1952 and aiding and abetting; (4) Use and Carry of a Firearm During and in Relation to, a Crime of Violence Causing Death, specifically the offense charged in Count Three, in violation of 18 U.S.C. §§ 924(c) and 924(j) and aiding and abetting; (5), along with two other Defendants, Conspiracy to Possess with Intent to Distribute and to Distribute Cocaine and Heroin in violation of 21 U.S.C. §§ 846, 841(A)(1), 841(b)(1)(A)(ii), and 841(b)(1)(C); (6) Using and Carrying a Firearm During and in Relation to a Drug Trafficking Crime, specifically

the offense charged in Count Five, and aiding and abetting; and (7) along with one other Defendant, Conspiracy to Launder Monetary Instruments in violation of 18 U.S.C. §§ 1956(a)(1)(A)(i), (a)(1)(B)(i) and 1956(h).

2    The legality of that traffic stop is discussed in ECF No. 237.

3    At least two district courts have reached the opposite result, concluding that none of the three facts must be found by a jury. *United States v. Lee*, No. 7:18-CR-153-FL-1, 2021 WL 640028 at *6-7 (E.D.N.C. Feb. 18, 2021) (concluding that none of the three facts required by § 841 must be found by a jury because an "inquiry into the 'fact of a prior conviction' may include antecedent findings and issues ... without running afoul of the Sixth Amendment.");

*United States v. Adams*, No. 1:18-CR-507-LMM-AJB, 2021 WL 2325641 at *21 (N.D. Ga. Mar. 17, 2021), report and recommendation adopted in relevant part, 2021 WL 1904680 at *8 (N.D. Ga. May 12, 2021).

4    As for Griffin's argument that § 841 is unconstitutional in its entirety because § 851—which sets out a procedure for proving the facts of a prior conviction for purposes of § 841—might allow an increased penalty to be applied in a manner that runs afoul of *Apprendi* and *Alleyne*, the Court has found no authority that would render § 841 wholly unconstitutional on that basis. Nor have any of the district courts to have considered the interplay between § 841, § 851, and the First Step Act found any reason to declare § 841 unconstitutional in its entirety. And moreover, in any event, § 841 will not be applied in an unconstitutional manner in this case, regardless of which procedural method the parties select or the Court may order to resolve this issue.

---

**End of Document** © 2023 Thomson Reuters. No claim to original U.S. Government Works.

 © 2023 Thomson Reuters. No claim to original U.S. Government Works.

34 F.4th 304
United States Court of Appeals, Fourth Circuit.

UNITED STATES of America, Plaintiff - Appellee,

v.

Chikosi LEGINS, Defendant - Appellant.

No. 20-4390
|
Argued: September 24, 2021
|
Decided: May 11, 2022

**Synopsis**

**Background:** Defendant, a former federal prison guard, was convicted in the United States District Court for the Eastern District of Virginia, David J. Novak, J., of making a false statement to law enforcement, and received an enhanced statutory maximum. Defendant appealed.

**Holdings:** The Court of Appeals, Richardson, Circuit Judge, held that:

evidence sufficiently supported finding that defendant's statements to Office of Inspector General were false, as required to support false-statement conviction;

jury's verdict convicting defendant of making a false statement was not inconsistent with its acquittal of defendant on sexual-assault counts;

indictment for making false statements to law enforcement did not allege a qualifying sexual-abuse offense, and thus did not justify an enhanced eight-year maximum sentence;

sentencing court's erroneous imposition of an enhanced eight-year statutory maximum sentence was harmless;

any error in government's statement during arraignment that defendant was only subject to a 5-year maximum for allegedly making a false statement to law enforcement, was harmless;

substantial evidence supported sentencing court's finding that some form of sexual contact occurred between defendant and victim in elevator, as required to support upward variance sentence of 54 months;

substantial evidence supported sentencing court's finding that some form of sexual contact, consensual or otherwise, occurred between defendant and victim in administrative office, as required to support upward variance sentence of 54 months; and

sentencing court did not improperly rely on acquitted crimes to calculate an initial guideline range.

Affirmed.

**Procedural Posture(s):** Appellate Review; Post-Trial Hearing Motion; Sentencing or Penalty Phase Motion or Objection.

**\*309**  Appeal from the United States District Court for the Eastern District of Virginia at Richmond. David J. Novak, District Judge. (3:19-cr-00104-DJN-1)

**Attorneys and Law Firms**

ARGUED: Charles A. Gavin, CAWTHORN, DESKEVICH & GAVIN, P.C., Richmond, Virginia, for Appellant. Christopher Chen-Hsin Wang, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. ON BRIEF: Gregory B. Friel, Deputy Assistant Attorney General, Tovah R. Calderon, Appellate Section, Civil Rights Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee.

Before DIAZ and RICHARDSON, Circuit Judges, and FLOYD, Senior Circuit Judge.

**Opinion**

Affirmed by published opinion. Judge Richardson wrote the opinion, in which Judge Diaz and Senior Judge Floyd joined.

RICHARDSON, Circuit Judge:

Former federal prison guard Chikosi Legins was indicted for sexually assaulting a prisoner twice and then lying to law enforcement about it. A jury convicted Legins only of making a false statement to law enforcement while acquitting him of the more substantial sex-crime charges. Following that verdict, the district court **\*310**  made two decisions that boosted Legins's sentence. First, it imposed an enhanced statutory maximum that was neither charged nor submitted to the jury. Second, it varied upward to impose the sentence Legins would have faced if he had been convicted of sexually abusing the prisoner.

On appeal, Legins challenges his false-statements conviction. We reject that challenge. Sufficient evidence supported that conviction, and any arguable inconsistency with the jury's acquittal on other counts does not invalidate the false-statement conviction. Legins next argues that the judge improperly imposed an enhanced statutory maximum penalty based on a judicial finding not in the indictment or found by the jury. *See* *Apprendi v. New Jersey*, 530 U.S. 466, 490, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000). We agree but are constrained to find the error harmless. *See* *Washington v. Recuenco*, 548 U.S. 212, 219–20, 126 S.Ct. 2546, 165 L.Ed.2d 466 (2006); *Neder v. United States*, 527 U.S. 1, 4, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999). Finally, we conclude that the court did not impose an unreasonable sentence.

## I. Background

### A. Alleged Sexual Assaults

In May 2018, B.L., then a prisoner at Petersburg Federal Correctional Institution, was hanging flyers around the prison to inform inmates of upcoming events. Legins, then a prison guard, escorted B.L. as he travelled from unit to unit to distribute the flyers. At 6:10 PM, a surveillance video shows the two men entering a camera-free staff corridor, along which was a similarly camera-free administrative office. At 6:15 PM, the video shows them emerging from the other side of the corridor. They offer wildly different accounts of the intervening 5 minutes.

That evening, B.L. reported to prison lieutenant Steven Arrant that he had been raped. After medical evaluation, B.L. prepared an affidavit describing his assault during those 5 minutes. According to B.L., Legins forced him to perform oral sex on him, and then anally raped him. Legins then ejaculated in his own hand and instructed B.L. to clean up.

And according to B.L., this was not the first time Legins sexually assaulted him. Two months earlier, Legins was similarly escorting B.L. as B.L. hung flyers. While in an elevator alone, Legins allegedly pushed B.L. to his knees and instructed B.L. to

perform oral sex on him, and B.L. did so. B.L. did not report this incident until after the May assault. He had, however, placed the sweatshirt he wore at the time, on which Legins had allegedly ejaculated, into a plastic bag. [1]

After completing his affidavit describing the assault, B.L. was taken to a local hospital, where a rape kit test was performed. The results were mixed. No physical indicia of forcible rape were found. But experts for both the prosecution and defense agreed that physical injuries are often not found. The exam did reveal toilet paper on B.L.'s anus, which the defense expert claimed would be unusual if the assault occurred as B.L. described. But Legins's DNA was found on a swab of B.L.'s anus, on B.L.'s jock strap, and on the sweatshirt B.L. kept from the March assault.

As all of this was going on, Legins began acting suspiciously. Before B.L. was taken to the hospital, Legins called the medical bay seeking medicine (which he had never done and was not authorized to **\*311** do) and made repeated calls to both the medical bay and the lieutenant's office seeking B.L.'s whereabouts (despite having no official reason to do so). When B.L. was leaving the medical bay, the escorting officer heard someone he believed to be Legins shout "You've got to be kidding me!" A few days later, Legins asked a fellow guard to write a statement saying that Legins was only alone with B.L. for a minute, but the guard refused because he had no personal knowledge of the events of that day.

Legins tells a very different story of what happened during those 5 minutes in May. In June 2018, he was interviewed by the FBI and the Office of Inspector General, placed under oath, and informed that false statements could be prosecuted under 🚩 18 U.S.C. § 1001. In the interview, Legins acknowledged taking B.L. into the secretary's office—which was unusual and against protocol—but denied any sexual activity. He claimed that he engaged in "just conversation" with B.L. while he unsuccessfully tried to log onto the computer to print documents. [2] Legins also claimed that he has never had any sexual contact with an inmate at Petersburg. When asked how he would explain the presence of his DNA were it to be found, Legins recalled that he had masturbated in the restroom located next to the secretary's office the day before the alleged sexual assault. Following the interview, Legins began repeating the masturbation story to his colleagues, adding a new detail: He had seen B.L. and another inmate unattended in that bathroom afterward, but did not report it even though they were in a restricted, guards-only area.

### B. District Court Proceedings

Legins was charged with sexual abuse of a ward [3] for the March incident. For the May incident, he was also charged with sexual abuse of a ward, aggravated sexual abuse, [4] and deprivation of civil rights. [5] In a final count, Legins was charged with making false statements [6] during his interview. The language of this false-statement count—the focus of this appeal—is as follows:

> **\*312** On or about June 5, 2018, in the Eastern District of Virginia, the defendant, CHIKOSI LEGINS, knowingly and willfully made false, fictitious, and fraudulent statements and representations to Special Agents of the Federal Bureau of Investigation (FBI) and the Department of Justice (DOJ) Office of the Inspector General as to material facts in relation [to] a matter within the jurisdiction of the FBI and DOJ, agencies of the United States. Specifically, the defendant, CHIKOSI LEGINS: (1) falsely denied that he engaged in a sexual act with any inmate at any time at Federal Correctional Institution, Petersburg; and (2) falsely stated that on May 10, 2018, he attempted to use a computer and printer while he was engaged in "just conversation" with inmate B.L. when they were alone in an unattended office with no surveillance cameras. Those statements and representations by CHIKOSI LEGINS were false, because as CHIKOSI LEGINS then well knew, he had engaged in a sexual act with an inmate at Federal Correctional Institution, Petersburg; and on May 10, 2018, the defendant used an unattended office with no surveillance cameras to engage in a sexual act with B.L.

During his arraignment, the government stated that the maximum sentence on the false-statement charge was 5 years. Legins pleaded not guilty and went to trial by jury. At trial, the jury was presented with a verdict form that asked whether Legins was guilty "as charged in [the false-statement count] of the Indictment," and asked it to note "which—or both—of [the two alleged false statements] supports [its] guilty verdict." J.A. 820.

The jury convicted Legins on the false-statement count. In finding him guilty of that count, the jury found that both statements presented in the Indictment supported the verdict—that is, both lying about "engag[ing] in a sexual act with any inmate" and lying about using a computer and printer while "engaged in 'just conversation' " with B.L. in the office. J.A. 820. But the jury acquitted Legins on all other counts, even though they involved the commission of the sexual acts that the jury found Legins lied about.

After denying Legins's motion for acquittal notwithstanding the verdict, the district court observed that the false-statement count justified an enhanced 8-year maximum sentence—not the standard 5-year maximum—because Legins's statement involved a sexual crime that is an "offense under Chapter 109A" of the criminal code. Legins objected to the increased statutory maximum sentence under *Apprendi* [7] and argued that the "misstatement" of the 5-year maximum sentence during arraignment also prejudiced him. The court disagreed and applied the 8-year statutory maximum. The increased statutory maximum also increased Legins's guideline offense level by 4 levels to 18. *See* U.S.S.G. § 2J1.2(b)(1)(A) ("If the (i) defendant was convicted under 18 U.S.C. § 1001; and (ii) statutory maximum term of eight years' imprisonment applies because the matter relates to ... chapter[ ] 109A ... increase by 4 levels."). Having no criminal history, Legins then faced a guidelines range of 27–33 months. *See* U.S.S.G. Ch. 5 Pt. A. [8]

**\*313**  At sentencing, the court adopted the 27–33-month range and granted the prosecution's requested upward variance. The court found that, while the guidelines accounted for the underlying May sexual abuse, [9] they did not reflect that Legins had abused B.L. more than once. The guidelines range did not reflect the "related conduct from the March offense—namely abusive sexual contact in violation of 18 U.S.C. § 2244(a)(4)." J.A. 1057. [10] Thus, as a "starting point" for determining the appropriate size of the variance, the court calculated the guideline range for this sexual offense: 15–21 months. *Id.* The Court then added this range to that for the false-statement count, leading to a total of 42–54 months. The court ultimately varied upwards to 54 months "[t]o account for" the March offense; the extent of Legins's "obstruction"—i.e., his calls to the medical bay and lieutenant's office during the initial investigation; his "premeditation"—i.e., concocting alternative explanations for the presence of his DNA; and a history of similar conduct—i.e., prior reprimands for making lewd comments to female wards and inappropriately entering female-only areas. J.A. 1058.

The court found that a 54-month sentence was appropriate given the "seriousness of the Defendant's conduct" and the need to afford "adequate deterrence to Defendant and other correctional officers," while still accounting for Legins's positive role in his family, country, and religious community. J.A. 1058; *see* 18 U.S.C. § 3553(a). This appeal followed. We have jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a).

## II. Discussion

We consider in turn Legins's arguments that: (1) his conviction is not supported by sufficient evidence; (2) his sentence was for a crime of which he was neither indicted nor convicted; and (3) his sentence is otherwise unreasonable.

### A. The Evidence Supports the Conviction

Legins first argues that his false-statement conviction was not supported by sufficient evidence. A § 1001 false-statement conviction requires (1) a false statement in a matter involving a government agency, (2) made knowingly or willfully, that is (3)

material to the matter within the agency's jurisdiction. 🔖 *United States v. Hamilton*, 699 F.3d 356, 362 (4th Cir. 2012). Legins's sufficiency challenge focuses on the first element, a false statement.

The government chose to go beyond reciting the three elements in the indictment. *See* 🔖 *Hamling v. United States*, 418 U.S. 87, 117, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974) (stating that an indictment is sufficient if it (1) "contains the elements of the offense charged and fairly informs a   **\*314**  defendant of the charge against which he must defend," and (2) "enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense"). The indictment includes two allegedly false statements and gives the reasons why each statement was false. As a result, Legins argues that the government could only convict him if they proved the statements were false *for the reasons* given in the indictment. [11]  So under his theory, the government had to prove that (1) Legins's denial of having "engaged in a sexual act with any inmate at any time at Federal Correctional Institution, Petersburg" was false because "he had engaged in a sexual act with an inmate at Federal Correctional Institution, Petersburg"; or (2) Legins's statement that "on May 10, 2018, he attempted to use a computer and printer while he was engaged in 'just conversation' with inmate B.L. when they were alone in an unattended office with no surveillance cameras" was false because "on May 10, 2018, the defendant used an unattended office with no surveillance cameras to engage in a sexual act with B.L." [12]  Legins argues there was insufficient evidence that he had performed a sexual act on an inmate, so a reasonable jury could not have found that his statements were false for the reasons alleged in the indictment.

"A defendant challenging the sufficiency of the evidence to support his conviction bears a heavy burden." *United States v. Beidler*, 110 F.3d 1064, 1067 (4th Cir. 1997) (cleaned up). That is because it is the jury's role to weigh conflicting evidence and find the truth; once that finding is made, we will not lightly disturb it. So "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." 🔖 *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Viewing the evidence in the light most favorable to the prosecution requires drawing all reasonable inferences in favor of the government and assuming the jury resolved any conflicting evidence in the prosecution's favor. *United States v. Jeffers*, 570 F.3d 557, 565 (4th Cir. 2009). Even an uncorroborated account of a single witness may constitute sufficient evidence. *United States v. Clark*, 541 F.2d 1016, 1017–18 (4th Cir. 1976) (per curiam); *United States v. Shipp*, 409 F.2d 33, 35–36 (4th Cir. 1969). [13]

 **\*315**  Sufficient evidence supported finding that both of Legins's statements were false for the reason charged—that is, Legins had performed a sexual act on an inmate. [14]  B.L. testified under oath that Legins had performed a sexual act on him. Just this account, if found credible by the jury (and we must assume it was), may suffice. *See Shipp*, 409 F.2d at 35–36. But the account is also significantly corroborated. An anal swab performed after the May incident revealed Legins's DNA, which was also found on B.L.'s clothing (including his jock strap). And B.L.'s testimony to explain the events was contradicted by the prison's IT manager, who confirmed that Legins did not try to use the computer during that time. Furthermore, the defendant's request for a colleague to falsely attest to personal knowledge that Legins was only with B.L. for a minute also shows he was conscious of his wrongdoing. *See* 🔖 *Wilson v. United States*, 162 U.S. 613, 621, 16 S.Ct. 895, 40 L.Ed. 1090 (1896) ("The destruction, suppression, or fabrication of evidence undoubtedly gives rise to a presumption of guilt, to be dealt with by the jury."); *United States v. McDougald*, 650 F.2d 532, 533 (4th Cir. 1981). So a rational juror could have concluded beyond a reasonable doubt that Legins performed a sexual act on B.L., making both statements false for the reasons alleged.

Legins responds by pointing to a laundry list of potential alternative sources of the DNA found on B.L.'s anus and clothing and to alleged inconsistencies between B.L.'s testimony and other evidence. Neither helps his cause. While the DNA found on B.L.'s anus and clothing *might* not have come through sexual contact, it is a reasonable inference that it did, given the location at which some of the DNA was found (i.e., B.L.'s anus) and B.L.'s testimony about its source. Legins's alleged inconsistencies fare no better. B.L. testified the rape "lasted like five minutes" after which B.L. cleaned himself up. This could not be, Legins argues, because a 5-minute rape would not have left enough time to clean up during the 5 minutes and 15 seconds the two were alone. But even if B.L.'s testimony could be read to overstate the length of the rape, it does little to undermine his testimony. For someone being coerced into unwanted sexual acts, 1 minute may feel like 5. The same goes for the Legins's arguments about

the lack of physical injury and the presence of toilet paper. The defense's expert only contended that she would not "anticipate" finding a lack of injuries and the presence of toilet paper if the event had occurred as B.L. described, not that B.L.'s description was *impossible*, and even then the jury was not required to believe her. We do not ask whether Legins's position is supported by some evidence, or even most evidence. We may only consider whether, viewing all the evidence in the light least favorable to Legins, *any* rational juror could have found it substantial enough to convict him. And **\*316** here, even with some contradictory evidence, there was sufficient evidence that Legins committed a sex act against B.L.

Legins counters that the evidence of any sexual act during the March and May incidents must have been unreliable because the jury acquitted Legins on the sexual-assault counts. Though framed as part of his sufficiency challenge, this is essentially an inconsistent-verdict argument—that the jury inconsistently concluded that Legins did not commit the charged sexual acts but did commit a sexual act for the false-statement count. We reject this contention for two reasons.

First, even if the verdict were internally inconsistent, it would not entitle Legins to relief. A defendant "cannot challenge his conviction merely because it is inconsistent with a jury's verdict of acquittal on another count." *United States v. Thomas*, 900 F.2d 37, 40 (4th Cir. 1990) (citing *United States v. Powell*, 469 U.S. 57, 83, 105 S.Ct. 471, 83 L.Ed.2d 461 (1984)); *accord United States v. Godel*, 361 F.2d 21, 24 (4th Cir. 1966) (upholding a § 1001 conviction despite an inconsistent acquittal on the underlying crime). As we have recognized, "an inconsistent verdict can result from mistake, compromise, or lenity, and a jury could just as likely err in acquitting as convicting." *United States v. Louthian*, 756 F.3d 295, 305 (4th Cir. 2014). So a reviewing court's "assessment of the reason for the inconsistency would be based either on pure speculation, or would require inquiries into the jury's deliberations that courts generally will not undertake." *Powell*, 469 U.S. at 66, 105 S.Ct. 471. The latter is proscribed by the long-standing and near-absolute no-impeachment rule, which upholds the justice system's "strong interest in protecting the finality of jury verdicts, encouraging open deliberations in the jury room, and preventing the harassment of jurors by litigants seeking to overturn the verdict." *Richardson v. Kornegay*, 3 F.4th 687, 702 (4th Cir. 2021). That leaves us with nothing but "pure speculation" into the jury's deliberations. We decline, as we have many times before, to engage in such speculation. *See Thomas*, 900 F.2d at 40; *Louthian*, 756 F.3d at 305–06.

Second, even if inconsistency would entitle Legins to relief, the jury's verdict is not necessarily inconsistent. The sexual-abuse counts each required the jury, as an element of the offense, to determine whether Legins committed a "sexual act," and the court instructed them on the precise legal definition of "sexual act" for each charge: either penetration or contact between a mouth and a penis or anus. [15] But during its discussion of the false-statement count, the court did not instruct the jury on the definition of "sexual act." Nor did it need to: "Sexual act" was used in that count descriptively, as part of the indictment's factual narrative. It was not an element of the offense, so it did not carry any particular legal definition.

In diligently following the jury instructions, the jury could have correctly concluded that "sexual act" as used in false-statement count carried its ordinary, colloquial meaning. That may include acts, such as masturbation, that are excluded under the legal definitions of "sexual act" applicable in the sexual-abuse counts. During his **\*317** closing argument, *defense counsel* proposed that the jury conclude that B.L. had voluntarily masturbated Legins—which would somewhat explain the presence of Legins's DNA on B.L.'s body and clothing. 4 Trial Transcript at 153:7–158:10, *United States v. Legins*, No. 3:19-cr-00104-DJN-1 (E.D. Va. Feb. 11, 2020), ECF No. 138. So if the jury found—as defense counsel asked them to—that B.L. had masturbated Legins, they could have properly convicted Legins on the false-statement count, despite acquitting him on sexual-abuse counts.

Because we find sufficient evidence to support Legins's conviction, and because the jury's verdict was not necessarily inconsistent—and would not entitle Legins to relief even if it were—we affirm Legins's conviction.

## B. The District Court Committed a Harmless *Apprendi* Error

Legins next challenges the district court's conclusion that he was subject to a statutorily enhanced maximum sentence for his false-statement conviction. Section 1001 sets the statutory maximum sentence at "5 years." But if "the matter relates to an offense under chapter 109A ... then the term of imprisonment imposed under this section shall be not more than 8 years." 18 U.S.C. § 1001(a). Chapter 109A includes aggravated sexual abuse and sexual abuse of a ward, which Legins was being investigated for when he made the false statements. So the government could have charged and convicted Legins of the aggravated § 1001 offense carrying the 8-year maximum—a point that Legins himself does not appear to contest. *See* Def.'s Position on Statutory Maximum, *United States v. Legins*, No. 3:19-cr-00104-DJN-1 (E.D. Va. Mar. 12, 2020), ECF No. 144 ("Hypothetically, it would be disingenuous of defense counsel to argue that the false statements which are before the court do not relate to offenses under Chapter 109(A)."). But though he could have been charged, he was not. And absent a charge and conviction, Legins was not subject to the 8-year statutory maximum sentence. Even so, we are constrained to find the district court's erroneous use of this enhanced statutory maximum harmless.

### 1. Existence of *Apprendi* Error

The Fifth and Sixth Amendments guarantee that, in federal courts, "[n]o person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury," and that guilt must be determined by "an impartial jury." U.S. Const. amends. V, VI. This significant safeguard of individual liberty ensures that the government cannot take away that liberty without the consent of two juries. It is thus necessary that all elements of an offense be included in the grand jury's indictment and submitted to the petit jury for its guilt determination. "[A] fact is by definition an element of the offense ... if it increases the punishment above what is otherwise legally prescribed." *Alleyne v. United States*, 570 U.S. 99, 107–08, 133 S.Ct. 2151, 186 L.Ed.2d 314 (2013). Thus, the Constitution requires that any fact that increases the statutory maximum, such as the increase in § 1001 from a 5-to an 8-year maximum, be alleged in the indictment and found by a jury, just like all other offense elements. *Apprendi*, 530 U.S. at 473–74, 120 S.Ct. 2348. [16]

**\*318**  The indictment does not allege that the matter within the FBI and DOJ's jurisdiction "relate[d] to" a Chapter 109A sexual-abuse offense. And the jury's verdict mirrors the indictment. Even so, the district court found the relation to a Chapter 109A sexual abuse offense matter was implied by other facts alleged. The indictment charged that Legins "[f]alsely den[ied] that he engaged in a sexual act with any inmate at any time at Federal Correctional Institute, Petersburg." J.A. 28. That statement was false, according to the indictment and the jury's guilty verdict, because Legins had engaged in a sexual act with an inmate. And since sexual acts with an inmate are prohibited by Chapter 109A, the district court applied the enhanced statutory maximum.

But there is a subtle yet significant mismatch between the facts alleged and found by the jury and the aggravating factor in § 1001. The jury found that Legins made statements that were false because he committed a sexual act with an inmate. Section 1001's aggravating factor depends on whether the "matter" within the FBI's jurisdiction when the statements were made were "relate[d] to" a Chapter 109A offense. Indeed, the statements need not be false denials of a Chapter 109A charge nor do the statements need primarily concern a Chapter 109A offense. Put another way, the aggravating factor in § 1001 depends not on a statement's *contents*, but rather the *context* in which it was made. The jury's finding turned on the conduct that rendered the statements false, while the aggravating factor depends on the nature of the investigation.

For example, imagine a situation in which a prison guard is being investigated for taking bribes from a particular prisoner in violation of 18 U.S.C. § 201. In actuality, the guard has also performed sexual acts with that prisoner. During the interview, the guard insists that he has never had a relationship with the prisoner, sexual or otherwise. The statement is a materially[17] false representation under § 1001(a)(2), which concerns an undiscovered Chapter 109A offense and is false because the guard has

committed a Chapter 109A offense. But the "matter" within law enforcement's jurisdiction at the time, the bribery investigation, did not relate to a Chapter 109A offense, so an 8-year sentence would be inappropriate.

To be sure, these are not the facts of our case; the FBI informed Legins early in the interview that he was being investigated for sexual abuse. But that fact was never alleged in the indictment, never stipulated to by the defendant, and never found by the jury. So neither the indictment nor the jury verdict contained sufficient facts on which to try or convict Legins on an 8-year aggravated § 1001 offense.

### 2. Harmless Error

Finding this constitutional error does not end our inquiry, however, because not all constitutional errors require automatic reversal; instead, "[m]ost constitutional errors can be harmless." **\*319** *Neder v. United States*, 527 U.S. 1, 8, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999) (quoting *Arizona v. Fulminante*, 499 U.S. 279, 306, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991)). [18] An error is harmless if it does not affect the defendant's "substantial rights." Fed. R. Crim. P. 52(a). For constitutional errors, the government bears the heavy duty of proving "beyond a reasonable doubt that the error complained of did not contribute to the [result] obtained." *Neder*, 527 U.S. at 15, 119 S.Ct. 1827 (quoting *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)).

But before we can determine whether the error was harmless, we need to determine what exactly that error was. There are two plausible options. First, we may think of it as a trial error: The government failed to include the aggravating factor in its indictment and jury instructions—omitting an essential element of its case. Or we may think of it as a sentencing error: Legins was properly charged and convicted of a baseline § 1001 offense, but the court erroneously sentenced him as if he had been convicted of the aggravated § 1001 offense.

The choice between these two options dictates how we conduct harmless-error analysis. For trial errors—such as the omission of an element from the indictment and jury instructions—we ask whether the jury would have reached the same verdict had the element been included. *See Greer v. United States*, —— U.S. ——, 141 S. Ct. 2090, 2100, 210 L.Ed.2d 121 (2021); *id.* at 2102 (Sotomayor, J., concurring in part) ("[A] constitutional [trial] error is harmless only if there is no reasonable doubt about whether it affected the jury's actual verdict in the actual trial."); *Neder*, 527 U.S. at 18, 119 S.Ct. 1827. In *Neder*, for instance, the defendant was charged **\*320** with tax fraud—making materially false statements on his tax return. 527 U.S. at 6–7, 119 S.Ct. 1827. But the trial court's instructions to the jury omitted the necessary requirement that the misrepresentation be material. *Id.* at 6, 8, 119 S.Ct. 1827. Without that element, Neder had not been convicted of any crime. Yet the Supreme Court affirmed Neder's conviction, holding that the constitutional error was harmless. *Id.* at 19–20, 119 S.Ct. 1827. This was so, the Court held, because no rational jury could have found that Neder's statements were immaterial given the "overwhelming" and "uncontroverted" evidence of materiality. *Id.* at 16–18, 119 S.Ct. 1827. The Court focused on the trial error because without the omitted element there was no crime on which Neder could be sentenced. Thus, *Neder* made clear that omitting an element is a trial error when the conduct is not a crime without the missing element.

But courts struggled with whether the same held true when the missing element was perceived as a sentencing factor, which affects the statutory sentencing range. In such a case, the defendant would still be guilty of an offense without the omitted element, just one carrying a lower possible sentence. So we might characterize that sort of missing-element error as a "sentencing" error; the court erroneously sentenced the defendant based on the greater crime instead of the lesser crime of which he was convicted. In that case, the error would be harmless if "the result at sentencing would have been the same" without the

error. 🚩 *United States v. Montes-Flores*, 736 F.3d 357, 370 (4th Cir. 2013). In other words, had the defendant been sentenced based on the crime for which he was charged and convicted, would he have received the same sentence?

Our circuit adopted this sentencing-error approach in 📁 *United States v. Promise*, 255 F.3d 150, 160 (4th Cir. 2001) (en banc). In 📁 *Promise*, as here, the district court imposed a statutory sentence enhancement (for certain drug amounts) that was not in the indictment or jury verdict. 📁 *Id.* at 153. Because the defendant did not object below under 📁 *Apprendi* (which had not yet been decided), we reviewed for plain error. Like harmless error, plain-error review requires the court to assess whether the error affected the defendant's "substantial rights." *Compare* Fed. R. Crim. P. 52(a), *with* Fed. R. Crim. P. 52(b). To decide whether the error affected Promise's substantial rights, we began, as we do here, by trying to define the nature of the error.

Chief Judge Wilkinson advocated for the trial-error approach: Although the government and court had failed to include the drug quantities in Promise's indictment and verdict form, the evidence of those drug amounts was overwhelming and uncontroverted. 📁 *Promise*, 255 F.3d at 166 (Wilkinson, C.J., concurring in part). So, Chief Judge Wilkinson concluded, the jury would have reached the same verdict even if the missing sentencing factor had been included in the indictment and jury instructions, and there was accordingly no error affecting Promise's substantial rights. 📁 *Id.*

But his view did not convince the court, which concluded that "the failure to charge a specific threshold drug quantity in the indictment or to instruct the jury regarding threshold drug quantity was not the error committed by the district court .... What was not valid was the sentence imposed, which exceeded the applicable maximum for the facts charged and proven." 📁 *Id.* at 160 n.8 (majority opinion). So the court implicitly rejected 📁 *Neder*'s trial-focused harmless-error standard, instead looking to whether the error affected Promise's sentence. And because Promise received a higher sentence than he would have had the 📁 *Apprendi* error not occurred, **\*321** the court found that his substantial rights *were* affected. 📁 *Id.* at 160.

In the years that followed, our circuit applied 📁 *Promise*'s sentencing conception of 📁 *Apprendi* errors in harmless-error analyses. *See* 📁 *United States v. Stokes*, 261 F.3d 496, 501 (4th Cir. 2001); 📁 *United States v. Chase*, 296 F.3d 247, 250 (4th Cir. 2002). We did so most expressly in ⚠️ *United States v. Mackins*, 315 F.3d 399 (4th Cir. 2003). As in 📁 *Promise*, the three defendants in ⚠️ *Mackins* were convicted of drug crimes, but neither the indictment nor jury form indicated the quantities of drugs involved. 📁 *Id.* at 404–05. When the judge determined those quantities at sentencing to increase the defendants' sentences, one of the defendants objected. ⚠️ *Id.* at 407. While conceding that an 📁 *Apprendi* error had occurred, the Government argued that it was harmless because the evidence of the drug amounts was " 'overwhelming' and 'uncontroverted.' " ⚠️ *Id.* at 409. The court rejected that argument. Relying on 📁 *Promise* and cases applying it, the court held that the proper harmless-error inquiry for an " 📁 *Apprendi* sentencing error" is whether "it ... result[ed] in a sentence greater than that which would otherwise have been imposed." ⚠️ *Id.* at 409 (quoting 📁 *Chase*, 296 F.3d at 250).

But three years later in 📁 *Washington v. Recuenco*, 548 U.S. 212, 126 S.Ct. 2546, 165 L.Ed.2d 466 (2006), the Supreme Court directed that we are to apply the same harmless-error standard from 📁 *Neder* to cases involving omitted sentencing factors. Arturo Recuenco threatened his wife with a handgun, for which he was charged in state court with assault with a deadly weapon. 📁 *Id.* at 214, 126 S.Ct. 2546. The jury found Recuenco guilty of assault and specified that the assault had been committed with a "deadly weapon." But at sentencing, rather than impose a 1-year mandatory sentencing enhancement for assaults involving a "deadly weapon," the judge imposed a 3-year mandatory enhancement for assaults involving a "firearm." 📁 *Id.* at 215, 126

S.Ct. 2546. The Washington Supreme Court held that this was an 🚩 *Apprendi* error because the defendant was sentenced on an offense of assault with a firearm even though the firearm element was neither charged nor found by the jury. 🚩 *Id.* at 216, 126 S.Ct. 2546. The state supreme court then held that this error was "structural"—i.e., can never be "harmless"—and accordingly vacated Recuenco's sentence. 🚩 *Id.*

The United States Supreme Court reversed, holding that 🚩 *Apprendi* errors, like most constitutional errors, can be harmless. 🚩 *Id.* at 220, 126 S.Ct. 2546. That top-line holding does not, of course, resolve *how* to perform the harmless-error analysis. But the Court's rationale makes that answer clear. The Court began by describing 🚩 *Neder*, in which, to reiterate, the Court held that the omission of an element of the offense may be harmless if it is "uncontested and supported by overwhelming evidence." 🚩 *Neder*, 527 U.S. at 17, 119 S.Ct. 1827. 🚩 *Recuenco* then explained:

> The State and the United States urge that this case is indistinguishable from 🚩 *Neder*. We agree. Our decision in 🚩 *Apprendi* makes clear that "[a]ny possible distinction between an 'element' of a felony offense and a 'sentencing factor' was unknown to the practice of criminal indictment, trial by jury, and judgment by court as it existed during the years surrounding our Nation's founding."

🚩 548 U.S. at 220, 126 S.Ct. 2546 (quoting 🚩 *Apprendi*, 530 U.S. at 478, 120 S.Ct. 2348).

Recuenco argued that 🚩 *Neder*'s trial-error approach did not apply because he was charged and convicted of one distinct crime (assault with a deadly weapon) but sentenced for another (assault with a firearm); this amounted, he argued, to "a directed

**\*322** verdict of guilt on an offense ... greater than the one for which the jury convicted him." 🚩 *Id.* at 221, 126 S.Ct. 2546. Justice Ginsburg, writing in dissent, made a similar argument. Unlike in 🚩 *Neder*, "[n]o error marred the case presented at trial. The prosecutor charged, and the jury found Recuenco guilty of, a complete and clearly delineated offense: 'assault in the second degree, being armed with a deadly weapon.' " 🚩 *Id.* at 225, 126 S.Ct. 2546 (Ginsburg, J., dissenting). In Justice Ginsburg's view, the error occurred post-trial at sentencing. The judge's decision to tack on the uncharged, unsubmitted firearms enhancement, she insisted, displaced "the jury's entirely complete verdict with, in essence, a conviction on an uncharged greater offense." 🚩 *Id.* at 228, 126 S.Ct. 2546.

But the Court was unpersuaded. Under 🚩 *Apprendi*, the Court noted, "elements and sentencing factors must be treated the same for Sixth Amendment purposes." 🚩 *Id.* at 220, 126 S.Ct. 2546 (majority opinion). Both Recuenco and Neder were sentenced for a crime which they were almost, but not exactly, charged and found guilty. For Neder, the missing element was materiality. 🚩 *Id.* at 221, 126 S.Ct. 2546. For Recuenco, it was use of a firearm. That Recuenco's crime, without the missing element, was itself a different crime did not, in the Court's view, make any difference. 🚩 *Id.* Holding otherwise, the Court noted, would produce bizarre results. If Washington, for instance, only criminalized "assault in the second degree while armed with a firearm," then the omission of the "with a firearm" element could be harmless error under the standard in 🚩 *Neder*. 🚩 *Id.* at 221–22, 126 S.Ct. 2546. To hold that 🚩 *Neder* applied in that case, but not in Recuenco's would, in the Court's view, defy logic. 🚩 *Id.* at 222, 126 S.Ct. 2546.

The takeaway from 🚩 *Recuenco* is clear: The Government's failure to include a sentence-enhancing factor in the indictment and jury charge should be treated exactly like its failure to include any other element of an offense. And the proper way to perform harmless-error analysis in both cases is to ask whether proof of the missing element is "overwhelming" and "uncontroverted."

*Neder*, 527 U.S. at 17–18, 119 S.Ct. 1827. In the years following *Recuenco*, that is how we, along with most of our sister circuits, have analyzed preserved *Apprendi* errors. *United States v. Catone*, 769 F.3d 866, 874 (4th Cir. 2014); *accord United States v. Harakaly*, 734 F.3d 88, 95–97 (1st Cir. 2013); *United States v. Confredo*, 528 F.3d 143, 156 (2d Cir. 2008); *Tarver v. Banks*, 541 F. App'x 434, 438–39 (5th Cir. 2013); *United States v. Kuehne*, 547 F.3d 667, 681 n.4 (6th Cir. 2008); *United States v. Hollingsworth*, 495 F.3d 795, 806 (7th Cir. 2007); *United States v. Guerrero-Jasso*, 752 F.3d 1186, 1193 (9th Cir. 2014); *United States v. King*, 751 F.3d 1268, 1279–80 (11th Cir. 2014); *United States v. Lopesierra-Gutierrez*, 708 F.3d 193, 208 (D.C. Cir. 2013); *contra United States v. Lewis*, 802 F.3d 449, 456 (3d Cir. 2015) (en banc) (treating *Apprendi* error as a sentencing error and declining to apply *Neder* harmless-error test).

In *Catone*, the defendant was charged and convicted of making false statements relating to federal benefits, violating 18 U.S.C. § 1920. 769 F.3d at 869. Under that statute, if the "benefits falsely obtained" exceed $1,000, the defendant is guilty of a felony punishable by up to a 5-year prison term; otherwise, they are guilty only of a misdemeanor punishable by no more than 1 year of imprisonment. 18 U.S.C. § 1920. Catone argued that, because the jury never found the amount of money he fraudulently obtained, his sixteen-month felony sentence violated *Apprendi*; the government countered that any such error was harmless.

**\*323** *Catone*, 769 F.3d at 872–73. We found *Neder*'s trial-error test applied: An "*Apprendi* error is harmless 'where a reviewing court concludes beyond a reasonable doubt that the omitted element was uncontested and supported by overwhelming evidence, such that the jury verdict would have been the same absent the error.' " *Id.* at 874 (quoting *Neder*, 527 U.S. at 17, 119 S.Ct. 1827).[19]

We therefore apply the harmless-error analysis supplied by *Neder* to the *Apprendi* error before us. To do so, we ask whether there is overwhelming and uncontroverted evidence that the "matter" within law enforcement's jurisdiction when they questioned Legins "related" to a Chapter 109A offense. Chapter 109A is entitled "Sexual Abuse," and includes 18 U.S.C. § 2243, Sexual Abuse of a Minor or Ward, one of the crimes for which Legins was later charged. That section prohibits any sexual act with a person who is in official detention under the defendant's custodial authority. 18 U.S.C. § 2243(b). Early in the June 5 interview, the investigators told Legins the following: "Mr. Legins, we are here today to interview you as a subject to answer questions in an official joint OIG-FBI investigation regarding sexual abuse of an inmate at FCI Petersburg." Digitally Recorded Sworn Statement of Chikosi Legins 3–4, *United States v. Legins*, No. 3:19-cr-00104-DJN-1 (E.D. Va. July 6, 2020), ECF No. 174, Attach. 1. They then reiterated that the investigation "pertains to sexual abuse." *Id.* There is no dispute that the investigators made these statements or that they are true.[20] So the statutory sentencing enhancement is supported by overwhelming evidence.

It is also uncontroverted: During his argument in the district court as to why the sentence enhancement should not apply, Legins conceded that "it would be disingenuous of defense counsel to argue that the false statements which are before the court do not relate to offenses under Chapter 109(A)" because the alleged false statements "were in connection with Counts One through Four, three of which are in Chapter 109(A)." Def.'s Position on Statutory Maximum at 2, *United States v. Legins*, No. 3:19-cr-00104-DJN-1 (E.D. Va. Mar. 12, 2020), ECF No. 144. Because the elements of an 8-year aggravated § 1001 offense are supported by overwhelming and uncontroverted evidence, we conclude that the district court's *Apprendi* error is harmless beyond a reasonable doubt.

We acknowledge that there is something deeply unsatisfying about this result. As Justice Scalia observed in his partial dissent in *Neder*, it is bizarre that a deprivation of the jury right, which reflects a distrust of judges to adjudicate criminal guilt, can be set aside as harmless when we judges find the result sufficiently clear. 527 U.S. at 32, 119 S.Ct. 1827 (Scalia, J., dissenting in part). It creates an inescapable irony, "in which the remedy for a constitutional violation by a trial judge (making

the determination of criminal guilt reserved to the jury) is a repetition of the same constitutional violation by the appellate court (making the determination of guilt reserved to the jury)." *Id.* And, as Justice Ginsburg noted in her *Recuenco* dissent, it is particularly unsettling in this context, when the defendant, "charged with one crime ... was convicted of another **\*324** ... *sans* charge, jury instruction, or jury verdict." 548 U.S. at 229, 126 S.Ct. 2546 (Ginsburg, J., dissenting).

Such a practice "diminishes the jury's historic capacity 'to prevent the punishment from getting too far out of line with the crime.' " *Id.* (quoting *United States v. Maybury,* 274 F.2d 899, 902 (2d Cir. 1960) (Friendly, J.)). But these arguments did not prevail and are not the law. Instead, we are bound by the majority opinions that rejected them, opinions holding that (1) omission of an element is harmless if evidence of the element is overwhelming and uncontroverted and (2) that the rule applies to all elements, including sentencing factors. And that resolves this case.

We also take some solace in the fact that this rule, properly applied, is a narrow one. It demands the government prove, beyond a reasonable doubt, that the jury would have convicted—also beyond a reasonable doubt—had the aggravating factor been submitted to them. This requires considering both record evidence and possible exculpatory evidence the defendant might have submitted if the crime had been properly charged. And if there is any reasonable possibility that a juror might have chosen not to convict, then the error was not harmless. Here, the aggravating factor is conclusively shown by evidence of unquestioned authenticity, and Legins has conceded—even after learning of the *Apprendi* issue—that it was, as a factual matter, satisfied. So the evidence is truly "overwhelming" and "uncontroverted," and Legins's *Apprendi* challenge is purely formalistic and procedural. We reaffirm that an *Apprendi* error is harmless under these narrow circumstances. [21]

### C. The Sentence Imposed was Reasonable

Legins also challenges his sentence as unreasonable. We review the reasonableness of the district court's sentence under "a deferential abuse-of-discretion standard," even if the sentence is within the guidelines range. *Gall v. United States,* 552 U.S. 38, 41, 128 S.Ct. 586, 169 L.Ed.2d 445 (2007).

First, Legins argues that the district court erred in "departing" upwards from the guidelines sentence. But the district court did not grant an upward *departure,* it granted an upward *variance.* "Departures are enhancements of, or subtractions from, a guidelines calculation 'based on a specific Guidelines departure provision.' ... Variances, in contrast, are discretionary changes to a guidelines sentencing range based on a judge's review of all the § 3553(a) factors ...." *United States v. Brown,* 578 F.3d 221, 225–26 (3d Cir. 2009). Because the district court granted a variance and not a departure, Legins's arguments that U.S.S.G. §§ 2J1.2 and 5K2.7 did not justify a departure are irrelevant.

Next, Legins argues that the district court erred in finding that he had committed certain sexual acts with B.L. in March and May 2018. The district court found that during the March incident, "Defendant at least engaged in consensual sexual contact with B.L., including masturbation, **\*325** that constitutes a violation of 18 U.S.C. § 2244(a)(4)." Memorandum Order at 13, *United States v. Legins,* No. 3:19-cr-00104-DJN-1 (E.D. Va. June 30, 2020), ECF No. 171. During the May incident, the court found that "Defendant consensually penetrated B.L.'s anus with his penis." *Id.* at 17.

In selecting a sentence, a court may rely on aggravating—or mitigating—facts found by only a preponderance of the evidence. *United States v. Grubbs,* 585 F.3d 793, 798–99 (4th Cir. 2009). We review those factual findings for clear error. *United States v. Savage,* 885 F.3d 212, 225 (4th Cir. 2018). Clear error exists when "after reviewing all the evidence, we are 'left with the definite and firm conviction that a mistake has been committed.' " *United States v. Steffen,* 741 F.3d 411, 415 (4th Cir. 2013) (quoting *United States v. May,* 359 F.3d 683, 688 (4th Cir. 2004)). "When reviewing factual findings for clear error, '[w]e

particularly defer to a district court's credibility determinations, for it is the role of the district court to observe witnesses and weigh their credibility ....' " *United States v. Palmer*, 820 F.3d 640, 653 (4th Cir. 2016) (quoting ⚑ *United States v. Abu Ali*, 528 F.3d 210, 232 (4th Cir. 2008)).

First, there was substantial evidence that some form of sexual contact occurred between Legins and B.L. during the March incident. To begin with, B.L.'s testimony that he was forced to perform oral sex on Legins may be adequate under a preponderance standard even if not corroborated by physical evidence. The district court believed that B.L. was a credible witness, a credibility determination to which we owe great deference. Furthermore, surveillance footage from that day shows B.L. and Legins entering the unmonitored area in which the elevator was located, where they remained for 5 minutes. Finally, the sweatshirt that B.L. was shown to be wearing in that footage tested positive for Legins's DNA. The district concluded, based on this evidence, that it was more likely than not that some form of sexual contact occurred between B.L. and Legins on March 16, 2018. We are not "left with the definite and firm conviction" that this was error.

And, as we have already discussed, there was also substantial evidence that some form of sexual encounter—consensual or otherwise—occurred between Legins and B.L. on May 10, 2018. For the same reasons that the jury possessed sufficient evidence to conclude beyond a reasonable doubt that such an act occurred, the court did not clearly err in finding so by a preponderance of the evidence.

Finally, Legins argues that "[t]he use of acquitted crimes [i.e., the March and May sexual incidents] to calculate an initial guideline range deprives a defendant of his Sixth Amendment right to a sentence wholly authorized by the jury's verdict." Op. Br. of Appellant 35. Legins's argument is incorrect on both the facts and the law. Factually, Legins is incorrect that the district court used acquitted conduct to calculate his initial guideline range. The district court calculated Legins's initial guidelines range as 27–33 months, based solely on the ⚑ § 1001 false-statement conviction. He then varied upward based on Legins's sexual misconduct, using the Sentencing Guidelines as a guide to determine how large an upward variance he should grant. [22]

**\*326** Legally, Legins is incorrect that the district court's consideration of acquitted conduct in calculating his sentence abridges his Sixth Amendment rights. The Supreme Court has expressly held the opposite, as have we. *See* ⚑ *United States v. Watts*, 519 U.S. 148, 157, 117 S.Ct. 633, 136 L.Ed.2d 554 (1997) ("We therefore hold that a jury's verdict of acquittal does not prevent the sentencing court from considering conduct underlying the acquitted charge, so long as that conduct has been proven by a preponderance of the evidence."); ⚑ *Grubbs*, 585 F.3d at 799 ("[A] sentencing court may consider uncharged and acquitted conduct in determining a sentence ...."). As the Supreme Court has discussed, district courts have broad discretion to impose sentences fully reflecting the defendant's "background, character, and conduct." ⚑ *Watts*, 519 U.S. at 151, 117 S.Ct. 633 (quoting 18 U.S.C. § 3661). This discretion includes the ability to examine the defendant's pertinent good conduct, as well as his pertinent bad conduct—which of course includes related criminal activity. Just as a judge may reduce a defendant's sentence upon finding that he has a "history of service to our country" and makes "contributions to his religious community," J.A. 1058, so too may the judge increase the defendant's sentence upon finding that he sexually abused a ward. [23]

We thus conclude that Legins's sentence was reasonable.

*  *  *

The district court erred in applying the statutory enhancement without an authorizing jury verdict. Doing so violated Legins's constitutional rights under ⚑ *Apprendi*. But that error does not warrant reversal under ⚑ *Recuenco* and ⚑ *Neder*. As Legins's remaining claims for relief lack merit, the district court's judgment is

AFFIRMED.

**All Citations**

34 F.4th 304

## Footnotes

1 According to B.L., there were also prior incidents of sexual harassment in which Legins masturbated in his presence.

2 Petersburg's IT officer testified at trial that based on the prison's data logs, no one tried to access that computer during the time of the May incident.

3 18 U.S.C. § 2243(b) ("Whoever ... knowingly engages in a sexual act with another person who is— (1) in official detention; and (2) under the custodial, supervisory, or disciplinary authority of the person so engaging; or attempts to do so, shall be fined under this title, imprisoned not more than 15 years, or both.").

4 18 U.S.C. § 2241(a) ("Whoever ... knowingly causes another person to engage in a sexual act—(1) by using force against that other person; or (2) by threatening or placing that other person in fear that any person will be subjected to death, serious bodily injury, or kidnapping; or attempts to do so, shall be fined under this title, imprisoned for any term of years or life, or both.").

5 18 U.S.C. § 242 ("Whoever ... willfully subjects any person ... to the deprivation of any rights, privileges, or immunities secured or protected by the Constitution or laws of the United States ... shall be fined under this title or imprisoned not more than one year, or both."). The indictment alleged that Legins's conduct constituted "cruel and unusual punishment." J.A. 26.

6 18 U.S.C. § 1001(a) ("[W]hoever, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully ... (2) makes any materially false, fictitious, or fraudulent statement or representation ... shall be fined under this title[and] imprisoned not more than 5 years .... If the matter relates to an offense under chapter 109A, 109B, 110, or 117, or section 1591, then the term of imprisonment imposed under this section shall be not more than 8 years.").

7 In *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), the Supreme Court held that "any fact (other than prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt." *Id.* at 476, 120 S.Ct. 2348 (quoting *Jones v. United States*, 526 U.S. 227, 243 n.6, 119 S.Ct. 1215, 143 L.Ed.2d 311 (1999)).

8 If the 5-year statutory maximum had applied, the guidelines range would have been 15–21 months. U.S.S.G. Ch. 5 Pt. A.

9 Section 2J1.2(c) provides that a defendant whose lies obstruct a criminal investigation is to be sentenced under § 2X3.1 as an accessory after the fact if doing so results in a higher sentence. The proper range under § 2X3.1 varies based on the severity of the underlying crime. The court found that, based on Legins's conduct in May, the range under § 2X3.1 would be lower than that provided in § 2J1.2, and so it did not apply.

10    While the jury acquitted Legins of sexual misconduct, the court could still find at sentencing that misconduct occurred. This stems from the different standards of proof required at those two stages. The jury must acquit the defendant unless his guilt is established beyond a reasonable doubt. *See, e.g.,* ⚑ *In re Winship*, 397 U.S. 358, 361–62, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). But at sentencing, the court considers all aggravating and mitigating information based on the preponderance of the evidence—i.e., that it probably happened. *See* ⚑ *United States v. Grubbs*, 585 F.3d 793, 798–99 (4th Cir. 2009).

11    Legins argues that proving that his statements were false for a reason other than that alleged in the indictment would constitute an impermissible constructive amendment of the indictment. *Cf.* ⚑ *Stirone v. United States*, 361 U.S. 212, 218–19, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960). A constructive amendment occurs when the government or court broadens the possible bases for conviction beyond those presented to the grand jury. *United States v. Cannady*, 924 F.3d 94, 99 (4th Cir. 2019). As explained below, sufficient evidence supports finding that Legins committed a sexual act on an inmate and thus that his statements were indeed false for the reasons alleged in the indictment. We thus need not decide whether his theory—that the government was limited by those reasons for falsity alleged in the indictment—is correct as a legal matter.

12    Although not express, the structure of the indictment suggests that the two reasons for falsity are each paired with one of Legins's two allegedly false statements.

13    While a single witness's uncorroborated account usually suffices, there are exceptions. Most notably, there is a "deeply rooted" common-law rule that a person cannot be convicted of perjury "solely upon the evidence of a single witness." *Weiler v. United States*, 323 U.S. 606, 608–09, 65 S.Ct. 548, 89 L.Ed. 495 (1945). Although ⚑ § 1001 bears some similarity to perjury (18 U.S.C. § 1621) as they both penalize material false statements, the Supreme Court has made clear that the two-witness rule derives from the "special considerations" granted to "witnesses compelled to testify in trials at law." *Weiler*, 323 U.S. at 609, 65 S.Ct. 548. ⚑ Section 1001 does not apply to witness testimony. ⚑ *Hubbard v. United States*, 514 U.S. 695, 714–15, 115 S.Ct. 1754, 131 L.Ed.2d 779 (1995). Accordingly, as our sister circuits have largely held, perjury's special two-witness rule does not apply to ⚑ § 1001. *See* ⚑ *Fisher v. United States*, 231 F.2d 99, 105–06 (9th Cir. 1956); *United States v. Killian*, 246 F.2d 77, 82 (7th Cir. 1957).

14    The jury could convict Legins of making a false statement if either of Legins's statements were false, though they ultimately concluded that both were. *See United States v. Dennis*, 19 F.4th 656, 671 (4th Cir. 2021) ("[I]ndictments charge in the conjunctive, but proof in the disjunctive is enough to convict"). Similarly, we may affirm if either of the jury's decisions are supported by sufficient evidence. *See* ⚑ *Griffin v. United States*, 502 U.S. 46, 57, 112 S.Ct. 466, 116 L.Ed.2d 371 (1991). We conclude that both are.

15    For the counts of deprivation of rights under color of law, ⚑ 18 U.S.C. § 242, and aggravated sexual abuse, ⚑ 18 U.S.C. § 2241(a), "sexual act" meant only penetrative sex or contact between the mouth and penis. For the two counts of sexual abuse of a ward, ⚑ 18 U.S.C. § 2243(b), "sexual act" meant penetrative sex, digital penetration, contact between the mouth and penis, or contact between the mouth and anus. So the sexual-abuse counts could not be predicated solely on masturbation.

16    It is inconsequential that whether a matter "relates to an offense under Chapter 109A" contains an inherent legal conclusion. Because it increases the statutory maximum sentence, it is an element of the offense. *See* ⚑ *Alleyne*, 570 U.S. at 107–08, 133 S.Ct. 2151. And all elements, even those involving a mixed question of law and fact, must be

determined by the jury. *See* *United States v. Gaudin*, 515 U.S. 506, 512, 115 S.Ct. 2310, 132 L.Ed.2d 444 (1995) (holding that a jury must decide whether a false statement under § 1001 is "material").

17 Materiality under § 1001 is a low bar. It merely requires that the statement have "a natural tendency to influence, or is capable influencing, the decision-making body to which it was addressed." *United States v. Hamilton*, 699 F.3d 356, 362 (4th Cir. 2012) (quoting *United States v. Littleton*, 76 F.3d 614, 618 (4th Cir. 1996)). So a false statement about sexual misconduct could be material to (i.e., capable of influencing) an investigation unrelated to sexual misconduct.

18 The government did not expressly argue in its response brief that the *Apprendi* error was harmless, first raising it in response to questioning at oral argument. As a general matter, we do not consider issues raised for the first time at oral argument. *See* *United States v. Cornell*, 780 F.3d 616, 625 n.2 (4th Cir. 2015). We have not yet addressed "head on" whether the government's failure to argue harmless error in its briefing waives the application of the doctrine. *See* *United States v. Brizuela*, 962 F.3d 784, 798 n.10 (4th Cir. 2020). On one hand, "[o]ur case law is clear that 'parties cannot waive the proper standard of review by failing to argue it.' " *United States v. Venable*, 943 F.3d 187, 192 (4th Cir. 2019) (quoting *Sierra Club v. U.S. Dep't of the Interior*, 899 F.3d 260, 286 (4th Cir. 2018)). On the other, we have stated in dicta that harmless error review can be waived. *See* *United States v. Hall*, 858 F.3d 254, 280 n.8 (4th Cir. 2017). We need not resolve this tension here. Waiver is a discretionary doctrine, and we retain "inherent authority to consider and decide pertinent matters that otherwise may be ignored as abandoned or waived." *United States v. Holness*, 706 F.3d 579, 592 (4th Cir. 2013).

We elect to exercise that authority here, for three reasons. First, Legins's presentment of the *Apprendi* issue in his opening brief was far from clear. Rather than raise it as a distinct issue under its own heading, he included it briefly alongside the Due Process challenge based on comments made during arraignment. The Government then raised harmless error in response to the arraignment issue, but not the *Apprendi* issue. Resp. Br. of Appellee 31. Given the messiness of the briefing, we are inclined to give both parties some leeway; we have been generous in our construction of Legins's arguments, and it seems only fair to afford the government similar grace. Second, the harmless-error issue does not turn on complicated or unclear facts. *See* *Holness*, 706 F.3d at 592 (noting that looking past waiver is more appropriate where "the facts have been sufficiently developed to readily permit evaluation of an alternative legal theory"). Third, Legins argued in his opening brief that the *Apprendi* issue was not harmless. Op. Br. of Appellant 22–23. So this is not a case in which a party is blindsided by an eleventh-hour argument. *Cf.* *United States v. Ashford*, 718 F.3d 377, 380–81 (4th Cir. 2013). Legins recognized that harmless error was the applicable standard and took the opportunity to argue under it.

19 In *Catone*, we ultimately concluded that the *Apprendi* error was not harmless because there was not "overwhelming evidence" that Catone fraudulently acquired more than $1,000 in benefits. *Id.* at 875.

20 The transcript of the interview was not admitted into evidence, though it was used as an aid for the jury as they listened to the audio recording of the interview, which was admitted by stipulation of the parties.

21 Though not entirely clear, Legins also seems to suggest that the government's statement during arraignment that he was only subject to a 5-year maximum on the false-statement count constitutes a separate reversible error. *See* Op. Br. of Appellant 20. And Rule 11(b)(1)(H) requires that a defendant be informed of the maximum possible sentence before entering a guilty or *nolo contedere* plea, but Legins did not enter such a plea. And even if that rule applied here, the error

would be harmless because Legins's sentence is less than the 5-year maximum he was notified of during arraignment. *See* 🚩 *Bell v. United States*, 521 F.2d 713, 715 (4th Cir. 1975).

22    This is an acceptable practice. The Guidelines "reflect the collected wisdom of various institutions," 🚩 *United States v. Goff*, 501 F.3d 250, 257 (3d Cir. 2007), and "it is fair to assume that the Guidelines, insofar as practicable, reflect a rough approximation of sentences that might achieve 🚩 § 3553(a)'s objectives," 🚩 *Rita v. United States*, 551 U.S. 338, 350, 127 S.Ct. 2456, 168 L.Ed.2d 203 (2007). Judges, when varying upward based on uncharged or acquitted conduct, may look to that gathered wisdom to guide their discretion.

23    Legins also appears to generally challenge the district court's weighing of the 🚩 § 3553(a) sentencing factors given the mitigating arguments Legins made. We find no error.

---

**End of Document**                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.